ALLISON LAPLANTE, OSB No. 023614
BRIDGETT BUSS, OSB No. 204997
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6894, laplante@lclark.edu
(503) 768-6825, bridgettbuss@lclark.edu

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit organization, | Case No. 3:21-cv-01591-HZ |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES NATIONAL MARINE FISHERIES SERVICE, a United States Government Agency, BARRY THOM, in his official capacity as NMFS Regional Administrator for the West Coast Region, THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency, and MICHAEL REGAN, in his official capacity as EPA Administrator, | (Pursuant to Administrative Procedure Act, Endangered Species Act) |
| Defendants. | |

FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      Plaintiff Northwest Environmental Advocates ("NWEA" or "Plaintiff") brings this action for declaratory and injunctive relief against the United States National Marine Fisheries Service, Barry Thom, in his official capacity as National Marine Fisheries Service Regional Administrator for the West Coast Region (together, "NMFS"), the U.S. Environmental Protection Agency, and Michael Regan, in his official capacity as Administrator for the Environmental Protection Agency (together, "EPA") (collectively, "Defendants"), pursuant to the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and the citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g).

2.      Actions taken by EPA related to its proposed approval of water quality standards developed by the State of Oregon under the federal Clean Water Act ("CWA") for temperature and intragravel dissolved oxygen run the risk of jeopardizing threatened and endangered species that depend upon habitat of the Willamette, Columbia, and other Oregon-based rivers and tributaries for spawning, rearing, migration, and a number of other uses. Specifically, EPA's actions impact Lower Columbia River Chinook salmon ("LCR Chinook"), Upper Willamette River Chinook salmon ("UWR Chinook"), Upper Columbia River spring Chinook ("UCR spring Chinook"), Snake River spring/summer Chinook ("SR S/S Chinook"), Snake River sockeye salmon ("SR Sockeye"), Lower Columbia River steelhead ("LCR steelhead"), Middle Columbia River steelhead ("MCR steelhead"), Upper Columbia River steelhead ("UCR steelhead"), Upper Willamette River steelhead ("UWR steelhead"), and Snake River Basin steelhead ("SRB steelhead") (collectively, "imperiled salmon and steelhead" or the "impacted species")—among the Pacific Northwest's iconic salmonid species that depend on cold, clean water for their survival.

3. Under the ESA, EPA was required to formally consult with NMFS regarding the impacts to ESA-listed species from EPA's decision to approve Oregon's temperature water quality standards, such as the 20°C criterion for salmonid migration corridors. The requirement for "formal consultation" is described under 50 C.F.R. § 402.14(a). This provision details the requirement that whenever a federal agency determines that a proposed action may affect one or more listed species, it must prepare and provide to NMFS and/or the United States Fish and Wildlife Service (together, "the Services"), depending on the species present, a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(a)(2), (c); 50 C.F.R. § 402.14(a).

4. On November 3, 2015, NMFS rendered its biological opinion ("2015 Biological Opinion") for EPA's proposed action—approval of Oregon's water quality standards for temperature and intragravel dissolved oxygen. That biological opinion is arbitrary, capricious, and not in accordance with law under section 706(a)(2) of the APA, 5 U.S.C. § 706(2)(A), because it (among other flaws) incorrectly concluded that the salmon and steelhead migration criterion in Oregon's temperature water quality standard would not jeopardize the imperiled species when modified by NMFS's reasonable and prudent alternative ("RPA") because that RPA was insufficient to impact baseline conditions underlying the initial finding of jeopardy, because it failed to explain how the RPA would avoid jeopardy, and because its finding of no jeopardy relied upon improper factors.

5. Under section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), EPA is required to ensure that its actions are not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species. Here, EPA is in violation of ESA section 7(a)(2) for failing to ensure that the salmon

and steelhead migration criterion in Oregon's temperature water quality standard does not jeopardize ESA-listed salmon and steelhead and their critical habitat, and for failing to implement a sufficient RPA to avoid jeopardy and adverse modification.

6. Additionally, EPA failed to reinitiate ESA consultation as required under 50 C.F.R. § 402.16, when reinitiation was triggered by exceeding the take limit specified in the 2015 Biological Opinion, and when the intent of the RPA was modified by a letter from NMFS to EPA on December 18, 2020 ("December 2020 Letter").

7. NWEA seeks an order holding unlawful and setting aside relevant portions of NMFS's 2015 Biological Opinion under section 706(a)(2) of the APA, 5 U.S.C. § 706(2)(A).

8. NWEA seeks an order requiring EPA to reinitiate ESA consultation with NMFS under 50 C.F.R. § 402.16.

9. NWEA also seeks an order declaring that (1) EPA violated section 7(a)(2) of the ESA by failing to avoid jeopardy to imperiled salmon and steelhead in its decision to approve Oregon's temperature water quality standards; and (2) EPA violated the ESA by failing to reinitiate consultation with NMFS, thereby failing to ensure against jeopardy.

10. Finally, NWEA seeks an order awarding NWEA its costs of litigation, including its reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(4).

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 5 U.S.C. §§ 701 *et seq.* (APA judicial review), and 16 U.S.C. § 1540(g) (ESA citizen suit provision). NWEA has challenged a final agency action as defined by the APA, 5 U.S.C. § 551(13).

12. As required by ESA section 11(g)(2)(A)(i), 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiff gave notice of the violations alleged in this amended complaint and Plaintiff's intent to sue under the ESA more than 60 days prior to the filing of this first amended complaint. A copy of Plaintiff's original notice letter, dated November 16, 2021, is attached to this First Amended Complaint as Exhibit 1. Defendants have not remedied the violations alleged in this First Amended Complaint, and Defendants' violations are continuing in nature.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in Oregon.

14. Pursuant to Local Rule 3-2(b), Divisional Venue is proper in this Court because a substantial part of the events and omissions giving rise to NWEA's claims occurred in Multnomah County.

**PARTIES**

15. NWEA is a non-profit environmental organization founded in 1969 and based in Portland, Oregon. NWEA's mission is to work through advocacy and education to protect and restore water quality and wildlife habitat in the Pacific Northwest and nationwide. NWEA has spent decades working to improve water quality programs and protect threatened and endangered species from water pollution and degraded habitat, in particular water temperatures unsafe for cold-water species including salmon and steelhead.

16. NWEA and its members use and enjoy the waters of Oregon for recreational, scientific, aesthetic, and commercial purposes. NWEA and its members particularly enjoy observing, studying, and photographing endangered and threatened species such as salmon and steelhead. A number of NWEA's members would like to recreationally fish for salmon and steelhead, but do not currently do so due to the threatened and endangered status of these species.

17.     NWEA and its members are harmed by NMFS's insufficient biological opinion addressing EPA's approval of Oregon's temperature water quality standard. The imperiled salmon and steelhead are particularly sensitive to water temperature, and thus NMFS's failure to issue a legally and scientifically sound biological opinion, NMFS's and EPA's failure to ensure that Oregon's temperature water quality standard does not jeopardize the impacted species, and EPA's failure to reinitiate ESA consultation are directly contributing to the continued decline of those species' populations in Oregon and their enjoyment by NWEA and its members.

18.     NWEA and its members have experienced, and without the relief sought by this case, will continue to experience the impairment of their ability to observe and someday recreationally engage with the imperiled salmon and steelhead species in their native habitat; diminished aesthetic, recreational, and spiritual enjoyment of waters known to provide habitat to those species resulting from their knowledge that the species are in jeopardy of extinction; and other injuries stemming from the increased risk of harm to the imperiled salmon and steelhead species because Oregon's EPA-approved temperature water quality standard is likely to jeopardize the continued existence of these species and negatively impact their critical habitat absent modification by an RPA or other action that sufficiently mitigates the underlying adverse baseline conditions. Unless the relief requested is granted, NWEA and its members will continue to be adversely affected and irreparably injured by the continued harm to these very important fish.

19.     NWEA's injuries are fairly traceable to NMFS's conduct. NMFS's issuance of the flawed biological opinion, and NMFS's resulting failure to ensure against jeopardy to the imperiled salmon and steelhead species or adverse modification to the species' habitat, has allowed adoption of, without proper mitigation measures in place, less protective water quality

standards for temperature than are needed for the species to survive and flourish, thereby exposing the species to excessive high river temperatures; increasing the risk of their continued decline; and impairing NWEA and its members' aesthetic, recreational, and other interests in the impacted species.

20. NWEA's injuries are also fairly traceable to EPA's conduct. Even if NMFS's RPA were sufficient to avoid jeopardy, which NWEA contests, EPA failed to timely implement the RPA from NMFS's flawed biological opinion and ensure against jeopardy to the imperiled salmon and steelhead species or destruction or adverse modification to the species' habitat. EPA also failed to reinitiate ESA consultation when reinitiation was triggered by exceedance of the incidental take limit and the modification of the agency action caused by the delay in implementation of the RPA, as well as the subsequent reinterpretation of the RPA through the December 2020 letter. These actions have impaired NWEA and its members' aesthetic, recreational, and other interests in the impacted species.

21. NWEA's injuries would be redressed by the relief that NWEA seeks in this case. Vacatur and remand of the unlawful portions of the 2015 Biological Opinion would require NMFS to revise or reissue the biological opinion, potentially resulting in the issuance of a sufficiently protective RPA to further protect the species, thereby reducing the temperature pollution threats to Columbia, Willamette, and Snake River salmon and steelhead, as well as other population segments impacted by those rivers, and redressing NWEA's and its members' injuries.

22. The defendants in this action are the United States National Marine Fisheries Service, Barry Thom, in his official capacity (together, "NMFS"), the United States Environmental Protection Agency, and Michael Regan, in his official capacity (together,

"EPA"). NMFS is an agency of the United States Department of Commerce responsible for administering the provisions of the Endangered Species Act for threatened and endangered marine and anadromous species, including the species of threatened and endangered salmon and steelhead that inhabit the Willamette River, Snake River, Columbia River, its estuary, and the Pacific Ocean. Barry Thom is sued only in his official capacity as the NMFS Regional Administrator for the West Coast Region, as successor in interest of William W. Stelle, Jr., the former Regional Administrator for the West Coast Region and responsible official who approved and signed the November 3, 2015 Biological Opinion challenged herein. EPA is a federal agency charged with the administration of the CWA. As a federal agency, EPA has a duty under the ESA to insure against jeopardy to ESA-listed species and destruction or adverse modification of their critical habitat. Michael Regan is sued only in his official capacity as the EPA Administrator.

## LEGAL BACKGROUND

### The Clean Water Act and Water Quality Standards

23. Congress adopted amendments to the CWA in 1972 in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife[.]" *Id*. § 1251(a)(2).

24. To meet these goals, the CWA requires states to identify and adopt water quality standards "[defining] the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria that protect the designated uses." *Id.* § 1313(a); 40 C.F.R. § 131.2. One such use includes the "protection and propagation of fish[.]" 40 C.F.R. § 131.2.

25. States must review applicable water quality standards at least once every three years, commonly referred to as a "triennial review." 33 U.S.C. § 1313(c)(1). Water quality standards must be sufficient to "protect the public health or welfare, enhance the quality of water, and serve the purposes of [the CWA]." 33 U.S.C. § 1313(c)(2)(A). The state must submit such water quality standards to EPA for review and subsequent approval or disapproval. *Id*. § 1313(c)(2), (3). A state-developed water quality standard does not become effective until EPA approves it. 40 C.F.R. § 131.21(c).

26. Water quality standards must include three elements: (1) one or more designated uses of a waterway; (2) numeric and narrative criteria specifying the water quality conditions, such as maximum amounts of toxic pollutants, maximum temperature levels, and the like, that are necessary to protect the designated uses; and (3) antidegradation policy requirements that ensure that uses dating to 1975 are protected and that high quality waters will be maintained and protected. 33 U.S.C. §§ 1313(c)(2), 1313(d)(4)(B); 40 C.F.R. Part 131, Subpart B. For waters with multiple use designations, the criteria must support the most sensitive use. 40 C.F.R. § 131.11(a)(1).

27. In addition to serving as the regulatory basis for permitted sources (termed "point sources") and nonpoint source controls for polluted runoff, water quality standards are the benchmarks by which the quality of a waterbody is measured. In particular, waterbodies that do not meet applicable water quality standards, or cannot meet applicable standards after the imposition of technology-based effluent limitations on point sources, are deemed to be "impaired" and placed on the CWA section 303(d) list. *See* 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.2(j). States must then develop Total Maximum Daily Loads ("TMDLs") for all 303(d)-

listed waters in order to establish the scientific basis for cleaning up water pollution that exceeds water quality standards.

28.     A TMDL is the total daily loading of pollutants for a particular waterbody or waterbody segment, and "shall be established at a level necessary to implement the applicable water quality standards with seasonal variation and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 131.21(c), (d). As with water quality standards, states submit TMDLs to EPA for approval or disapproval. *See* 33 U.S.C. § 1313(d)(2). In turn, section 303(d) requires that within 30 days after submission EPA must either approve the TMDLs or disapprove them and establish its own TMDLs for the effected waterbodies. *Id*.

### The Endangered Species Act

29.     The ESA applies to all federal agency actions "authorized, funded, or carried out by such agency," 16 U.S.C. § 1536(a)(2), including EPA's review and approval of state water quality standards.

30.     The purpose of the ESA is to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]" 16 U.S.C. § 1531(b). One overarching requirement of the ESA is that all federal departments and agencies must "seek to conserve" threatened and endangered species. 16 U.S.C. § 1531(c)(1). The terms "conserve" and "conservation" mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

31. The ESA requires the Secretary of Interior or Commerce to list species that the Secretary believes may become extinct in the near future as being either "threatened" or "endangered." 16 U.S.C. § 1533. A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

32. Section 7 of the ESA enumerates the substantive and procedural obligations of federal agencies with respect to listed species. 16 U.S.C. § 1536. All federal agencies must ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2).

33. The ESA's implementing regulations define "jeopardy" to an endangered or threatened species as "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. In meeting the duty to prevent jeopardy, each agency is required to use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

34. Agencies must also ensure that agency actions are not likely to "result in the destruction or adverse modification of [critical] habitat." *Id.*; *see also* 50 C.F.R. § 402.14(g)(4). This is a separate determination from whether the action will jeopardize the continued existence of threatened or endangered species.

35. Critical habitat includes areas that are "essential for the conservation of the species[.]" 16 U.S.C. § 1532(5)(A). Federal regulations define the "destruction or adverse

modification" of critical habitat as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species." 50 C.F.R. § 402.02.

36.     Whenever a federal agency determines that a proposed action may affect one or more listed species, it must consult with NMFS and/or the United States Fish and Wildlife Service (together, "the Services"), depending on the species present. 50 C.F.R. § 402.14(a). A federal agency proposing an action that "may affect" a listed species must prepare and provide to the relevant Service a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(a)(2), (c); 50 C.F.R. § 402.14(a).

37.     The "may affect" threshold that triggers section 7 consultation is low: "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (citing 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)).

38.     For those actions that may affect a listed species, the Services must review all information provided by the action agency, as well as any other relevant information, to determine whether the proposed action is likely to jeopardize a listed species or destroy or adversely modify its designated critical habitat. 50 C.F.R. § 402.14(g)–(h). This determination is set forth in a biological opinion from one or both of the Services. 50 C.F.R. § 402.14(h); 16 U.S.C. § 1536(b)(3)(A).

39.     In formulating a biological opinion, each Service must evaluate the "effects of the action" together with "cumulative effects" on the listed species. 50 C.F.R. § 402.14(g)(3)–(4). The Service must also add these effects to the "environmental baseline," which includes "past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have

already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in progress." 50 C.F.R. § 402.14(g)(4); 50 C.F.R. § 402.02. Finally, the Service must consider any "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

40. If, after analyzing these factors, the Service concludes that the proposed action is likely to jeopardize a listed species, or destroy or adversely modify its critical habitat, the Service must identify and describe any reasonable and prudent alternative, or RPA, to the proposed action that it believes would avoid jeopardy and destruction/adverse modification. 16 U.S.C. § 1536(b)(3)(A). If the Service believes there is no RPA, the biological opinion must so state. 50 C.F.R. § 402.14(h)(2).

41. If the Service finds that either a proposed action "or implementation of any [RPAs] and the resultant incidental take of listed species" will not cause jeopardy or destruction or adverse modification of critical habitat, it will also issue an incidental take statement ("ITS") for any take of a listed species that is likely to occur. 50 C.F.R. § 402.14(i). The ITS must include "reasonable and prudent measures" ("RPMs") that the Service finds necessary or appropriate to minimizing the likelihood of jeopardy, and must set forth terms and conditions that must be complied with to implement the RPMs. 16 U.S.C. § 1536(b)(4)(C). The ITS must also, among other things, "specif[y] the impact, i.e., the amount or extent, of such incidental taking on the species[.]" 50 C.F.R. § 402.14(i)(1)(i).

42. In addition to setting out the procedure for interagency consultation, section 7 of the ESA establishes the duty of all federal agencies to prevent jeopardy of listed species. 16 U.S.C. § 1536. Section 7(a)(2) provides the mandate that "[e]ach federal agency shall . . . insure

that any [federal] action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2). "Jeopardy" is not defined within the ESA itself, but the ESA implementing regulations clarify that to "[j]eopardize means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of the species in the wild by reducing the reproduction, numbers, or distribution of the species." 50 C.F.R. § 402.02.

43.     Agencies are also required to reinitiate consultation with the relevant Service in certain circumstances:

> Reinitiation of consultation is required and shall be requested by the federal agency or by the Service, where discretionary federal involvement or control over the action has been retained or is authorized by law, and
> (1) If the amount or extent of taking specified in the incidental take statement is exceeded;
> (2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
> (3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or
> (4) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16(a)(1–4).

44.     Section 9 of the ESA makes it unlawful for any person to "take" an endangered species of fish or wildlife. 16 U.S.C. § 1538(a)(1)(B). All "persons," including any "any officer, employee, agent, department, or instrumentality of the Federal Government" are subject to the ESA's take prohibition. 16 U.S.C. § 1532(13).

45.     Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. at § 1532(19). However, an action agency's compliance with the RPMs of an incidental take statement

authorizes the "incidental take" of listed species that will occur as a result of the agency's action. 16 U.S.C. § 1536(o)(2). "Incidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency[.]" 50 C.F.R. § 402.02.

46. Individual citizens may enforce ESA violations in order "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof." 16 U.S.C. § 1540 (g)(1)(A). Citizens must provide 60 days' notice of any alleged violations to the alleged violator and the Secretary of the Interior. *Id*. § 1540(g)(2)(A)(i). After 60 days have passed citizens may sue in federal district court to enforce against violations of the ESA. *Id*. § 1540(g)(3)(A).

**Judicial Review Under the APA**

47. The APA governs judicial review of agency decisions under the ESA that are not subject to the ESA's citizen suit provision. The APA provides a right of judicial review to persons "adversely affected or aggrieved by an agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702. The scope of this review is limited to "final agency action[s] for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

48. The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). Although finality is not defined in the APA, the Supreme Court has held that an agency action is considered "final" when it marks the "consummation of the agency's decisionmaking process" and the action is one by which "rights or obligations have been determined or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78

(1997). Issuance of a biological opinion by either of the Services marks the consummation of the

ESA section 7 consultation process, and is a final agency action subject to review under APA

section 702. *Id.* at 178.

49.     Under the APA, a reviewing court must set aside an agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). Arbitrary and capricious review under the APA requires a court to determine

"whether the agency considered the relevant factors and articulated a rational connection

between the facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v.

Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations omitted).

"A [biological opinion] may also be invalid if it fails to use the best available scientific

information as required by 16 U.S.C. § 1536(a)(2)." *Id.*

## FACTUAL BACKGROUND

### Salmonids and the Impact of Temperature

50.     Many Pacific Northwest salmonid species are listed as threatened or endangered

under the ESA. As EPA has noted,

> Water temperature is a critical aspect of the freshwater habitat of Pacific
> Northwest salmonids. Those salmonids listed as threatened or endangered under
> the ESA and other coldwater salmonids need cold water to survive. Human-
> caused increases in river water temperatures have been identified as a factor in the
> decline of ESA-listed salmonids in the Pacific Northwest.

EPA, *EPA Region 10 Guidance for Pacific Northwest State and Tribal Temperature

Water Quality Standards* (April 2003) at Forward (hereinafter "Regional Temperature

Guidance")[1]. Because cold-water salmonids are highly sensitive to in-stream

---

[1] Available at: https://nepis.epa.gov/Exe/ZyPDF.cgi/P1004IUI.PDF?Dockey=P1004IUI.PDF
(last visited January 20, 2022).

temperatures, "[w]ater temperatures significantly affect the distribution, health, and survival of native salmonids in the Pacific Northwest." *Id*. at 5.

51. Water temperatures at levels unsafe for salmonids are ubiquitous in Oregon and Washington. Forty-four percent of Oregon's river miles have been identified as not meeting water quality standards—listed on the state's EPA-approved CWA section 303(d) list—an increase from 33 percent in 2012. *See* Oregon DEQ, *Fact Sheet: 2018/2020 Integrated Report* (undated) at 2.[2] Of these, "[i]mpairment of the Fish and Aquatic Life use is the most commonly unsupported use. This is largely driven by non-attainment of the temperature criteria." *Id*. In Washington, 1,106 waterbody segments are listed on the state's EPA-approved 303(d) list for violating temperature water quality standards out of a total of 4,548 segments listed, a list last updated in 2012. *See* Letter from Daniel D. Opalski, Director, Office of Waters and Watersheds, EPA Region 10, to Heather Bartlett, Program Manager, Water Quality Division, Washington Ecology, Re: *Approval of Washington State 2012 303(d) List* (July 22, 2016).

52. A wide range of human impacts have caused in-stream temperatures to rise across the waters of the Pacific Northwest. These include: (1) removal of streamside vegetation that removes shade and makes streams more prone to warming due to erosion's impacts on the width of streams; (2) water withdrawals; (3) CWA section 402 permitted discharges from cities and industrial facilities, as well unpermitted return flows from irrigation; (4) modifications to the shape and complexity of streams, such as channelizing, straightening, and diking; (5) changes to upland water flows and groundwater; and (6) dams and their reservoirs. *See* Regional Temperature Guidance at 6–7.

---

[2] Available at: https://www.oregon.gov/deq/wq/Documents/2018-2020-IRFactSheet.pdf (last visited January 20, 2022).

53. Numerous studies have documented the impacts of temperature on salmon. *See e.g., id*. at 7–10. NMFS has attributed specific adverse effects on salmonids to increased temperatures, including increased juvenile mortality, increased susceptibility and exposure to diseases, impaired ability to avoid predators, altered migration timing, and changes in fish community structure that favor competitors of salmonids. *See id*. at 7. "NMFS included high water temperatures among risk factors related to the listings under the ESA of the following evolutionarily significant units (ESUs) of chinook salmon: Puget Sound, Lower Columbia River, Snake River spring/summer, and Upper Willamette (Myers et al. 1998). NMFS also noted high water temperatures in its analyses of risk factors related to the ESA listings of Upper Willamette River steelhead and Ozette Lake sockeye." *Id.*

54. Water temperatures of the Columbia and Snake Rivers have garnered much public attention in recent years. For example, in the summer of 2015, roughly 250,000 adult sockeye salmon died in the Columbia and Snake Rivers because excessively warm water prevented them from successfully migrating upstream.

**Oregon's Attempt to Address Temperature Standards in the 1990s**

55. Oregon began attempting to address the problem of temperature in the early 1990s. In its 1992 to 1994 Triennial Review of water quality standards, Oregon developed new standards for temperature, including numeric criteria for different life cycle stages of salmonid species that require different temperatures. For example, salmon and steelhead spawning is a more temperature-sensitive life cycle stage than rearing or migration, so water quality standards for spawning are typically set at cooler temperatures than water quality standards for rearing or migration.

56.     Oregon completed the revision of its water quality standards and sent them to EPA for approval on July 26, 1996. Among the numeric criteria was a 20°C (68°F) criterion for salmonid rearing and migration in the Lower Willamette River. On July 7, 1999, NMFS completed a biological opinion that concluded the standards were likely to adversely affect salmonids but, despite its concerns, it also concluded that the standards would not jeopardize the species based on certain promises made by Oregon. On July 22, 1999, EPA disapproved this 20°C criterion, but when the state failed to take action within 90 days of EPA's disapproval, as required by CWA section 303(c)(3), EPA took no action itself. 33 U.S.C. § 1313(c)(3).

57.     After three years, in April of 2001, NWEA sued EPA for failing to promptly promulgate the replacement temperature criterion for salmonid rearing and migration in the Lower Willamette River. The district court concluded that EPA was under a nondiscretionary duty to act and that it had failed to act "promptly" as required by the statute. *Nw. Envtl. Advocates v. United States EPA (NWEA I),* 268 F. Supp. 2d 1255, 1261 (D. Or. 2003).

58.     In its 1996 temperature standards, Oregon also included a 17.8°C (64°F) criterion for salmon rearing but it did not indicate where and when this criterion applied. Both EPA and NMFS expressed concern about this missing information. The court in *NWEA I* held that EPA's approval of the temperature criteria without the missing information was arbitrary and capricious. *Id.* at 1267–68. The court also held that the no-jeopardy biological opinion by NMFS was arbitrary and capricious because it relied on state commitments that NMFS failed to demonstrate were likely to occur. *Id.* at 1273.

59.     The court then ordered EPA to rescind portions of its 1999 approval of Oregon's temperature standards and promulgate replacement standards or approve new Oregon standards by March 2, 2004. *Id.* at 1268.

60.     During the pendency of *NWEA I*, EPA Region 10 undertook to develop its Regional Temperature Guidance. The Guidance recommended numeric criteria and various narrative provisions to protect salmonids. *See* Regional Temperature Guidance at 25 (tables 3, 4). Among the recommended criteria is a 20°C criterion for salmonid migration that specifies the need to include a narrative criterion to accompany the numeric one. That recommendation was for states to include "a provision to protect and, where feasible, restore the natural thermal regime." *Id.* at 25. EPA explained the reason for this additional provision was that "rivers with significant hydrologic alterations (e.g., rivers with dams and reservoirs, water withdrawals, and/or significant river channelization) may experience a loss of temperature diversity in the river, such that maximum temperatures occur for an extended period of time and there is little cold water refugia available for fish to escape maximum temperatures." *Id*. at 29.

61.     With specific reference to the Columbia and Snake Rivers, the Regional Temperature Guidance stated:

> Although some altered rivers, such as the Columbia and Snake, experience similar summer maximum temperatures today as they did historically, there is a big difference between the temperatures that fish experience today versus what they likely experienced historically. Unaltered rivers generally had a high degree of spatial and temporal temperature diversity, with portions of the river or time periods that were colder than the maximum river temperatures. These cold portions or time periods in an otherwise warm river provided salmonids cold water refugia to tolerate such situations. The loss of this temperature diversity may be as significant to salmon and trout in the Columbia and Snake Rivers and their major tributaries as maximum temperatures. Therefore, protection and restoration of temperature diversity is likely critical in order for salmonids to migrate through these waters with minimal thermal stress.

*Id*. at 29–30.

## Oregon's Second Attempt to Address Temperature Standards

62.     Following the court's order in *NWEA I*, Oregon completed a wholesale revision of its water quality standards for temperature. Oregon revised its temperature standards to include

new numeric and narrative criteria, new policies for their implementation, maps to show the "where and when" of salmonid life cycle stages, and a provision that allowed Oregon—without any federal agency review—to change numeric criteria upwards if it determined that water temperatures were "naturally" hotter than those criteria. This last provision was termed the "natural conditions criterion." On December 10, 2003, Oregon submitted the new standards to EPA for approval and EPA engaged in a consultation pursuant to the ESA. Once again, NMFS found that the standards did not jeopardize the ESA-listed salmonid species. On March 2, 2004, EPA approved the new and revised standards.

63.     In December 2005, NWEA once again challenged EPA's approval of Oregon's new temperature standards and the Services' biological opinions. Complaint, *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, No. 3:05-cv-01876-AC, ECF No. 1. Among other aspects of the EPA action, NWEA challenged the agency's approval of the natural conditions criterion as circumventing the water quality standards-setting process established by section 303(c) of the CWA. In its order on summary judgment, the court held that the operation of the natural conditions criterion to supplant numeric criteria established to protect salmonids with a less protective standard was unlawful. *See Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency* (*NWEA II*), 855 F. Supp. 2d 1199, 1217 (D. Or. Feb. 28, 2012). The court also noted that the record contained evidence that waters that were naturally hotter than the numeric criteria also were far more complex, and that historical conditions that provided cold water refugia wherein salmonids could obtain relief from high temperatures no longer exist today. *Id.* ("The record indicates that waters with naturally higher temperatures were protective of salmonids because they also provided sufficient cold water refugia" but "many of Oregon's modern waterbodies have undergone dramatic changes and are no longer the rivers they once were.").

64.     While the court in *NWEA II* upheld EPA's approval of Oregon's 20°C numeric criterion, it expressed concern about whether it was adequately protective of the species:

> The court shares some of plaintiff's concerns regarding the uncertainty inherent in the approval of the 20C criterion and attendant narrative provision calling for sufficient coldwater refugia, and in the fact that the selected criteria [sic] is at the upper end of the range allowing successful migration.

*Id*. at 1214. The court reviewed EPA's rationale and noted that "NMFS advised the EPA that some migrating adults are present in waters governed by the 20C criterion during summer maximums. The NMFS found that migrating or holding adults would be exposed to higher temperatures in those rivers for more than a limited duration."[3] *Id*. at 1213 (citation omitted). But the court concluded that "EPA based its approval on Oregon's inclusion of the narrative criteria protecting and ensuring cold water refugia[,]" noting that "[c]old water refugia is [sic] crucial to the survival of salmonids in suboptimal temperatures." *Id*. at 1214. Finally, the court cited EPA's conclusion that "all rivers where this criterion apply are currently listed on Oregon's § 1313(d) [(section 303 (d))] list of impaired waters, so the refugia necessary to protect salmonids will be identified and restored during the TMDL [clean-up plan] process." *Id*.

65.     In April 2013, among other things, the court in *NWEA II* set aside and remanded EPA's approval of the natural conditions criterion and ordered EPA to take action consistent with its order on summary judgment. Stipulated Order on Narrative Water Quality Criteria and Antidegradation Internal Management Directive*, Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, No. 3:05-cv-01876-AC (April 10, 2013), ECF No. 370.

---

[3] In this context, "holding" is when individual salmon and steelhead temporarily hold (wait) in tributaries, deep pools, or other locations instead of continuing migration through sub-optimal conditions.

66.	The court also ruled that the biological opinions provided by the Services were hopelessly flawed. *NWEA II,* 855 F. Supp. 2d at 1222–1231. First, finding that overall, "NMFS' cursory review" was arbitrary, *id*. at 1223, and its "failure to discuss any impacts to the species' recovery" was likewise arbitrary, *id*. at 1224, the court then turned to the agency's evaluation of baseline conditions. The NMFS biological opinion found that "many of the biological requirements of the listed species were not being met under the environmental baseline for many streams and watersheds in Oregon. . . . conclud[ing] that '[a]ny further degradation of these conditions would significantly reduce the likelihood of survival and recovery of these species due to the status of the environmental baseline.'" *Id*. at 1224–25. But it impermissibly justified new criteria that were "above the appropriate range for threatened salmonids based on past violations of a lower temperature standard." *Id*. at 1225.

67.	The court specifically took NMFS to task for its rationalization that a 20°C temperature criterion was acceptable because it would be an improvement over current water temperatures, ordering the agency on remand to instead "make its jeopardy analysis on the *biological needs* of the listed salmonids." *Id*. at 1226 (emphasis added). The *NWEA II* court then remanded the NMFS biological opinion for further consideration and ordered EPA to take actions in response to new biological opinions. Stipulated Order on Nonpoint Source and Endangered Species Act Remedies*, Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, No. 3:05-cv-01876-AC (January 7, 2013), ECF No. 351.

68.	EPA subsequently disapproved Oregon's natural conditions criterion consistent with the court's order in *NWEA II*. *See* Letter from Danial D. Opalski, Director, Office of Water and Watersheds, EPA Region 10 to Gregory Aldrich, Oregon DEQ, Re: *Disapproval of Oregon's Water Quality Standards: Natural Conditions Criteria for Temperature OAR 340-041-*

*0028(8); Statewide Narrative Natural Conditions Criteria OAR 340-041-0007(2)* (August 8, 2013).

**The Consequences of EPA's Approval of Oregon's Superseding
Natural Conditions Criterion**

69.     In the interim, in 2012, NWEA challenged EPA's approval of Oregon temperature TMDL clean-up plans between February 11, 2004 and December 17, 2010. Complaint for Declaratory and Injunctive Relief, *Nw. Envtl. Advocates v. United States EPA,* 3:12-CV-01751-HZ (Sept. 27, 2012), ECF No. 1. The complaint alleged, *inter alia*, that based on the then-applicable natural conditions criterion, Oregon used these TMDLs to supplant the biologically-based numeric criteria and replace them with new superseding criteria as high as 32.5°C (90.5°F), a temperature that is lethal to salmon within seconds. *Id*. at 17–22.

70.     Once again, the court agreed with NWEA that EPA's actions—here, approving TMDLs that blessed dangerously high temperatures under the guise of their being "natural conditions"—was unlawful. *Nw. Envtl. Advocates v. United States EPA* (*NWEA III),* No. 3:12-CV-01751-HZ, 2017 WL 1370713, at *8–9 (D. Or. Apr. 11, 2017). Then, in December 2018, Judge Hernandez in *NWEA III* ordered that the temperature TMDLs be replaced. *Nw. Envtl. Advocates v. United States EPA,* No. 3:12-cv-01751-HZ 2018 WL 6524161, at *7 (D. Or. Dec. 12, 2018). Further briefing addressed the schedule by which the temperature TMDLs will be replaced including whether TMDLs that addressed primarily nonpoint source pollution from logging and farming should be given priority over those that include NPDES-permitted point sources. NWEA argued that since, unfortunately, Oregon does not use its TMDLs to control polluted runoff from nonpoint sources, priority should be established based on the number of point sources included. The court agreed: "the Court agrees with Plaintiff that the issuance of new TMDLs for river basins and subbasins in which a greater number of NPDES permits have

been issued should take priority over the TMDLs for basins in which fewer NPDES permits have been issued. Accordingly, the Court directs the State and EPA, after meaningful conferral with Plaintiff, to reformulate their proposed timeline to prioritize the issuance of TMDLs in such basins and subbasins." Order, *Nw. Envtl. Advocates v. United States EPA,* No. 3:12-cv-01751-HZ (June 11, 2019), ECF No. 200.

71.     In October 2020, the court in *NWEA III* ordered a final schedule for the replacement TMDLs including deadlines for EPA approval or disapproval ranging from January 15, 2024 through May 29, 2028. Order Amending Final Order and Judgment, *Nw. Envtl. Advocates v. United States EPA,* No. 3:12-cv-01751-HZ (October 19, 2020), ECF No. 224. Among the temperature TMDLs on the schedule are the following that include tributaries to the Columbia River: Southern Willamette Subbasins; Mid-Willamette Subbasins; Lower Willamette Subbasins; Willamette River mainstem and Major Tributaries; John Day Basin, Snake River-Hells Canyon; Lower Grande Ronde, Imnaha, and Wallowa Basins; Umatilla Basin-Walla Walla Subbasin; and the Willow Creek Subbasin. *Id.* at 2.

**Related Litigation to Address Temperature Pollution
from Oregon Nonpoint Sources**

72.     In addition to seeking to ensure that water quality standards for temperature are protective of cold-water species, in particular threatened and endangered species listed under the ESA, NWEA has sorrowfully concluded that Oregon does not use TMDLs to implement much-needed nonpoint source pollution controls. *See, e.g., NWEA III*, Third Declaration of Nina Bell in Support of Plaintiff's Consolidated Reply Brief on Remedies (June 22, 2018), ECF No. 180. For this reason, NWEA brought suit against EPA and the National Oceanic and Atmospheric Administration ("NOAA") in 2009 pursuant to the requirements of the Coastal Zone Act Reauthorization Amendments ("CZARA"). 16 U.S.C. § 1455b(a)(2) (CZARA requires that

states' coastal programs "be coordinated closely with State and local water quality plans developed pursuant to sections . . . 1313 . . . of Title 33," which includes water quality standards and TMDLs.); *see also id.* § 1455b(b)(3) (CZARA requires "additional management measures applicable to the land uses and areas identified . . . that are necessary to achieve and maintain applicable water quality standards under section 1313 of Title 33 and protect designated uses.").

73. Based on a legal opinion prepared by the Oregon Attorney General, the Oregon Department of Environmental Quality ("DEQ") committed to "develop Implementation Ready TMDLs, which is a new and novel approach to achieving and maintaining water quality standards" to demonstrate that it could directly implement TMDLs to control logging rather than rely on the Oregon Board of Forestry. Final Settlement Agreement, *NWEA v. Locke*, No. CV09-0017-PK (D. Or. Sept. 27, 2010) at 2–3.

74. Subsequent to the settlement agreement in this CZARA case, Oregon DEQ withdrew its pledge to use TMDLs to protect water quality from logging activities and other nonpoint sources of pollution in a 2013 letter. *See* Letter from Dick Pederson, Director, Oregon Dept. of Envtl. Quality, and Jim Rue, Director, Oregon Dept. of Land Conservation and Dev't, to Dan Opalski, EPA, and Margaret Davidson, NOAA (July 1, 2013). In response to Oregon's failure—since 1998—to demonstrate its ability to control nonpoint source polluted runoff from logging sufficient to protect water quality and cold-water species, EPA and NOAA disapproved Oregon's Coastal Nonpoint Source Pollution Control Program on January 30, 2015. Pursuant to the requirements of CZARA, EPA and NOAA informed Oregon on March 9, 2016 that the agencies were proceeding to withhold a portion of federal grant funds from Oregon, a penalty that now totals $8,171,040.

75.     Despite this federal penalty for failing to implement or revise logging practices to, among other things, "protect riparian areas for medium-sized and small fish-bearing (type "F") streams and non-fish-bearing (type "N") streams," in December 2021, the Oregon DEQ and the Oregon Department of Forestry ("ODF") signed a memorandum of understanding ("MOU") pertaining to the use of TMDLs to address logging practices that makes no mention of the DEQ legal authority to directly regulate logging activities, as described by the Oregon DOJ in 2010. Oregon DEQ/ODF, *Memorandum of Understanding: Oregon Department of Forestry – Oregon Department of Environmental Quality Collaboration on Achieving Water Quality Goals* (December 9, 2021).[4] The MOU also refers to DEQ's use of a statutory provision in which its governing body, the Oregon Environmental Quality Commission, may petition the Oregon Board of Forestry seeking changes to logging practices based on TMDLs. *Id.* at 6. This process has never been invoked.

**Hydroelectric Dams and the Columbia and Snake Rivers TMDLs**

76.     While logging, farming, and other land use activities significantly alter the temperatures of streams and rivers used for salmonid spawning, rearing, and migration, large hydroelectric dams on the Columbia and Snake Rivers have also had a significant impact on both water temperatures and their timing that, in turn, affect the primary use of these rivers as a migration corridor. In 2000, EPA began to develop TMDLs to address the high temperatures in the Columbia and Snake Rivers, in response to the Pacific Northwest states' having requested federal action. EPA released draft TMDLs in 2003, which identified dams on the Columbia and Snake Rivers as the primary contributors to high water temperatures, but it failed to issue final

---

[4] Available at: https://www.oregon.gov/deq/FilterDocs/odfDEQmou.pdf (last visited January 24, 2022).

TMDLs for over a decade, and even then, only did so after litigation was initiated in 2017 to address this failure.

77.    In February 2017, a group of organizations filed suit against EPA for failing to complete the Columbia and Snake Rivers TMDLs. *See* Complaint, *Columbia Riverkeeper, et al., v. Pruitt*, 2:17-CV-00289-RSM (February 23, 2017), ECF No. 1. The court held for the plaintiffs, and on August 13, 2021, EPA finalized its Columbia and Snake River Temperature TMDLs. U.S. Environmental Protection Agency, Region 10, Columbia and Lower Snake Rivers Temperature Total Maximum Daily Load (August 13, 2021).[5] The TMDLs identify 23 tributaries in the Lower Columbia River that provide cold water refuge from high mainstem river temperatures and sets temperature, flow, and cold water volume targets for 13 of these tributaries. TMDLs at 3. The TMDLs cite EPA's Cold Water Refuges Plan, noting that:

> Approximately 700,000 to 2,000,000 adult salmon and steelhead currently return from the ocean and migrate up the Columbia River past Bonneville Dam each year. Roughly 40% of these fish migrate when Columbia River water temperatures reach or exceed 20°C; consequently, they may endure adverse effects in the form of disease, stress, decreased spawning success, and lethality (EPA, 2003). To minimize exposure to warm temperatures in the Columbia River, adult salmon and steelhead temporarily move into CWRs [Cold Water Refuges] during their upstream migration. In the lower Columbia River, CWRs occur primarily where cooler tributary rivers flow into the Columbia River.

*Id*. at 37. In particular, migrating steelhead rely upon the cold water refuges: "[w]hen temperatures are 20°C or higher, approximately 60 - 80% of the steelhead use CWRs. Fall Chinook start to occupy CWRs at slightly warmer temperatures (20 - 21°C) and about 40% use cold water refuges when temperatures reach 21 - 22°C (Goniea et al. 2006)." *Id.*

---

[5] Available at: https://www.epa.gov/system/files/documents/2021-08/tmdl-columbia-snake-temperature-08132021.pdf (last visited January 20, 2022).

**The 2015 Biological Opinion—After Remand in *NWEA II***

78.     In 2015, NMFS issued a new biological opinion pursuant to the court order in *NWEA II*. NMFS, *Endangered Species Act Biological Opinion on the Environmental Protection Agency's Proposed Approval of Certain Oregon Water Quality Standards Including Temperature and Intergravel Dissolved Oxygen* (November 3, 2015) (the "2015 Biological Opinion"). The 2015 Biological Opinion evaluated the narrative criterion for 20°C salmonid migration corridors:

> In addition, these water bodies must have coldwater refugia that are sufficiently distributed so as to allow salmon and steelhead migration without significant adverse effects from higher water temperatures elsewhere in the water body. Finally, the seasonal thermal pattern in the Columbia and Snake Rivers must reflect the natural seasonal thermal pattern.

*Id*. at 173 (citing OAR 340-041-0028(4)(d)).

79.     This time around, NMFS determined that EPA's proposed approval of the 20°C criterion would result in jeopardy. *Id.* at 269.  It noted that EPA's biological evaluation had stated that "'USEPA expects the cold water refugia provision to be primarily considered in NPDES permits and TMDLs.'" *Id*. at 173. However, NMFS concluded that "DEQ has not implemented the narrative criterion for NPDES permits consistently, if at all." *Id*. With regard to implementation of the cold water refugia narrative criterion in TMDLs, NMFS evaluated two TMDLs that included waters covered by the 20°C migration criterion. The agency concluded that "[o]verall, the narrative criterion pertaining to CWR does not, to date, appear to be an effective means for minimizing the adverse effects likely to be experienced by migrating salmon and steelhead under the 20°C migration corridor criterion." *Id*. at 176.

80.     The NMFS 2015 Biological Opinion then set out certain RPAs pertaining to cold water refugia in the Columbia and Willamette Rivers. EPA was tasked with completion of a plan

for the Columbia River and Oregon DEQ was given the lead on the Willamette River plan, although "EPA ultimately is responsible for implementation of the RPA." *Id*. at 269. For each of the Willamette and the Columbia Rivers, the RPA calls for the development of a Cold Water Refugia Plan, the purpose of which is "to adequately interpret the narrative criterion to allow for implementation of the criterion through DEQ's Clean Water Act authorities." *Id.* at 270. Two pages of detailed requirements for the plan are set out in the RPA, but none requires that direct action be taken that may impact baseline river conditions to potentially reduce jeopardy to these species.

81. Even so, NMFS went on to determine that "it is our biological opinion that the proposed action *as revised by the RPA* is not likely to jeopardize the continued existence of [the imperiled salmon and steelhead species] or destroy or adversely modify critical habitat that we have designated for these species[.]" *Id*. at 274 (emphasis added).

82. Because NMFS produced a legally flawed biological opinion to support EPA's approval of Oregon's temperature water quality standards, it failed to ensure that the proposed action would not jeopardize the impacted species. Every day that passes with these unsafe water quality criteria in place poses more risk of injury and lethal harm to the imperiled species and thus more injury to NWEA and its members.

83. The NMFS 2015 Biological Opinion also contains an incidental take statement for the ESA-listed salmon and steelhead. NMFS stated that incidental take could not be accurately quantified as a number of fish because the action areas were too large, so it instead used habitat measures for the extent of take as surrogates for the amount of take, as well as "reinitiation triggers." *Id*. at 277–278. One of these surrogates was "the time required to complete the [CWR] plans for the Willamette and Columbia rivers," which was November 3, 2018. Another surrogate

was "the time required for DEQ to issue an administrative order or re-issue the NPDES permit for Dyno Nobel facility on the Columbia River[.]" *Id.* at 277–278. This deadline was November 3, 2017, two years from the signing of the 2015 Biological Opinion. *Id.* at 278.

84. EPA missed the November 3, 2018 Cold Water Refuge Plan deadline set out in the 2015 Biological Opinion; the Willamette Cold Water Refuge Study was not completed until March 18, 2020, and the Columbia Cold Water Refuge Plan was not completed until January 7, 2021. Similarly, the Dyno Nobel permit was not reissued until February 5, 2019. By failing to meet these deadlines for the Cold Water Refuge plans, and the Dyno Nobel permit's not having been reissued by the date identified in the 2015 Biological Opinion, EPA exceeded the take limit. Under 50 C.F.R. § 402.16(a)(1), EPA was required to reinitiate ESA consultation but failed to do so. Missing these deadlines also subsequently modified the RPA in a manner not considered in the 2015 Biological Opinion. This modification triggered reinitiation under 50 C.F.R. § 402.16(a)(3) because EPA's assumptions regarding the amount of take that would occur before the plans were issued was incorrect, because the plans were delayed, and the take limit was exceeded in an amount not contemplated in the 2015 Biological Opinion.

**The December 2020 Letter**

85. On December 18, 2020, NMFS sent a letter to EPA after EPA had requested confirmation from NMFS that its Columbia River Cold Water Refuge Plan and the Oregon DEQ's Lower Willamette River Cold Water Refuge Report satisfied the requirement of RPA measures in the NMFS 2015 Biological Opinion. The NMFS letter shifted the purpose of the 2015 Biological Opinion's RPA from "ensuring that the action's effects do not appreciably increase the risks to the species' potential for survival or to the species' potential for recovery[,]" 2015 Biological Opinion at 272, to merely "increasing understanding of how adult Endangered

Species Act listed salmon and steelhead are using cold water refuges as they migrate upstream through the lower Columbia and lower Willamette river," December 2020 Letter.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**

**NMFS's Violations of the APA, 5 U.S.C. § 706(2)(A):
Arbitrary and Capricious Biological Opinion**

86.     NWEA incorporates and realleges all preceding paragraphs as if fully set forth herein.

87.     In its 2015 Biological Opinion consulting on EPA's proposed approval of Oregon's temperature and intragravel dissolved oxygen water quality standards, NMFS determined that the proposed approval of those standards, as modified by NMFS's proposed RPA, would not jeopardize the impacted species or destroy or adversely modify their critical habitat. Relying upon the adoption of the RPA and its presumed ability to avoid jeopardy, NMFS issued an incidental take statement to EPA, allowing take by EPA in accordance with its terms.

88.     NMFS's 2015 Biological Opinion is a final agency action within the meaning of the APA, 5 U.S.C. § 704.

89.     NMFS's issuance of the 2015 Biological Opinion was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), for at least the following reasons:

(A)     NMFS reached its "no jeopardy" determination for the impacted species by relying on improper factors, including non-federal mitigation actions that are not reasonably certain to occur;

(B)     NMFS failed to articulate a rational connection between its findings in the 2015 Biological Opinion and its conclusion that approval of Oregon's temperature

water quality standard, as modified by NMFS' proposed RPA, would not

jeopardize the continued existence of the impacted species;

(C)     The ITS itself is invalid because it was issued based on the assumption that EPA

would adopt the RPA and the presumed sufficiency of the RPA to avoid jeopardy;

because the RPA was flawed and fails to avoid jeopardy, the ITS is flawed by

extension; and

(D)     NMFS's proposed RPA is insufficient to adequately reduce the impacts of EPA's

approval of Oregon's temperature water quality standard to avoid jeopardy, yet it

still provided EPA with an incidental take statement allowing additional take and

violating NMFS's obligation under section 7(a) of the ESA to avoid jeopardy.

90.     The Court should therefore hold unlawful and set aside the 2015 Biological

Opinion or relevant portions thereof pursuant to section 706(2) of the APA, 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**

**EPA's Violations of ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2):**
**Failure to Avoid Jeopardy and Destruction or Adverse Modification to Critical Habitat**

91.     NWEA incorporates and realleges all preceding paragraphs as if fully set forth

herein.

92.     EPA has the duty to "insure" that its actions are "not likely to jeopardize" species

or result in destruction or adverse modification to their critical habitat pursuant to ESA section

7(a)(2), 16 U.S.C. § 1536(a)(2).

93.     NMFS concluded in the 2015 Biological Opinion that the proposed action to

approve the 20°C temperature criterion, without the RPA, "is likely to appreciably reduce the

likelihood of survival and recovery" of LCR Chinook salmon, UWR Chinook salmon, SR

sockeye salmon, LCR steelhead, UWR steelhead, MCR steelhead, UCR steelhead, and SRB steelhead. 2015 Biological Opinion at 269. Without implementation of the RPA, which includes completion of the Cold Water Refuge Plans, "the proposed action is likely to jeopardize the continued existence of LCR Chinook salmon, UWR Chinook salmon, SR sockeye salmon, LCR steelhead, UWR steelhead, MCR steelhead, UCR steelhead, and SRB steelhead, and will destroy or adversely modify critical habitat that [NMFS] ha[s] designated for these species." *Id*.

94.     The RPA in the 2015 Biological Opinion is intended to avoid jeopardy and adverse modification to critical habitat; however, if the RPA fails to avoid jeopardy and adverse modification, EPA is still required to do so under ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2).

95.     EPA has failed to fulfill its independent obligation to ensure no jeopardy or destruction or adverse modification to critical habitat by relying on an insufficient RPA that does not prevent the 20°C temperature criterion from causing jeopardy to the imperiled salmon and steelhead or destruction or adverse modification to their critical habitat. This is evidenced by the 2015 Biological Opinion's finding of "jeopardy" *without the RPA*, and the impotence of the final plans to make any on-the-ground or in-the-water changes that would modify the bases of those findings.

96.     For at least these reasons, EPA is in violation of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2).

**THIRD CLAIM FOR RELIEF**

**EPA's Violations of ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2):
Failure to Reinitiate ESA Consultation**

97.     NWEA incorporates and realleges all preceding paragraphs as if fully set forth herein.

98. EPA is required to reinitiate ESA consultation when it has discretionary involvement or control over an action that is likely to adversely affect an ESA-listed species and reinitiation has been triggered. 50 C.F.R. § 402.16(a).

99. Reinitiation of ESA consultation is triggered if the amount or extent of take permitted by the ITS is exceeded. 50 C.F.R. § 402.16(a)(1).

100. Reinitiation of consultation is also required if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence. 50 C.F.R. § 402.16(a)(3).

101. EPA's decision to complete the Cold Water Refuge plans was discretionary because the RPA terms are not binding—the agency has the choice to embrace or reject the RPA, although it does so at its own peril. *See Bennett v. Spear*, 520 U.S. 154, 157 (1997).

102. NMFS used "the time required to complete the [Cold Water Refuge] plans for the Willamette and Columbia rivers" and "the time required for DEQ to issue an administrative order or re-issue the NPDES permit for Dyno Nobel facility on the Columbia River" as habitat measures for the extent of take as surrogates for the amount of take in the ITS of the 2015 Biological Opinion. *Id.* at 277–278.

103. EPA exceeded the amount of take specified in the ITS when it missed the November 2018 deadlines for the Willamette and Columbia River Cold Water Refuge plans, and when the Dyno Nobel permit was not reissued by the date identified in the 2015 Biological Opinion.

104. By failing to meet these deadlines, EPA exceeded the take limit, and under 50 C.F.R. § 402.16(a)(1), was required to reinitiate ESA consultation but failed to do so.

105.     EPA's missing the Cold Water Refuge plan deadlines triggered reinitiation under 50 C.F.R. § 402.16(a)(3). EPA's assumptions regarding the amount of take that would occur before the plans were issued were incorrect because the plans were delayed, and the take limit was exceeded in an amount not contemplated in the 2015 Biological Opinion.

106.     Additionally, NMFS's having issued the December 2020 Letter triggered reinitiation of ESA consultation because it modified the purportedly sufficient RPA to become insufficient by accepting the inadequate plans as meeting the intent of the RPA. The December 2020 Letter modifies the 2015 Biological Opinion because it changes the purpose of the RPA from "ensuring that the action's effects do not appreciably increase the risks to the species' potential for survival or to the species' potential for recovery[,]" 2015 Biological Opinion at 272, to "increasing understanding of how adult Endangered Species Act listed salmon and steelhead are using cold water refuges as they migrate upstream through the lower Columbia and lower Willamette river," December 2020 Letter.

107.     For at least these reasons, EPA is in violation of its obligation to reinitiate consultation pursuant to ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.16(a).

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, NWEA respectfully requests that this Court:

A.     Declare that NMFS's 2015 Biological Opinion for EPA's proposed approval of Oregon's 20ºC migration corridor criterion, or relevant portions thereof, is arbitrary, capricious, and not in accordance with law;

B.     Set aside the 2015 Biological Opinion or relevant portions thereof, including the inadequate reasonable and prudent alternative and incidental takes statement, and remand to

NMFS with instructions to issue a new biological opinion for EPA's approval of Oregon's 20ºC migration corridor criterion;

C.  Declare that EPA violated ESA section 7 by failing to avoid jeopardy to listed species or destruction or adverse modification of their critical habitat by relying on an insufficient RPA that does not avoid jeopardy to the imperiled salmon and steelhead and their critical habitat caused by the 20ºC temperature criterion;

D.  Declare that EPA failed to reinitiate ESA consultation, as required by ESA section 7(a)(2) and 50 C.F.R. § 402.16;

E.  Order EPA to reinitiate ESA consultation with NMFS under 50 C.F.R. § 402.16.

F.  Award NWEA its costs of litigation, including its reasonable attorneys' fees, pursuant to and 28 U.S.C. § 2412 and 16 U.S.C. § 1540(g)(4); and

G.  Grant such other and further relief as the Court may deem just and proper.


Dated this 24th day of January, 2022.

Respectfully submitted,

s/Bridgett Buss
ALLISON LAPLANTE
BRIDGETT BUSS
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6894, laplante@lclark.edu
(503) 768-6825, bridgettbuss@lclark.edu

*Attorneys for Plaintiff Northwest
Environmental Advocates*
