Exhibit 1



Allison LaPlante
Co-Director and Clinical Professor

Earthrise Law Center at Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
*phone* 503-768-6894
*fax* 503-768-6642
laplante@lclark.edu
earthriselaw.org

November 16, 2021

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Michael S. Regan, Administrator
Office of the Administrator
United States Environmental Protection Agency
William Jefferson Clinton Building
Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Deb Haaland, Secretary
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

> **Re: 60-Day Notice of Intent to Sue for Violations of the Endangered Species Act Related to Certain Columbia and Willamette River Salmon and Steelhead Population Segments**

Dear Administrator Regan and Secretary Haaland:

We write on behalf of Northwest Environmental Advocates ("NWEA") to respectfully request that you remedy ongoing violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. As NWEA establishes below, the U.S. Environmental Protection Agency ("EPA") and its officials have violated and are violating the ESA by failing to ensure against jeopardy to ESA-listed species resulting from EPA's 2004 approval of Oregon's water quality standards for temperature, specifically its 20°C migration corridor water quality criterion that applies primarily to the Columbia and Willamette Rivers. Because this criterion provides for river temperatures that are unsafe for salmon and steelhead, the criterion includes a narrative provision that was intended to ensure some temporary relief from those temperatures to migrating salmonids. EPA subsequently failed to take adequate steps to mitigate this harm, including, but not limited to, failing to timely produce Cold Water Refuge Plans that ensure

against jeopardy to threatened salmon and steelhead and their critical habitat, and failing to reinitiate ESA consultation once reinitiation was triggered.

The Columbia River and Willamette River provide critical habitat to several ESA-listed species of salmon and steelhead. As a result, EPA is required to comply with the ESA when taking any action that may affect these species or their critical habitat, including when seeking to approve water quality standards developed by the State of Oregon under the Clean Water Act ("CWA") that impact the Columbia and Willamette Rivers. As part of that approval process, EPA consulted with the National Marine Fisheries Service ("NMFS"), which then issued its Biological Opinion on the Environmental Protection Agency's Proposed Approval of Certain Oregon Water Quality Standards Including Temperature and Intergravel Dissolved Oxygen ("2015 Biological Opinion"). That 2015 Biological Opinion included a reasonable and prudent alternative ("RPA") to modify the EPA approval action and an Incidental Take Statement ("ITS") limiting the extent of take allowed.

While we do not believe the RPA contained within the 2015 biological opinion itself is sufficient to ensure no jeopardy to threatened salmon and steelhead, even if it were sufficient to do so, EPA violated ESA section 7(a)(2) when it failed to reinitiate consultation after exceeding the take limit established in the ITS by missing the deadlines set out in the ITS as surrogates for a numerical incidental take limit. 50 C.F.R. § 402.16.

EPA also failed to reinitiate consultation after the assumptions underlying the 2015 biological opinion and its ITS were modified by a December 18, 2020 letter from NMFS to EPA. Letter from Michael Tehan, NMFS, to Daniel Opalski, EPA, December 18, 2020 ("December 2020 Letter"). That letter appears to shift the purpose of the 2015 Biological Opinion's RPA from "'ensuring that the action's effects do not appreciably increase the risks to the species' potential for survival or to the species' potential for recovery[,]" 2015 Biological Opinion at 272, to merely "increasing understanding of how adult Endangered Species Act listed salmon and steelhead are using cold water refuges as they migrate upstream through the lower Columbia and lower Willamette river," December 2020 Letter.

1.  EPA's Role in Setting Water Quality Standards Compliant with the ESA.

Under the CWA, states are required to identify and adopt water quality standards to define the "goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria that protect those designated uses." 40 C.F.R. § 131.2. One such use includes the "protection and propagation of fish[.]" *Id*. States must review applicable water quality standards at least once every three years, commonly referred to as a "triennial review," and must submit the results of this review, including any proposed revisions to water quality standards, to the EPA for ultimate review and approval. *Id*. at § 131.20(a), (c).

As a federal agency, EPA is subject to all federal environmental protection laws, including the ESA. Under the ESA, all federal agencies are required to consult with NMFS and/or the U.S. Fish and Wildlife Service, as appropriate, to ensure that proposed federal actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]"

2

ESA section 7(a)(2); 16 U.S.C. § 1536(a)(2). This includes when reviewing and approving state water quality standards. While "jeopardy" is not defined within the ESA itself, the ESA implementing regulations clarify that to "[j]eopardize means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of the species in the wild by reducing the reproduction, numbers, or distribution of the species." 50 C.F.R. § 402.02.

If the expert agency makes a finding of "no jeopardy," it may then issue an ITS to the action agency. 16 U.S.C. § 1536(b)(4). If, however, the expert agency finds that the proposed action *will* result in jeopardy to threatened or endangered species or their critical habitat, then it "shall suggest those [RPAs] which [it] believes would not violate subsection (a)(2)[.]" *Id*. at § 1536(b)(3)(A). "Following the issuance of a 'jeopardy' opinion, the agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(3e)." *Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*, 551 U.S. 644, 652 (2007). Relying upon the RPA to reduce the impact of proposed action to "no jeopardy," the expert agency may then issue an incidental take statement to the action agency. 16 U.S.C. § 1536(b)(4).

EPA is also required to reinitiate consultation with NMFS in certain circumstances. "Reinitiation of consultation is required and shall be requested by the federal agency or by the Service, where discretionary federal involvement or control over the action has been retained or is authorized by law, and

(1) If the amount or extent of taking specified in the incidental take statement is exceeded;
(2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
(3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or
(4) If a new species is listed or critical habitat designated that may be affected by the identified action."

50 C.F.R. § 402.16(a)(1)–(4).

2. Salmon and Steelhead in the Columbia and Willamette Rivers.

The Columbia and Willamette Rivers are critical habitat for several species of salmon and steelhead that have been listed under the ESA, including Lower Columbia River ("LCR") Chinook salmon, LCR steelhead, Middle Columbia River ("MCR") steelhead, Upper Columbia River ("UCR") steelhead, Upper Willamette River ("UWR") Chinook salmon, and UWR steelhead. These salmon and steelhead use these rivers for migration and spawning throughout their life cycles. High temperatures in the Columbia and Willamette Rivers are injuring and killing these threatened species and impairing their ability to migrate and spawn successfully. And EPA projects that instream water temperatures will rise due to the effects of climate change.

3

Because of this, it is imperative that the state and federal governments get the water quality standards "right."

3. The 2015 Biological Opinion.

EPA formally consulted with NMFS to get approval for, among other things, the following water quality standard:

> The seven-day-average maximum temperature of a stream identified as having a migration corridor use on subbasin maps and tables OAR 340-041-0101 to 340-041-0340: Tables 101B, and 121B, and Figures 151A, 170A, 300A, and 340A, may not exceed 20.0 degrees Celsius (68.0 degrees Fahrenheit). In addition, these water bodies must have cold water refugia that are sufficiently distributed so as to allow salmon and steelhead migration without significant adverse effects from higher water temperatures elsewhere in the water body. Finally, the seasonal thermal pattern in Columbia and Snake Rivers must reflect the natural seasonal thermal pattern[.]

OAR 340-041-0028(4)(d). The term "cold water refugia" is defined as "those portions of a waterbody where or times during the diel temperature cycle when the water temperature is at least 2 degrees Celsius colder than the daily maximum temperature of the adjacent well-mixed flow of the water body." OAR 340-041-0002(10).

NMFS reviewed EPA's proposed action to approve Oregon's 20°C migration corridor temperature criterion, and issued a biological opinion on November 3, 2015. This biological opinion concluded that "after reviewing the current status of the listed species, the environmental baseline within the action area, the effects of the proposed action, and cumulative effects, it is our biological opinion that the proposed action *is likely to jeopardize* the continued existence of [threatened and endangered salmonid species including the six listed above] and will destroy or adversely modify critical habitat that we have designated for those species." 2015 Biological Opinion at 269 (emphasis added).

NMFS provided EPA with an RPA to "avoid[] jeopardy by ensuring that the action's effects do not appreciably increase the risks to the species' potential for survival or to the species' potential for recovery." *Id*. at 272. The RPA proposed that EPA create a Cold Water Refuge Plan for the Columbia River covered by Oregon's 20°C criterion in order to avoid a finding of jeopardy (the "Columbia River Plan"). *See* 2015 Biological Opinion at 269–274. The deadline for completion of this Plan was November 3, 2018, three years from the signing of the 2015 Biological Opinion. *Id*. The RPA also proposed the Oregon Department of Environmental Quality ("DEQ") create a Cold Water Refuge Plan for the Willamette River in order to avoid jeopardy (the "Willamette River Plan"), although EPA was still ultimately responsible for implementation of the RPA and attendant Cold Water Refuge Plans. *Id*. The deadline for the Willamette River Plan was also November 3, 2018. *Id*.

In addition to the RPA, the 2015 Biological Opinion also contains an ITS for the listed salmon and steelhead. NMFS stated that incidental take could not be accurately quantified as a

4

number of fish taken because the action areas were too large, so it instead used habitat measures for the extent of take as surrogates for the amount of take, as well as "reinitiation triggers." *Id*. at 277–278. One of these surrogates was "the time required to complete the [Cold Water Refuge] plans for the Willamette and Columbia rivers," which was November 3, 2018. Another surrogate was "the time required for DEQ to issue an administrative order or re-issue the NPDES permit for Dyno Nobel facility on the Columbia River[.]" *Id*. at 277–278. This deadline was November 3, 2017, two years from the signing of the 2015 Biological Opinion. *Id*. at 278.

4. <u>Violation of ESA Section 7(a)(2).</u>

EPA is in violation of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), for failing to ensure that its actions are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat designated for such species.

The 2015 Biological Opinion's evaluation of the 20ºC numeric criterion for migration corridors observes that baseline conditions are already killing fish, making the need for cold water refugia even more critical. 2015 Biological Opinion at 197–202.

According to NMFS, the proposed action to approve the 20ºC temperature criterion, without the RPA, "is likely to appreciably reduce the likelihood of survival and recovery" of LCR Chinook salmon, UWR Chinook salmon, UWR steelhead, MCR steelhead, and UCR steelhead. *Id*. at 269. Without implementation of the RPA, which includes completion of the Plans, "the proposed action is likely to jeopardize the continued existence of LCR Chinook salmon, UWR Chinook salmon . . . LCR steelhead, UWR steelhead, MCR steelhead, UCR steelhead, and will destroy or adversely modify critical habitat that [NMFS] has designated for these species." *Id*.

Whether or not the RPA itself was sufficient to avoid jeopardy, EPA has failed to fulfill its independent obligation to ensure no jeopardy. This is evidenced by the 2015 Biological Opinion's finding of "jeopardy" *without the RPA*, and the impotence of the final Cold Water Refuge Plans for the Columbia and Willamette Rivers to make any on-the-ground changes that would modify the bases of those findings.

Section 7(a)(2), 16 U.S.C. § 1536(a)(2), mandates that "[e]ach Federal agency shall . . . insure that any [agency action] is not likely to jeopardize" species and their critical habitat. This means that the EPA has the duty to "insure" that its action—here, the completion of the Cold Water Refuge Plans—is "not likely to jeopardize" species. It is clear, based upon NMFS's "jeopardy" determination that EPA's approval of the 20ºC criterion causes jeopardy. 2015 Biological Opinion at 269. Therefore it is incumbent upon EPA to ensure that it takes action— here, via the Cold Water Refuge Plans—to avoid this jeopardy. The RPA is offered as an action proposed by NMFS that EPA can take to allegedly avoid jeopardy. However, even if NMFS's proposed RPA fails to avoid jeopardy, EPA is *independently* required to avoid the likelihood of jeopardy.

5. <u>Reinitiation of ESA Consultation Was Triggered by Missing the Deadlines Set Out in the 2015 Biological Opinion's RPA Because Those Deadlines Were Adopted as Surrogate Take Limits.</u>

EPA is required to reinitiate ESA consultation when it has discretionary involvement or control over an action that is likely to adversely affect an ESA-listed species and reinitiation has been triggered. 50 C.F.R. § 402.16(a). Here, EPA's decision to complete the Cold Water Refuge Plans was discretionary because the RPA terms are not binding; the agency has the choice to embrace or reject the RPA, although it does so to its own peril. *See Bennett v. Spear,* 520 U.S. 154, 157 (1997).

Reinitiation of ESA consultation is required if the amount or extent of take specified in the ITS is exceeded. 50 C.F.R. § 402.16(a)(1). The ITS that NMFS included in the 2015 biological opinion was only valid if EPA adopted and implemented the terms of the RPA. NMFS was not able to accurately quantify the incidental take as a number of fish taken because of its view that the action areas were too large, so it instead used habitat measures for the *extent* of take as surrogates for the *amount* of take. 2015 Biological Opinion at 277. As noted above, two of these surrogates were "the time required to complete the [Cold Water Refuge] plans for the Willamette and Columbia rivers" and "the time required for DEQ to issue an administrative order or re-issue the NPDES permit for Dyno Nobel facility on the Columbia River[.]" *Id.* at 277–278. NMFS describes both of these surrogates as "a clear reinitiation trigger," because they are quantifiable and may be monitored. *Id.* at 278. NMFS assumed in the 2015 Biological Opinion that DEQ, EPA, and other parties would have the information needed to implement the Cold Water Refuge Plans through DEQ's Clean Water Act authorities within three years, and that the NPDES permit renewal for Dyno Nobel would occur after two years. *Id.*

EPA missed the November 2018 Cold Water Refuge Plan deadline set out in the 2015 Biological Opinion: the Willamette Cold Water Refuge Study was not completed until March of 2020, and the Columbia Cold Water Refuge Plan was not completed until January of 2021. Similarly, the Dyno Nobel permit was not reissued until February 2019. By failing to meet these deadlines, EPA exceeded the take limit, and under 50 C.F.R. § 402.16(a)(1) was required to reinitiate ESA consultation. It failed to do so.

Missing these deadlines also subsequently modified the RPA in manner not considered in the 2015 Biological Opinion, and triggered reinitiation under 50 C.F.R. § 402.16(a)(3) because NMFS's assumptions regarding the amount of take that would occur before the Plans were issued was incorrect, because the Plans were delayed, and the take limit was exceeded in an amount not contemplated in the 2015 Biological Opinion.

6. <u>Reinitiation of ESA Consultation was Triggered by the December 2020 Letter From NMFS.</u>

Reinitiation of consultation is required if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence. 50 C.F.R. § 402.16(a)(3). NMFS' issuance of the December 2020 Letter triggered reinitiation of ESA consultation because it modified the

First Amended Complaint
Exhibit 1 - Page 6 of 7

purportedly "sufficient" RPA to become "insufficient" when the agency accepted the inadequate EPA and DEQ Cold Water Refuge Plans and Studies as meeting the stated intent of the RPA as set out in the 2015 Biological Opinion: "[t]he purpose of the [Cold Water Refuge] plan is to adequately interpret the narrative criterion to allow for implementation of the criterion through DEQ's Clean Water Act authorities." 2015 Biological Opinion at 270.

The December 2020 Letter modifies the 2015 Biological Opinion because it changes the purpose of the RPA from "ensuring that the action's effects do not appreciably increase the risks to the species' potential for survival or to the species' potential for recovery[,]" 2015 Biological Opinion at 272, to "increasing understanding of how adult Endangered Species Act listed salmon and steelhead are using cold water refuges as they migrate upstream through the lower Columbia and lower Willamette river," December 2020 Letter.

This letter serves as NWEA's notice of intent to sue the EPA and its officials under the ESA for these violations. 16 U.S.C. § 1540(g)(2).

NWEA anticipates that during the 60-day period when EPA considers this notice, and before NWEA files any lawsuit, EPA may wish to meet and confer as to its position on these matters. NWEA welcomes such an engagement.

NWEA is represented by counsel in this matter:

Allison LaPlante (OSB No. 023614)
Bridgett Buss (OSB No. 204997)
Earthrise Law Center
Lewis & Clark Law School
503-768-6894 (LaPlante)
laplante@lclark.edu
503-768-6825 (Buss)
bridgettbuss@lclark.edu

Please feel free to contact us if EPA is interested in meeting, or if you have questions or concerns about this notice of intent to sue.

Thank you for your time and consideration.


Sincerely,

Allison LaPlante                                    Bridgett Buss