ALLISON LAPLANTE, OSB No. 023614
Attorney at Law
333 NE Russell St. #200
Portland, OR 97212
(503) 351-1326, allison.laplante@gmail.com

LYDIA DEXTER, OSB No. 233151
Earthrise Law Center, Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6830, lydiadexter@lclark.edu

BRYAN TELEGIN, OSB No. 105253
Telegin Law
175 Parfitt Ave., SW Suite N270
Bainbridge Island, WA 98110
(206) 453-2884, Ext. 101, bryan@teleginlaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit organization, | Case No. 3:21-cv-01591-AB |
| Plaintiff, | |
| v. | **MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY** |
| UNITED STATES NATIONAL MARINE FISHERIES SERVICE, a United States Government Agency, JENNIFER QUAN, in her official capacity as NMFS Regional Administrator for the West Coast Region, THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency, and MICHAEL REGAN, in his official capacity as EPA Administrator, | **(Oral Argument Requested)** |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

MOTION...................................................................................................................... 1

CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7-1(a) ........................ 1

MEMORANDUM ........................................................................................................ 1

INTRODUCTION ........................................................................................... 1

LEGAL BACKGROUND ............................................................................... 4

I.      The Clean Water Act and Water Quality Standards ............................ 4

II.     The Endangered Species Act ............................................................... 6

III.    Judicial Review ................................................................................... 9

FACTUAL AND PROCEDURAL BACKGROUND ...................................... 10

I.      *NWEA I* ............................................................................................ 10

II.     *NWEA II* ........................................................................................... 12

III.    *NWEA III* ......................................................................................... 15

IV.     Current Litigation ............................................................................... 16

ARGUMENT .................................................................................................. 18

I.      The Court Should Order NMFS to Supplement its Administrative Record Because Additional Documents Are Necessary to Determine Whether NMFS Considered All Relevant Factors........................................................................................ 18

i    MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
     SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

II.   Claim 2 Arises Under the Endangered Species Act, Not the Administrative Procedure Act, and Review Thereof Is Not Limited to any "Administrative Record".......................... 30

III.   Because Claim 2 Is Not Limited to any "Administrative Record" NWEA is Entitled to Discovery ............................................................................................................... 33

CONCLUSION....................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Audubon Society of Portland v. Zinke*,
No. 1:17-cv-00069-CL (lead), 2017 WL 2172439 (D. Or. May 16, 2017) ......................20

*Bennett v. Spear*,
520 U.S. 154 (1997) ..............................................................................................10, 17

*Camp v. Pitts*,
411 U.S. 138 (1993) .........................................................................................................18

Center for Biological Diversity v. Bureau of Land Management,
698 F.3d 1101 (9th Cir. 2012) .........................................................................................17

*Center for Biological Diversity v. Ross*,
349 F.Supp.3d 38 (D.C. Cir. 2018) ..................................................................................32

*Daniels-Hall v. National Education Association*,
629 F.3d 992 (9th Cir. 2010) ...........................................................................................29

*Fence Creek Cattle Company v. U.S. Forest Service*,
602 F.3d 1125 (9th Cir. 2010) ..........................................................................................19

*Friends of the Clearwater v. Dombeck*,
222 F.3d 552 (9th Cir. 2000) .........................................................................................4, 33

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) ........................................................................................3, 19

*National Wildlife Federation v. Federal Emergency Management Agency*,
No. C11-2044-RSM, 2014 WL 5449859 (W.D. Wash. Oct. 24, 2014) ...........................31

*Northcoast Environmental Center v. Glickman*,
136 F.3d 660 (9th Cir. 1998) ...........................................................................................33

*Northwest Coalition for Alternatives to Pesticides v. U.S. Environmental Protection Agency*,
920 F. Supp. 2d 1168 (W.D. Wash. 2013) .......................................................................32

*Northwest Environmental Advocates v. U.S. Environmental Protection Agency*,
268 F.Supp.2d 1255 (D. Or. 2003) ..................................................................................11

*Northwest Environmental Advocates v. U.S. Environmental Protection Agency*,
855 F.Supp.2d 1199 (D. Or. 2012) ............................................................................13, 14

*Northwest Environmental Advocates v. U.S. Environmental Protection Agency*,
No. 3:12-cv-01751-HZ, 2017 WL 1370713 (D. Or. Apr. 11, 2017) ................................15

*Northwest Environmental Advocates v. U.S. Environmental Protection Agency*,
No. 3:12-cv-01751-HZ, 2018 WL 6524161 (D. Or. Dec. 12, 2018) ..............................15

*Northwest Environmental Advocates v. U.S. Environmental Protection Agency*,
No. 3:21-cv-01136-HZ, 2022 WL 15331465 (D. Or. Oct. 24, 2022)...............................33

*Oregon Natural Desert Association v. Bureau of Land Management*,
625 F.3d 1092 (9th Cir. 2008) .....................................................................................30

*Oregon Natural Desert Association v. Kimbell*,
593 F.Supp.2d 1213 (D. Or. 2008) ..............................................................................34

*Oregon Natural Desert Association v. Tidwell*,
716 F.Supp.2d 982 (D. Or. 2007) ...........................................................................32, 34

*Pacific Coast Federation of Fishermen's Association v. National Marine Fisheries Service*,
265 F.3d 1028 (9th Cir. 2001) .....................................................................................10

*San Luis & Delta-Mendota Water Authority v. Locke*,
776 F.3d 971 (9th Cir. 2014) .......................................................................................19

*Washington Toxics Coalition v. U.S. Environmental Protection Agency*,
413 F.3d 1024 (9th Cir. 2005) .....................................................................................30

*Western Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ..............................................................................4, 8, 31

*Wild Fish Conservancy v. Pritzker*,
No. C16-0223-JCC, 2016 WL 9175633 (W.D. Wash. June 30, 2016) ............................31

*Xerces Society for Invertebrate Conservation, et al. v. Shea, et al.*,
No. 3:22-cv-00790-HZ (D. Or. Dec. 9, 2022), ECF No. 27 .............................................20

**Statutes**

The Administrative Procedure Act, §§ 551 *et seq.*; §§ 701 *et seq.*

5 U.S.C. § 551(13) ......................................................................................................9

5 U.S.C. § 702.....................................................................................................2, 3, 9

5 U.S.C. § 704..................................................................................................9, 18, 30

5 U.S.C. § 706........................................................................................4, 18, 30

5 U.S.C. § 706(2)(A)....................................................................................2, 3, 10

The Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*

33 U.S.C. § 1251(a) ...............................................................................................4

33 U.S.C. § 1251(a)(2)...........................................................................................4

33 U.S.C. § 1313(a) ...............................................................................................5

33 U.S.C. § 1313(c)(1)...........................................................................................5

33 U.S.C. § 1313(c)(2)...........................................................................................5

33 U.S.C. § 1313(c)(2)(A) ......................................................................................5

33 U.S.C. § 1313(c)(3)........................................................................................5, 11

33 U.S.C. § 1313(d)(1)(A)......................................................................................5

33 U.S.C. § 1313(d)(1)(C)......................................................................................6

33 U.S.C. § 1313(d)(2) ..........................................................................................6

33 U.S.C. § 1313(d)(4)(B)......................................................................................5

The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*

16 U.S.C. § 1531(b)...............................................................................................6

16 U.S.C. § 1531(c)(1)...........................................................................................6

16 U.S.C. § 1532(3)...............................................................................................6

16 U.S.C. § 1532(5)(A)(i).......................................................................................7

16 U.S.C. § 1532(6)...............................................................................................7

16 U.S.C. § 1532(20).............................................................................................7

16 U.S.C. § 1533....................................................................................................6

16 U.S.C. § 1536....................................................................................................7

16 U.S.C. § 1536(a)(2)........................................................................ *passim*

16 U.S.C. § 1536(b)(3)(A)......................................................................8, 9

16 U.S.C. § 1536(c) ..................................................................................8

16 U.S.C. § 1540(g)(1)(A)................................................................3, 9, 30

Coastal Zone Act Reauthorization Amendments, 16 U.S.C. §§ 1455b *et seq.*

16 U.S.C. § 1455b(a)(2).........................................................................25

16 U.S.C. § 1455b(a)(3).........................................................................25

## Regulations

40 C.F.R. § 130.2(j) ..................................................................................5

40 C.F.R. Part 131, Subpart B ...................................................................5

40 C.F.R. § 131.2 .....................................................................................5

40 C.F.R. § 131.11(a)(1)............................................................................5

40 C.F.R. § 131.21(c).............................................................................5, 6

40 C.F.R. § 131.21(d) ...............................................................................6

50 C.F.R. § 402.02 ................................................................................7, 8

50 C.F.R. § 402.14(a)................................................................................8

50 C.F.R. § 402.14(g) ...............................................................................8

50 C.F.R. § 402.14(g)(3)............................................................................8

50 C.F.R. § 402.14(g)(4)........................................................................7, 8

50 C.F.R. § 402.14(h) ...............................................................................8

50 C.F.R. § 402.14(h)(2)............................................................................9

## Federal Rules of Civil Procedure, Federal Rules of Evidence, Local Rules

District Court of Oregon Local Rule 7-1(a)................................................1

Federal Rules of Civil Procedure 26(a)(2)(B)(2)...............................................................34

Federal Rules of Civil Procedure 26(a)(2)(B)(3)...............................................................34

Federal Rules of Evidence 201(b)(2).................................................................................30

**Other Court Documents**

Complaint for Declaratory and Injunctive Relief,
    *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, 3:12-cv-01751-HZ (Sept. 27, 2012), ECF
    No. 1................................................................................................................................15

Opinion and Order,
    *Nw. Env't Advoc. V. U.S. Env't Prot. Agency*, No. 3:21-cv-01136-HZ (Aug. 20, 2024),
    ECF No. 76 ......................................................................................................................33

Order,
    *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, No. 3:12-cv-01751-HZ (June 11, 2019),
    ECF No. 200 ....................................................................................................................16

Order Amending Final Order and Judgment,
    *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, No. 3:12-cv-01751-HZ (October 19,
    2020), ECF No. 224 ........................................................................................................16

Order Regarding Scope of Review,
    *Nw. Env't. Advocs. v. U.S. Dep't of Commerce, et al*, Case No. C16-1866-JCC (W.D.
    Wash. Nov. 8, 2017), Dkt. No. 58 ..................................................................................31

Stipulated Order on Nonpoint Source and Endangered Species Act Remedies,
    *Nw. Env't Advocs. v. U.S. Env't. Prot. Agency*, No. 3:05-cv-01876-AC (January 7, 2013)
    ...........................................................................................................................................14

**Miscellaneous**

51 Federal Register 19,926 (June 3, 1986) ...........................................................................8

ENVIRONMENTAL PROTECTION AGENCY, EPA REGION 10 GUIDANCE FOR PACIFIC NORTHWEST
STATE AND TRIBAL TEMPERATURE WATER QUALITY STANDARDS (Apr. 2003),
https://nepis.epa.gov/Exe/ZyPDF.cgi/P1004IUI.PDF?Dockey=P1004IUI.PDF ....................11, 12

Fish Passage Center, *Homepage*, https://www.fpc.org/fpc_homepage.php ................................22

<u>**MOTION**</u>

Plaintiff Northwest Environmental Advocates ("NWEA") hereby moves the Court for an order compelling Defendants National Marine Fisheries Service and Jennifer Quan, in her official capacity as National Marine Fisheries Service Administrator for the West Coast Region (together, "NMFS"), to supplement NMFS's administrative record with the documents filed herewith as exhibits to the Declaration of Nina Bell. Additionally, NWEA moves the Court for an order declaring that the Court's review of NWEA's claim against Defendants U.S. Environmental Protection Agency and Michael Regan, in his official capacity as Administrator for the Environmental Protection Agency (together, "EPA"), is not confined to any purported "administrative record" filed by EPA in this case, and that both NWEA and EPA may rely upon any admissible evidence in support of their cross motions for summary judgment. Relatedly, NWEA requests that the Court grant it leave to take limited discovery for its claim against EPA.

<u>**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7-1(a)**</u>

Pursuant to Local Rule 7-1(a), the undersigned counsel certifies that the Parties made a good faith effort to resolve the dispute, and were unable to fully do so.

<u>**MEMORANDUM**</u>

**INTRODUCTION**

Oregon's rivers are home to many species of cold-water fish, such as salmon and steelhead ("salmonids"), that are listed as threatened or endangered under the federal Endangered Species Act ("ESA"). Water temperature is the single most important biological factor for these species. Elevated water temperatures result in, *inter alia*, increased juvenile fish mortality, increased susceptibility and exposure to diseases, impaired ability to avoid predators, altered

1 MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

migration timing, and changes in fish community structure that favor competitors of salmonids. Unfortunately, Oregon's rivers are far too warm to support these imperiled cold-water species—a problem only getting worse as we face the effects of climate change.

NWEA has been working for years to improve the water quality standards for temperature in Oregon because these standards form the basis of many regulatory decisions that impact salmonids. Over more than two decades, it has taken four lawsuits—all of which NWEA has won in whole or in part—to hold federal agencies' feet to the fire on their decision making regarding temperature problems in Oregon. But NWEA is back before this Court again because, when finally pushed to give meaning to a water quality provision known as the "cold water refugia" requirement, NMFS passed the buck in establishing the steps needed to avoid jeopardy to salmon and steelhead from the dangerously high temperatures they face as they migrate through the Willamette and Columbia Rivers. In turn, EPA, which oversees Oregon's Clean Water Act ("CWA") program, and which has an *independent duty* to ensure that its actions do not jeopardize these same cold-water species, has likewise failed to protect these salmonids as the law requires.

NWEA has challenged both agencies' most recent actions and inactions regarding the 20°C criterion for salmonid migration in Oregon's water quality standards, and its associated requirement to protect and restore "cold water refugia." In this case, NWEA brings suit against NMFS and EPA over NMFS's decision that EPA's approval of the standards does not jeopardize salmonids, in reliance on an ineffectual Reasonable and Prudent Alternative ("RPA"), and EPA's independent failure to take actions to ensure against jeopardy. *See* ECF No. 45 at ¶¶ 83–93.

Claim 1, against NMFS, arises under the Administrative Procedure Act ("APA"), which authorizes challenges to final agency actions when those actions are arbitrary and capricious. 5

U.S.C. §§ 702, 706(2)(A). Specifically, Claim 1 alleges that the Biological Opinion produced by NMFS in 2015, consulting on EPA's proposed approval of Oregon's temperature standards ("2015 Biological Opinion"), is arbitrary and capricious because, after finding that those water quality standards likely jeopardize the continued existence of salmonids in the Willamette and Columbia Rivers, it arbitrarily and capriciously concluded that that dire result could be avoided by a vague RPA that failed to define any actions to protect the species. In Claim 1, NWEA alleges that reliance on this vague RPA in the 2015 Biological Opinion is inadequate as a matter of law and fact.

Because Claim 1 arises under section 706(2)(A) of the APA, judicial review of this claim is limited to an administrative record. However, this Court should order NMFS to "supplement" its administrative record with the documents attached to the Declaration of Nina Bell under the standard articulated by the Ninth Circuit in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). *See* Bell Decl. at ¶¶ 3–30. As explained below, these documents are necessary for the Court "to determine whether the agency has considered all relevant factors and has explained its decision." *Lands Council*, 395 F.3d at 1030.

In contrast, Claim 2, against EPA, arises under the ESA citizen-suit provision, which authorizes suit against agencies when they are in violation of the ESA. 16 U.S.C. § 1540(g)(1)(A). This includes EPA's mandatory duty under section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), to ensure that its actions are not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species. Claim 2 alleges that EPA is in violation of ESA section 7(a)(2) for failing to ensure that EPA's approval of Oregon's 20° migration criterion does not jeopardize ESA-listed salmonids and their critical habitat. *See* ECF No. 45 at ¶¶ 5, 88–93.

3    MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
      SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

Although EPA has filed a set of documents it describes as an "administrative record" for Claim 2, NWEA files this motion to ask the Court to clarify that the Parties will not be limited to those documents, but instead may rely upon any admissible evidence in support of their summary judgment motions. NWEA does not seek the full breadth of discovery, however; in the interest of efficiency and judicial economy, NWEA merely seeks to include expert testimony in the form of reports and depositions. Because Claim 2 is not brought under the APA, the APA's instruction that "the court shall review the whole record or those parts of it cited by a party," 5 U.S.C. § 706, does not apply. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495–97 (9th Cir. 2011). Further, because NWEA does not challenge a discrete agency decision, but rather EPA's *failure to act* as ESA section 7(a)(2) requires, the Court may consider documents beyond what the agency may file as part of its so-called "administrative record." *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). The Court should accordingly clarify the scope of review of Claim 2 and issue an order allowing the Parties to depose and cross-examine experts in support of their summary judgment motions, as well as to submit with those motions any admissible evidence in support of their respective positions.

## LEGAL BACKGROUND

### I. The Clean Water Act and Water Quality Standards

Congress adopted amendments to the CWA in 1972 in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id*. § 1251(a)(2).

To meet these goals, the statute requires states to identify and adopt water quality standards "defin[ing] the water quality goals of a water body, or portion thereof, by designating

the use or uses to be made of the water and by setting criteria that protect the designated uses." *Id.* § 1313(a); 40 C.F.R. § 131.2. One such use includes the "protection and propagation of fish." 40 C.F.R. § 131.2.

States must review applicable water quality standards every three years, commonly referred to as a triennial review. 33 U.S.C. § 1313(c)(1). Water quality standards must be sufficient to "protect the public health or welfare, enhance the quality of water and serve the purposes of [the Act]." 33 U.S.C. § 1313(c)(2)(A). The state must submit such standards to EPA for review and subsequent approval or disapproval. *Id*. § 1313(c)(2)–(3). A state-developed water quality standard does not become effective until EPA approves it. 40 C.F.R. § 131.21(c).

Water quality standards must include three elements: (1) one or more designated uses of a waterway; (2) numeric and narrative criteria specifying the water quality conditions, such as maximum amounts of toxic pollutants, maximum temperature levels, and the like, that are necessary to protect the designated uses; and (3) "antidegradation" policy requirements. 33 U.S.C. §§ 1313(c)(2), (d)(4)(B); 40 C.F.R. Part 131, Subpart B. For waters with multiple use designations, the criteria must support the most sensitive use. 40 C.F.R. § 131.11(a)(1).

In addition to serving as the regulatory basis for permitted sources (termed "point sources") and "nonpoint source" controls for polluted runoff, water quality standards are the benchmarks by which the quality of a waterbody is measured. In particular, waterbodies that do not meet applicable water quality standards, or cannot meet applicable standards after the imposition of technology-based effluent limitations on point sources, are deemed to be "water quality limited" or "impaired" and placed on the Clean Water Act section 303(d) list. *See* 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.2(j). States must then develop Total Maximum Daily Load ("TMDL") clean-up plans for all 303(d)-listed waters in order to establish the scientific

5   MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
    SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

basis for reducing levels of water pollution that exceed water quality standards.

A TMDL is the total daily loading of pollutants for a particular waterbody or waterbody segment, and "shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 131.21(c)–(d). As with water quality standards, states submit TMDLs to EPA for approval or disapproval. *See* 33 U.S.C. § 1313(d)(2). In turn, section 303(d) requires that within 30 days after submission EPA must either approve the TMDLs or disapprove them and establish its own TMDLs for the affected waterbodies. *Id.*

## II.    The Endangered Species Act

The ESA applies to all federal agency actions "authorized, funded, or carried out by such agency," 16 U.S.C. § 1536(a)(2), including EPA's approval of state water quality standards.

The purpose of the ESA is to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). One overarching requirement of the ESA is that all federal departments and agencies must "seek to conserve" threatened and endangered species. 16 U.S.C. § 1531(c)(1). The terms "conserve" and "conservation" mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

The ESA requires the Secretary of Interior or Commerce to list species that the Secretary believes may become extinct in the near future as being either "threatened" or "endangered." 16 U.S.C. § 1533. A species is "endangered" if it "is in danger of extinction throughout all or a

6   MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
    SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

ESA section 7 enumerates the substantive and procedural obligations of federal agencies for listed species. 16 U.S.C. § 1536. Substantively, all federal agencies must ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2).

The ESA's implementing regulations define "jeopardy" to an endangered or threatened species as "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. In meeting the duty to prevent jeopardy, each agency is required to use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

Agencies must also ensure that agency actions are not likely to "result in the destruction or adverse modification of [critical] habitat." *Id.*; *see also* 50 C.F.R. § 402.14(g)(4). This is a separate determination from whether the action will jeopardize the continued existence of threatened or endangered species.

Critical habitat includes areas that are "essential for the conservation of the species[.]" 16 U.S.C. § 1532(5)(A)(i). Federal regulations define the "destruction or adverse modification" of critical habitat as "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." 50 C.F.R. § 402.02.

Procedurally, whenever a federal agency determines that a proposed action may affect one or more listed species, it must consult with NMFS and/or the United States Fish and Wildlife

Service (together, "the Services"), depending on the species present. 50 C.F.R. § 402.14(a). A federal agency proposing an action that "may affect" a listed species must prepare and provide to the relevant Service a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(a)(2), (c); 50 C.F.R. § 402.14(a).

The "may affect" threshold that triggers section 7 consultation is low: "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Kraayenbrink*, 632 F.3d at 496 (citing 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)). For those actions that may affect a listed species, the Services must review all information provided by the action agency, as well as any other relevant information, to determine whether the proposed action is likely to jeopardize a listed species or destroy or adversely modify its designated critical habitat. 50 C.F.R. § 402.14(g)–(h). This determination is set forth in a "biological opinion" from one or both of the Services. 50 C.F.R. § 402.14(h); 16 U.S.C. § 1536(b)(3)(A).

In formulating a biological opinion, each Service must evaluate the "effects of the action" together with "cumulative effects" on the listed species. 50 C.F.R. § 402.14(g)(3). The Service must also add these effects to the "environmental baseline," which includes "past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in progress." 50 C.F.R. § 402.14(g)(4); 50 C.F.R. § 402.02. Finally, the Service must consider any "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

If, after analyzing these factors, the Service concludes that the proposed action is likely to jeopardize a listed species, or destroy or adversely modify its critical habitat, the Service must identify and describe any reasonable and prudent alternative ("RPA") to the proposed action that it believes would avoid jeopardy and destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A). If the Service believes there is no RPA, the biological opinion must so state. 50 C.F.R. § 402.14(h)(2).

### III.    Judicial Review

Under the ESA citizen-suit provision—a cause of action provided by the ESA independent of any other cause action such as the APA, as discussed below—individual citizens may bring suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A).

Separate from this ESA citizen-suit provision, the APA governs judicial review of agency decisions under the ESA that are not subject to the ESA's citizen-suit provision. The APA grants a right of judicial review to persons "adversely affected or aggrieved by an agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702. The scope of this review is limited to "final agency action[s] for which there is no other adequate remedy in a court." *Id.* § 704.

The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" *Id.* § 551(13). Although finality is not defined in the APA, the Supreme Court has held that an agency action is considered "final" when it marks the "consummation of the agency's decisionmaking process" and the action is one by which "rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal

9   MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
      SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

quotations omitted). Issuance of a biological opinion by the Services marks the consummation of the ESA section 7 consultation process, and is a final agency action subject to review under APA section 702. *Id.* at 178.

Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review under the APA requires a court to determine "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations omitted). "A [biological opinion] may also be invalid if it fails to use the best available scientific information as required by 16 U.S.C. § 1536(a)(2)." *Id*. at 1034.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     *NWEA I*

The federal agencies and the State of Oregon have known about the detrimental impacts of high water temperatures on salmonids for many years. In the 1990s, Oregon began attempting to address the problem of temperature in its rivers. In its 1992–1996 triennial review of water quality standards, Oregon developed new standards for temperature, including numeric criteria for life cycle stages of salmonid species that require different temperatures. After completing these new standards, Oregon sent them to EPA for its approval on July 26, 1996. Among the numeric criteria was a 20°C (68°F) criterion for salmonid rearing and migration in the Lower Willamette River. On July 7, 1999, NMFS completed a biological opinion that concluded these standards were likely to adversely affect salmonids, but, despite its concerns, it also concluded that the standards would not jeopardize the species based on certain promises made by Oregon.

On July 22, 1999, EPA disapproved this 20°C criterion; but when the state failed to take action within 90 days of EPA's disapproval, as required by Clean Water Act section 303(c)(3), EPA took no action itself, even though it was required to do so. 33 U.S.C. § 1313(c)(3).

In April 2001, after three years of no action by either Oregon or EPA, NWEA sued EPA for failing to promptly promulgate replacement temperature criterion for salmonid rearing and migration in the Lower Willamette River. NWEA also challenged EPA's approval of certain additional provisions of Oregon's 1996 standards, including a 17.8°C (64°F) criterion for salmon rearing, because Oregon failed to indicate where and when this criterion applied. This Court concluded that EPA was under a mandatory duty to act and that it had failed to act "promptly" as required by the statute. *Nw. Env't Advocs. v. U.S. Env't Prot. Agency* ("*NWEA I*"), 268 F.Supp.2d 1255, 1261 (D. Or. 2003). The Court also held that EPA's approval of the 17.8°C rearing criterion was arbitrary and capricious. *Id.* at 1267–68. Further, the Court held that NMFS's finding of no-jeopardy in its biological opinion was arbitrary and capricious, as the agency had relied on state commitments it could not demonstrate were likely to occur. *Id.* at 1273. The Court ordered EPA to rescind its approval of portions of Oregon's 1996 water quality standards, and to then promulgate standards or approve new Oregon standards by March 2, 2004. *Id.* at 1268.

During the pendency of *NWEA I*, EPA Region 10 undertook to develop regional temperature guidance. The Guidance recommended numeric criteria and narrative provisions to protect salmonids. *See* Regional Temperature Guidance at 25 (tables 3, 4).[1] Among the

---

[1] The Regional Temperature Guidance is in the current NMFS administrative record at NMFS0013519–0013575 and can be found on EPA's website at: https://nepis.epa.gov/Exe/ZyPDF.cgi/P1004IUI.PDF?Dockey=P1004IUI.PDF (last visited September 5, 2024).

11  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
    SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

recommended criteria was a 20°C migration criterion, supplemented and supported by a narrative provision "to protect and, where feasible, restore the natural thermal regime." *Id.* at 25. This additional narrative provision was meant to ensure that sufficient areas of water cooler than 20°C would protect salmonids from the harmful effects of extended periods of exposure to the known hazards of the 20°C criterion. These areas were termed "cold water refugia."

According to EPA, providing such cold water refugia would be especially important in "rivers with significant hydrologic alterations (e.g., rivers with dams and reservoirs, water withdrawals, and/or significant river channelization)," which "may experience a loss of temperature diversity . . . , such that maximum temperatures occur for an extended period of time and there is little cold water refugia available for fish to escape maximum temperatures." *Id*. at 29. With specific reference to the Columbia and Snake Rivers, EPA explained in its Regional Temperature Guidance that "protection and restoration of temperature diversity"—specifically through the requirement to provide sufficient cold water refugia—"is likely critical in order for salmonids to migrate through these waters with minimal thermal stress." *Id*. at 29–30.

## II.    *NWEA II*

Following the Court's order in *NWEA I*, and with the Regional Temperature Guidance now in hand, Oregon completed a wholesale revision of its temperature water quality standards. Oregon revised its standards to include new numeric and narrative criteria, new policies for their implementation, maps to show the "where and when" of salmonid life cycle stages, and a provision that allowed Oregon—without any federal agency review—to change numeric criteria upwards if it determined that water temperatures were "naturally" hotter than those criteria. This last provision was termed the "natural conditions criterion." On December 10, 2003, Oregon submitted the new standards to EPA for approval and EPA engaged in a consultation with the

12  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
     SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

Services pursuant to the ESA. Once again, NMFS found that the standards did not jeopardize the ESA-listed salmonids. On March 2, 2004, EPA approved the new and revised standards.

In December 2005, NWEA again challenged EPA's approval of Oregon's new temperature standards (including the natural conditions criterion), as well as NMFS's biological opinion. The Court held that the operation of the natural conditions criterion to supplant numeric criteria established to protect salmonids with a less protective standard was unlawful. *See Nw. Env't Advocs. v. U.S. Env't Prot. Agency* (*"NWEA II"*), 855 F. Supp.2d 1199, 1217–18 (D. Or. Feb. 28, 2012). The Court also rejected EPA and Oregon's attempt to unlawfully exempt nonpoint sources (e.g., farming and logging) from compliance with temperature standards. *Id*. at 1207–13.

The Court also ruled that NMFS's biological opinion was hopelessly flawed. *Id.* at 1222–31. First, finding that overall, "NMFS' cursory review" was arbitrary, *id.* at 1223, and its "failure to discuss any impacts to the species' recovery" was likewise arbitrary, *id*. at 1224, the Court then turned to the agency's evaluation of baseline conditions. The NMFS biological opinion found that "many of the biological requirements of the listed species were not being met under the environmental baseline for many streams and watersheds in Oregon . . . conclud[ing] that '[a]ny further degradation of these conditions would significantly reduce the likelihood of survival and recovery of these species due to the status of the environmental baseline.'" *Id.* at 1224–25. But it nonetheless impermissibly justified new criteria that were "above the appropriate range for threatened salmonids based on past violations of a lower temperature standard." *Id.* at 1225. The Court remanded NMFS's biological opinion for further consideration and ordered EPA to take actions in response to new biological opinions. Stipulated Order on Nonpoint Source and Endangered Species Act Remedies, *Nw. Env't Advocs. v. U.S. Env't. Prot. Agency*,

No. 3:05-cv-01876-AC (January 7, 2013). In response to this stipulated order, NMFS developed the 2015 Biological Opinion at issue in this case.

In the same ruling, the Court upheld EPA's approval of Oregon's 20°C numeric criterion under the Clean Water Act, but expressed concern about whether that criterion would adequately protect the species due to skepticism about Oregon's ability to meaningfully implement the accompanying narrative provision requiring protection of cold water refugia:

> The court shares some of plaintiff's concerns regarding the uncertainty inherent in the approval of the 20C criterion and attendant narrative provision calling for sufficient coldwater refugia, and in the fact that the selected criteria [*sic*] is at the upper end of the range allowing successful migration. However. . . [u]nder the deferential standard of review required in cases such as the one at bar, the court is forced to conclude that the EPA had a rational basis for approving the criterion.

*NWEA II*, 855 F. Supp.2d at 1214. Critical to the Court's upholding of the 20°C was EPA's representation to the Court that cold water refugia would be identified and protected during the development of TMDLs under CWA section 303(d). As the Court stated:

> The EPA responds that all rivers where this criterion apply are currently listed on Oregon's § 1313(d) list of impaired waters, so the refugia necessary to protect salmonids will be identified and restored during the TMDL process. Additionally, the regulation requires cold water refugia that is "sufficiently distributed so as to allow salmon and steelhead migration without significant adverse effects from higher water temperatures...." Even though Oregon does not define what amount of refugia is sufficient to protect salmonids, the narrative provision requires that it protect the designated use.

*Id*. (quoting OAR 340–041–0028(4)(d)).

Thus, the Court reviewed the water quality standard components—both numeric and narrative—*on their face* and reluctantly upheld the 20°C criterion. The Court took EPA and Oregon at their word that the relevant cold water refugia would be identified and restored during the TMDL process. As discussed in the next section, that never actually happened.

### III.    *NWEA III*

Following its success in *NWEA II*, in 2012, NWEA challenged EPA's approval of Oregon temperature TMDLs completed between February 11, 2004 and December 17, 2010. Complaint for Declaratory and Injunctive Relief, *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, 3:12-cv-01751-HZ (Sept. 27, 2012), ECF No. 1. The complaint alleged, *inter alia*, that based on the then-applicable natural conditions criterion, Oregon used these TMDLs to supplant the biologically-based numeric criteria—including the 20°C migration criterion with its accompanying narrative provision to protect cold water refugia—and replaced them with new superseding criteria as high as 32.5°C (90.5°F), a temperature that is instantaneously lethal to salmon. *Id.* at 17–22.

Once again, the Court agreed with NWEA that EPA's actions—here, approving TMDLs that blessed dangerously high temperatures under the guise of their being "natural conditions"—was unlawful. *Nw. Env't Advocs. v. U.S. Env't Prot. Agency* ("*NWEA III*"), No.3:12-cv-01751-HZ, 2017 WL 1370713, at *9–10 (D. Or. Apr. 11, 2017). Then, in December 2018, Judge Hernandez ordered the temperature TMDLs be replaced. *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, No. 3:12-cv-01751-HZ2018WL 6524161, at *7 (D. Or. Dec. 12, 2018). Further briefing addressed the schedule for the replacement TMDLs. NWEA argued that since, unfortunately, Oregon does not use its TMDLs to control polluted runoff from nonpoint sources, priority should be established based on the number of NPDES-permitted point sources covered by each TMDL. The Court agreed: "the Court agrees with Plaintiff that the issuance of new TMDLs for river basins and subbasins in which a greater number of NPDES permits have been issued should take priority over the TMDLs for basins in which fewer NPDES permits have been issued. Accordingly, the Court directs the State and EPA, after meaningful conferral with Plaintiff, to

15  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
     SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

reformulate their proposed timeline to prioritize the issuance of TMDLs in such basins and subbasins." Order, *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, No. 3:12-cv-01751-HZ (June 11, 2019), ECF No. 200.

In October 2020, the court in *NWEA III* ordered a final schedule for the replacement TMDLs including deadlines for EPA actions through May 29, 2028. Order Amending Final Order and Judgment, *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, No. 3:12-cv-01751-HZ (October 19, 2020), ECF No. 224. Among temperature TMDLs on the schedule are the following that include tributaries to the Columbia River: Southern Willamette Subbasins; Mid-Willamette Subbasins; Lower Willamette Subbasins; Willamette River mainstem and Major Tributaries; John Day Basin, Snake River-Hells Canyon; Lower Grande Ronde, Imnaha, and Wallowa Basins; Umatilla Basin-Walla Walla Subbasin; and the Willow Creek Subbasin. *Id.* at 2.

## IV. Current Litigation

As Oregon and EPA have been working to replace the temperature TMDLs this Court threw out, NMFS's and EPA's actions and inactions have given rise to this instant suit.

NMFS was required by this Court in *NWEA II* to redo its ESA consultation on Oregon's temperature standards. At that point, the question was no longer about what the standard said on its face and whether, *in concept*, "sufficiently distributed cold water refugia" would be adequate to protect migrating salmonids from overheated waters. The question became whether, *in fact and in practice*, the criterion was being implemented to avoid jeopardy to these species. Rather than meaningfully undertaking that analysis or proposing changes that would ensure against jeopardy, NMFS punted the issue back to EPA and Oregon, vaguely requiring the agencies that had long ignored the refugia narrative criterion to develop "plans" for cold water refugia.

As NWEA will show at summary judgment, NMFS's approach does not pass muster under the ESA. In the new 2015 Biological Opinion, NMFS's RPA did not even require EPA or Oregon to submit these future, yet-to-be written cold water refugia plans to NMFS to ensure they met the ESA requirement to avoid jeopardy. For this and other reasons, Claim 1 alleges that the 2015 Biological Opinion was arbitrary and capricious. Having not seen the plans, NMFS was in no position to determine that they would comply with the ESA.

In addition to that failure by NMFS, EPA itself has an independent obligation to ensure that its actions do not jeopardize listed species. 16 U.S.C. § 1536(a)(2). As the Supreme Court noted, "[t]he action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril." *Bennett*, 520 U.S. at 170. The inverse is also true; EPA cannot avoid liability under the ESA by hiding behind an inadequate biological opinion issued by NMFS. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012) ("In particular, an agency cannot meet its section 7 obligations by relying on a Biological Opinion that is legally flawed or by failing to discuss information that would undercut the opinion's conclusions.").

Under the ESA citizen-suit provision, Claim 2 alleges that EPA and Oregon's so-called "plans" to protect and restore cold water refugia—much of which merely report past efforts that have failed to avoid jeopardy—do not satisfy EPA's independent obligation to protect salmonids under the ESA. This claim is not limited to whatever was before NMFS when it issued the 2015 Biological Opinion. Instead, it is a citizen-suit claim, with a *de novo* review, for this Court to determine whether EPA is meeting its ESA duties.

The Parties have conferred for nine months about the Defendants' records. *See* ECF Nos. 50, 53, 55, 57. NWEA agrees that judicial review of Claim 1 is based on NMFS's administrative

record because the issuance of the 2015 Biological Opinion was a final agency action within the meaning of the APA. 5 U.S.C. § 704. Under the APA, courts determine whether a final agency action was arbitrary and capricious based on "the whole record[.]" *Id.* § 706. Thus, NWEA acknowledges that this Court's review will be based on the record that NMFS submitted. NWEA and NMFS have worked for many months to agree about NMFS's administrative record. While able to resolve a great number of issues, the Parties were ultimately unable to reach a complete resolution pertaining to the documents discussed below, giving rise to NWEA's request that the Court supplement the administrative record with these documents.

Additionally, the Parties were unable to reach an agreement as to the scope of judicial review of Claim 2 of NWEA's Second Amended Complaint, alleging EPA failed to ensure its actions are not likely to jeopardize ESA-listed species or result in the destruction or adverse modification of their critical habitat pursuant to ESA section 7(a)(2). ECF No. 45 at ¶¶ 88–93.

## ARGUMENT

**I.  The Court Should Order NMFS to Supplement its Administrative Record Because Additional Documents Are Necessary to Determine Whether NMFS Considered All Relevant Factors**

**A.  Standards for Supplementation**

Judicial review for APA section 706(2) claims is traditionally limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). However, the Ninth Circuit has crafted four exceptions to this general rule:

(1)  when it needs to determine whether the agency has considered all relevant factors and has explained its decision;
(2)  when the agency has relied upon documents or materials not included in the record;
(3)  when it is necessary to explain technical terms or complex matters; and
(4)  when a plaintiff makes a showing of agency bad faith.

18  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

*Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (citing *Lands Council*, 395 F.3d at 1030).

Here, supplementation of NMFS's administrative record is warranted to ensure that the agency considered all relevant factors, under the first Ninth Circuit exception. While the relevant factors exception cannot be used to "judge the wisdom of the agency's action[,]" it "permits a district court to consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis[.]" *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014).

**B. This Court Can Defer Ruling on NWEA's Supplementation Requests**

NWEA moves for supplementation of NMFS's administrative record, pursuant to the Court's order that NWEA file any record motions pertaining to the "scope and sufficiency," language to which the Parties stipulated (*see, e.g.*, ECF No. 50 at 5), of the agencies' records by September 6, 2024. *See* ECF No. 62. At the time the Parties originally negotiated a process for resolving record disputes, NWEA understood this to mean that it should review NMFS's administrative record for its completeness, and confer with NMFS about what documents were necessary to complete the record—a different standard than supplementation. Nevertheless, out of an abundance of caution, NWEA assumes here that this motion should also cover supplementation.

NWEA has done its best to explain the relevance of each document requested for supplementation. But, at this point, the Court does not have the benefit of the Parties' arguments on the merits of the case. For this reason, judges in this District have allowed parties to file supplementation motions concurrently with their summary judgment motions—even when the parties are required to make other arguments (such as the "completeness" of a record, or the

19 MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

scope of judicial review for the claim against EPA in this case) in advance of the summary judgment briefing. *See, e.g.*, *Audubon Soc'y of Portland v. Zinke*, No. 1:17-cv-00069-CL (lead), 2017 WL 2172439, at \*1–2 (D. Or. May 16, 2017); *Xerces Soc'y for Invertebrate Conservation, et al. v. Shea, et al.*, No. 3:22-cv-00790-HZ (D. Or. Dec. 9, 2022), ECF No. 27 (following *Audubon Society* and holding that "the parties may include requests to supplement the Administrative Records with extra-record materials as part of their summary judgment briefs"). Accordingly, the Court should choose to defer the supplementation issues until the summary judgment phase, where the Parties will be better able to explain the need for supplementation in the context of the merits briefing.

## C. If the Court Chooses to Address Supplementation Now, the Court Should Supplement NMFS's Record with Several Categories of Documents

NWEA seeks to supplement the NMFS record with documents falling into roughly four categories. The section that follows explains the basis for inclusion of each category of documents, followed by a table explaining the relevance of any particular document.

### 1. Documents Underlying the Adoption and Implementation of the Temperature Standards and Refugia Requirement

NWEA requests that the Court allow supplementation of NMFS's record with three documents foundational in the creation of Oregon's cold water refugia criterion. To the extent NMFS claims that it did not consider these documents, directly or indirectly, it should have.

| Document/Exhibit | Relevance |
|---|---|
| **Exhibit A**<br>DEP'T OF ENV'T QUALITY, 1992–1994 WATER QUALITY STANDARDS REVIEW (1995) | This Oregon rulemaking document is the first time that cold water refugia were considered for water quality standards "as an important element in the survival of cold-water species in warmer waters." Bell Decl., Ex. A, p. 69. The provision was supported unanimously by DEQ's advisory committee. Bell Decl., Ex. A, p. 73. DEQ's decades-long failure to protect and restore refugia is relevant to the likely efficacy of the NMFS's RPA directing DEQ to create a plan to do so. |

20  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
     SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

| | |
|---|---|
| **Exhibit B**<br><br>Letter from Dr. Stan Gregory and Dr. Carl Schreck, Indep. Multidisc. Science Team, State of Or., to Governor Ted Kulongoski et al., and attachment, Technical Report 2004-1 (May 7, 2004) | Oregon's Independent Multidisciplinary Science Team ("IMST") wrote this consensus report—with technical review by the author of the 2015 Biological Opinion, NMFS's Jeff Lockwood—in response to the Oregon Legislature and Governor. Bell Decl., Ex. B, pp. 1, 5. The IMST determined both that refugia were essential and that the Oregon water quality standards were inadequate to identify, protect, and restore refugia. Bell Decl., Ex. B, pp. 9, 10, 39, 58–61, 63, 116. This highly respected report on Oregon's temperature standards, including refugia protections, is relevant to their importance and the over 10 years that had transpired without action to protect and restore refugia by the date the 2015 Biological Opinion was completed. |
| **Exhibit C**<br><br>DEP'T OF ENV'T QUALITY, TEMPERATURE INTERNAL MANAGEMENT DIRECTIVE ("IMD") (2008) | This document is Oregon's internal guidance on using its temperature water quality standards including the refugia criterion, covering their protection and restoration, and asserting that this "will most likely occur during the development of and following a TMDL" and that implementation of this protection for nonpoint sources "will likely be assigned to" other agencies. Bell Decl., Ex. C, p. 56; *see also id*. at 73. It also discusses "how to determine whether cold water refugia are sufficiently distributed." *Id*. at 57. The state's *only guidance* on the refugia criterion is a relevant factor that NMFS should have considered. |

### 2. Documents Related to the 2015 Columbia River Sockeye Salmon Die-off

As NWEA alleges in its complaint, and as widely publicized in news reports, in the summer of 2015, at least 250,000 adult sockeye salmon died in the Columbia and Snake Rivers due to excessively high water temperatures during migration. ECF No. 45 at ¶ 51. Although this massive die-off occurred months before the 2015 Biological Opinion was finalized, and although the die-off was directly related to the issues covered in the Biological Opinion, NMFS claims to have not relied on the documents listed below, or any others like them. The Biological Opinion refers to these summer 2015 high temperatures, but contains no information regarding the numbers of dead sockeye, among other things. These documents are important for the Court to understand whether NMFS considered all relevant factors in developing the Biological Opinion

and RPA, and at a minimum, the Court can look to these documents to determine whether NMFS

adequately explained its decision.

| Document/Exhibit | Relevance |
|---|---|
| **Exhibit D**<br><br>Memorandum from Michele DeHart, Fish Passage Ctr. ("FPC" or "Center"), to Erick Van Dyke (July 28, 2015) | In this memorandum, the Fish Passage Center[2] quotes NMFS as stating that hot temperatures are negatively impacting adult migrating salmon and steelhead in the mainstem Columbia and Snake Rivers "as well as in the tributaries." Bell Decl., Ex. D, p. 1. Tributaries are the means by which refugia are created in the Columbia River. The state of tributaries is relevant to NMFS's RPA that relies on DEQ's Clean Water Act authorities to protect and restore refugia to protect salmon. |
| **Exhibit E**<br><br>Memorandum from Michele DeHart, FPC, to Charles Morrill, Wash. Dep't of Fish & Wildlife, et al. (Oct. 28, 2015) | NMFS relied on data from the Center in its Biological Opinion. *See, e.g.*, Bell Decl., Ex. BB, pp. 137 (n.33, 35), 193 (n.57). In this memorandum, the Center discusses the long history of unmitigated high temperatures in the Columbia and Snake Rivers, including terminated efforts by NMFS and EPA (Columbia/Snake TMDL). *See, e.g.,* Bell Decl., Ex. E, pp. 4–6; 30–35 (Appendix A). It raised concerns about the 20°C criterion. *Id*. at 6–7. The memo provides context for the importance of refugia (i.e., percentages of the fish migration season that exceed the 20°C criterion). *Id*. at 11. The history of failure to address high temperatures in the Columbia and the adequacy of the criterion are relevant factors that NMFS should have taken into account in developing the Biological Opinion and the RPA. |
| **Exhibit F**<br><br>Memorandum from FPC Staff to Paul Wagner, NMFS (Nov. 13, 2015) | This memorandum is written to NMFS and refers to the October 28, 2015 memorandum from the Center, demonstrating that NMFS read the October 28, 2015 memorandum. |
| **Exhibit G** | This multi-state agency established by Congress in 1980 reported on the adverse effects of 2015's high temperatures in the Columbia River on sockeye salmon. While news |

---

[2] "The Fish Passage Center provides technical assistance and information to fish and wildlife agencies and tribes, in particular, and the public in general, on matters related to juvenile and adult salmon and steelhead passage through the mainstem hydrosystem in the Columbia River Basin." *See* Fish Passage Center, *Home Page*, https://www.fpc.org/fpc_homepage.php (last visited Sept. 4, 2024).

22  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
    SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

| John Harrison, *Warm Water Blamed for Huge Columbia River Sockeye Die-Off*, Nᴡ. Pᴏᴡᴇʀ & Cᴏɴsᴇʀᴠᴀᴛɪᴏɴ Cᴏᴜɴᴄɪʟ (July 31, 2015) | organizations reported on the number of dead sockeye, the Biological Opinion only references the high temperatures in the Columbia River in July 2015. *See* Bell Decl., Ex. BB, pp. 216, 228–29, 233, 236, 237, 240. Nowhere in the Biological Opinion does NMFS refer to how many sockeye perished even as news outlets reported that at least 250,000 fish—or 50 percent of the run—had died. This is relevant information that NMFS should have considered and discussed in its evaluation. |
| --- | --- |

### 3. TMDLs and Associated Documents that NMFS Has Declined to Put in the Record

The current NMFS administrative record contains several TMDL clean-up plans for waterways that violate water quality standards. Additionally, NWEA understands that NMFS will complete the record with additional TMDLs, as a result of the Parties' lengthy conferral process. However, NMFS has declined to include several TMDLs in the record. As explained above, TMDLs are the primary—likely only—means by which the cold water refugia criterion will be carried out to protect salmonids. The Biological Opinion both discusses TMDLs generally and it relies on TMDLs to implement the RPA. *See* Bell Decl., Ex. BB, pp. 180–81, 276. Moreover, while the Biological Opinion did not consult on the then-disapproved natural conditions criterion, *see* Bell Decl., Ex. BB, p. 12, n.5, NMFS did not acknowledge that this criterion—which used TMDLs to supersede numeric criteria including the 20° C criterion—is baked into the existing temperature TMDLs, *id*. at 178. The Court should be able to consider these additional TMDLs to get the full picture of how temperature TMDLs work in Oregon, including those that impact tributaries that are key to the refugia requirement.

| Document/Exhibit | Relevance |
| --- | --- |
| **Exhibit H** | |

| | |
|---|---|
| Middle Columbia-Hood (Miles Creeks) Subbasin TMDL (2008) | These four temperature TMDLs for Columbia River tributaries are relevant to the analysis in the Biological Opinion and the RPA because they demonstrate how Oregon uses its Clean Water Act authorities in ways contemplated by the RPA. Each TMDL is different. For example, the 2008 Umatilla River TMDL that NMFS did not evaluate is not at all like the Umpqua TMDL that NMFS discussed in the Biological Opinion. *See, e.g.*, Bell Decl., Ex. BB, p. 180. The Biological Opinion cites to TMDLs that are subject to the refugia requirement associated with the 20°C criterion, claiming they must be revised. *Id*. However, NMFS did not assert that other Columbia tributary TMDLs that have superseding temperatures far in excess of 20° C—for which no refugia requirement attaches—are subject to revision. These existing TMDLs are relevant to the analysis of the Biological Opinion and the likely efficacy of the RPA. Moreover, the Biological Opinion states that "DEQ apparently has not released any work on CWR in the Columbia River" but failed to look at all of the Columbia Basin TMDLs that would be relevant to tributaries' being cold water refugia, instead only citing those TMDLs where a 20°C criteria applies. *Id*. (citing the Willamette and John Day TMDLs). |
| **Exhibit I** Umatilla River TMDL (2001) | |
| **Exhibit J** Umatilla Walla Walla Basin TMDL (2005) | |
| **Exhibit K** Willamette Molalla Pudding TMDL (2008) | |
| **Exhibit L** EPA, COLUMBIA/SNAKE RIVERS TEMPERATURE TMDL INCLUDING APPENDIX A: PROBLEM ASSESSMENT, PRELIMINARY DRAFT (July 2003) | This 2003 draft of EPA's Temperature TMDL for the Columbia and Snake Rivers—entirely abandoned before the Biological Opinion—is relevant to NMFS's analysis of the likelihood the RPAs based on the Clean Water Act would successfully protect salmon including through refugia. It explains the historical role of alluvial plain refugia in the Columbia. *See, e.g.,* Bell Decl., Ex. L, pp. 21, 22, 44, 45, 54. It also states that the Columbia/Snake TMDL will not restore such cold water refugia. *Id*. at 45. |
| **Exhibit M** EPA, *Columbia/Snake River Temperature TMDL* [PowerPoint] (Sept. 25, 2002) | This EPA presentation demonstrates that it began, and then abandoned, the Columbia/Snake Rivers Temperature TMDL well over a decade before completion of the Biological Opinion. It also shows EPA's treating the tributaries—that create the cold water refugia—as unimportant because their temperature load inputs to the Columbia were minimal. Bell Decl., Ex. M, p. 19. |
| **Exhibit N** Deschutes Basin TMDLs | DEQ's website pertaining to TMDLs for the Deschutes River is relevant because, as a major tributary to the Columbia River, NMFS would have known that DEQ's protection (or lack thereof) of the Deschutes was highly relevant to DEQ's being |

24  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
    SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

| | able to protect the potential refugia it creates at the confluence with the Columbia. The nearly 25 years during which these TMDLs have not been completed is relevant to NMFS's reliance in the RPA on DEQ's developing TMDLs to protect and restore refugia. |
| --- | --- |

### 4. Documents Pertaining to Oregon's Nonpoint Program

The documents below pertain to Oregon's programs to control nonpoint sources such as farming and logging—the most significant source of high water temperatures in Oregon. These documents reflect a particular emphasis on control of nonpoint source pollution in coastal areas, and attendant requirements of the Coastal Zone Act Reauthorization Amendments ("CZARA"). *See* 16 U.S.C. § 1455b(a)(2) (CZARA requires that states' coastal programs "be coordinated closely with State and local water quality plans developed pursuant to sections . . . 1313 . . . of Title 33," which includes water quality standards and TMDLs); *see also id.* § 1455b(b)(3) (CZARA requires "additional management measures applicable to the land uses and areas identified . . . that are necessary to achieve and maintain applicable water quality standards under section 1313 of Title 33 and protect designated uses."). As set forth in NWEA's complaint, NWEA brought suit against EPA and the National Oceanic and Atmospheric Administration ("NOAA")[3] under CZARA in 2009, resulting in a settlement reflecting Oregon's commitment to develop a new kind of TMDL to be directly implemented to control nonpoint sources. *See* ECF 45 at ¶¶ 69–72. Unfortunately, Oregon subsequently withdrew that commitment, and Oregon eventually lost federal funding for its failure to meet CZARA requirements. These documents provide important context for the longtime failures of Oregon's nonpoint program, the history of federal agency involvement, and the agencies' understanding of these failures. NMFS's RPA

---

[3] NMFS is a part of NOAA, and NMFS was heavily involved in the resolution of the 2009 lawsuit.

25  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
    SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

relies on assumptions about DEQ's use of its Clean Water Act authorities, including particularly

TMDLs, to protect and restore refugia for salmonids. These documents are relevant to show that

NMFS's assumptions were unsupported.

| Document/Exhibit | Relevance |
|---|---|
| **Exhibit O**<br><br>NOAA/EPA, FINDINGS FOR THE OREGON COASTAL NONPOINT PROGRAM (Jan. 13, 1998) | These 1998 findings by NOAA and EPA identified failures in Oregon's control of nonpoint source pollution that eventually led to the federal agencies' disapproval of Oregon's coastal nonpoint program, for an area that includes part of the Columbia River. Because the Biological Opinion's RPA relies on Oregon DEQ and its Clean Water Act authorities, whether the state was using those authorities effectively to address stream temperatures by controlling nonpoint source pollution was a relevant factor. |
| **Exhibit P**<br><br>USFS/BLM, FOREST SERVICE AND BUREAU OF LAND MANAGEMENT PROTOCOL FOR ADDRESSING CLEAN WATER ACT SECTION 303(D) LISTED WATERS (ver. 2.0 1999) | Much of the land in the drainage basins flowing into the Columbia River that establish (or fail to establish) refugia at their confluences is in federal ownership by the Bureau of Land Management ("BLM") and U.S. Forest Service. This Protocol establishes how these two federal land agencies have agreed to respond to TMDLs. Both this commitment and whether they have complied with this commitment are relevant factors in NMFS's consideration of how effective the RPA based on Oregon DEQ's use of the Clean Water Act could be in protecting salmon. |
| **Exhibit Q**<br><br>BLM/DEQ, MEMORANDUM OF AGREEMENT TO MEET STATE AND FEDERAL WATER QUALITY RULES AND REGULATIONS (2003) | Oregon DEQ signed memoranda of agreement with land management agencies on how they will work together to address waters identified as not meeting water quality standards; this is one such agreement. Both this agreement and whether the signatories had complied with this agreement are relevant factors in NMFS's consideration of how effective the RPA based on Oregon DEQ's use of the Clean Water Act could be in protecting salmon. |
| **Exhibit R**<br><br>NOAA/EPA, DRAFT NOAA AND EPA PRELIMINARY DECISIONS ON INFORMATION SUBMITTED BY OREGON TO MEET COASTAL NONPOINT | These 2003 interim findings by NOAA and EPA on Oregon's coastal nonpoint program include expectations of nonpoint source controls needed to protect the Lower Columbia River. The findings are relevant to NMFS's analysis in the Biological Opinion and RPA, which rely on Oregon DEQ's use of its Clean Water Act authorities. |

| | |
|---|---|
| PROGRAM CONDITIONS OF APPROVAL (Dec. 30, 2003) | |
| **Exhibit S**<br><br>*Northwest Environmental Advocates v. Locke, et al.*, Civil No. 09-0017-PK Final Settlement Agreement including exhibits A through F | This 2010 settlement between NWEA, NOAA, and EPA memorialized Oregon DEQ's commitment to develop a "new process" wherein DEQ would use TMDLs to specify required best management practices for landowners and confirming DEQ's legal authority to require such enforceable practices. Bell Decl., Ex. S, pp. 4–6. NMFS knew this settlement established a new kind of TMDL focused on controlling nonpoint source pollution, unlike the existing Oregon TMDLs. When NOAA/EPA ultimately disapproved Oregon's coastal nonpoint program in January 2015, NMFS knew that DEQ had not followed through on developing these new "Implementation Ready TMDLs" as it had committed in the settlement, a factor that NMFS should have considered in its RPA. |
| **Exhibit T**<br><br>Letter from Nina Bell, NWEA, to Michael Bussell, EPA, and John King, NOAA, and associated attachments (May 2, 2012) | This letter from NWEA to NOAA and EPA—and copied to NMFS management and Jeff Lockwood, author of the 2015 Biological Opinion— raises concerns that the federal agencies' interim approval of agricultural pollution controls for coastal waters was not adequate. For example, the letter specifically discusses the failure of the Umpqua Basin TMDL to control agricultural pollution. *See* Bell Decl., Ex. T, 15–21. The Biological Opinion specifically cites and discusses the Umpqua Basin TMDL. *See* Bell Decl., Ex. BB, pp. 112, 161–64, 180. Whether the 2006 Umpqua TMDL has been or could be successful in reducing stream temperatures is relevant to the analysis of the Biological Opinion and the efficacy of the RPA. |
| **Exhibit U**<br><br>Letter from Nina Bell, NWEA, to Michael Bussell, EPA, and John King, NOAA, and associated attachments (June 13, 2012) | This letter from NWEA to NOAA and EPA—and copied to NMFS management and Jeff Lockwood, author of the Biological Opinion—raises concerns that the federal agencies' interim approval of agricultural pollution controls was not adequate because they misconstrued whether state agricultural rules are enforceable. In addition, the letter discusses Oregon DEQ's adoption of rules that repudiate the commitments it made in settlement of the case *NWEA v. Locke* to use a new kind of TMDL and its legal authorities to control nonpoint source pollution. This letter is relevant to NMFS's understanding of the likelihood the RPA would control the most significant source of temperature pollution in Columbia River basins. |

| | |
|---|---|
| **Exhibit V**<br><br>OR. DEP'T OF AGRIC., OREGON AGRICULTURAL WATER QUALITY REPORT (Sept. 2012) | This 2012 report discusses how the Oregon Department of Agriculture complies with the Clean Water Act including TMDLs. It provides a clear, simple explanation of what its basin-specific rules mean for farmers in the context of the Clean Water Act. Given the extensive agricultural lands in Columbia River basins that may or may not create refugia at their confluence with the Columbia, this explanation should have been a relevant factor for NMFS in evaluating whether water quality standards and TMDLs would be effective in providing salmon with cold water refugia so long as DEQ was relying on other agencies for implementation. |
| **Exhibit W**<br><br>Letter from Margaret Davidson, NOAA, and Dan Opalski, EPA, to Greg Aldrich, DEQ, including enclosure (Dec. 21, 2012) | These initial findings by NOAA and EPA in 2012 pertain to the use of a new TMDL approach to control coastal nonpoint source pollution. In this letter, the federal agencies agree that regular TMDLs are not sufficiently enforceable to achieve this pollution control. Enclosure at 1. The agencies also explain what information they need to find that the new TMDL approach will work. These findings are relevant to NMFS's analysis in the Biological Opinion and its RPA as to whether TMDLs will result in reduction of nonpoint sources sufficient to protect and restore refugia. |
| **Exhibit X**<br><br>Letter from Nina Bell, NWEA, to Daniel Opalski, EPA, and Margaret Davidson, NOAA, and associated attachments (May 10, 2013) | This letter from NWEA to NOAA and EPA (and copied to NMFS management and staff), raised concerns that the federal agencies' interim approval of agricultural pollution controls was not adequate because the state agricultural rules are ineffective in addressing any past activities that continue to cause water pollution. It also pointed out the applicability of necessary riparian buffers designed by NMFS for western Washington to western Oregon. Finally, the letter discusses how DEQ treats its TMDLs as not requiring riparian restoration, using the Rogue River TMDL as an example. The 2015 Biological Opinion specifically cites and discusses the Rogue Basin TMDL. *See* Bell Decl., Ex. BB, pp. 142, 180. Whether the Rogue TMDL has been or could be successful in reducing stream temperatures is relevant to NMFS's analysis in the Biological Opinion and the efficacy of the RPA. |
| **Exhibit Y**<br><br>Letter from Dick Pedersen, DEQ, and Jim Rue, Dep't of Land Conservation Dev., to Dan Opalski, EPA, and | This letter from Oregon DEQ to NOAA and EPA repudiates the agreement made in settlement of *NWEA v. Locke* to use a new kind of TMDL, "Implementation Ready TMDL," to control nonpoint source pollution, including from farming and logging, and is the basis of the federal agencies' ultimate disapproval of Oregon's coastal nonpoint program. This letter and its attachment are |

| Margaret Davidson, NOAA, including attachment (July 1, 2013) | relevant to NMFS's assessment of whether an RPA that relies upon DEQ's use of its Clean Water Act authorities would protect salmon. |
|---|---|
| **Exhibit Z**<br><br>NOAA/EPA, OREGON COASTAL NONPOINT PROGRAM NOAA/EPA PROPOSED FINDING (Dec. 20, 2013) | This 2013 proposed finding by NOAA and EPA that Oregon had failed to control nonpoint source pollution sufficiently to meet water quality standards demonstrates that Oregon's historical failure to use its Clean Water Act authorities was relevant to the likelihood that the RPA based on that same agency's using those same authorities would successfully protect salmon. *See, e.g.,* Bell Decl., Ex. Z, p. 7. In addition to the federal agencies' concerns about inadequate logging practices, they noted that NMFS has identified "insufficient riparian buffers around agriculture activities are one of the contributors to the [coho] salmon's decline," inviting public comment on whether Oregon has programs to control agricultural nonpoint source pollution to meet water quality standards. *Id.* at 14. |
| **Exhibit AA**<br><br>NOAA/EPA, NOAA/EPA FINDING THAT OREGON HAS NOT SUBMITTED A FULLY APPROVABLE<br><br>COASTAL NONPOINT PROGRAM (Jan. 30, 2015) | This final decision by NOAA and EPA that Oregon does not have a program to control nonpoint source pollution in coastal basins, including the Lower Columbia River, is a relevant factor that NMFS should have considered in establishing an RPA that relies upon the DEQ to use its Clean Water Act authorities to protect and restore cold water refugia. These two federal agencies' having already found that DEQ does not take necessary actions and that it had repudiated its commitment to do so made in 2010 should have been relevant to NMFS's reliance on those very same actions. |

### D. In the Alternative to Supplementation, this Court May Take Judicial Notice of Most Documents at Issue

This Court has broad authority to take judicial notice of most of the documents Plaintiff seeks to supplement NMFS's administrative record with. As noted in the Declaration of Nina Bell, many of these documents are available on public government websites, and thus this Court may take judicial notice of them. *See* Bell Decl. at ¶¶ 3–30. It is routine practice for courts to take judicial notice of documents found on agency websites, including in cases governed by the APA. *See, e.g., Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by

29  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE
   SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

government entities [], and neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein."); *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1112 n.14 (9th Cir. 2008) (taking judicial notice of public agency documents, including agency guidance and handbooks, in an APA case). *See also* Fed. R. Evid. 201(b)(2) (allowing a court to grant judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Here, the documents at issue meet this standard; they are public documents, available on reputable government websites, including information created or verified by the agencies. Therefore, NWEA respectfully requests that, if this Court denies NWEA's request to supplement the NMFS record with these documents, the Court take judicial notice of the publicly available documents listed in the Bell Declaration. *See* Bell Decl. at ¶¶ 3–30.

II.   **Claim 2 Arises Under the Endangered Species Act, Not the Administrative Procedure Act, and Review Thereof Is Not Limited to any "Administrative Record"**

The APA provides a cause of action only where there is no other adequate remedy in a court. 5 U.S.C. § 704. For Claim 2, there *is* an adequate remedy: the ESA's citizen-suit provision. 16 U.S.C. § 1540(g)(1)(A). Because the APA does not govern NWEA's claim against EPA, its provision limiting review to the "record" does not apply. *See* 5 U.S.C. § 706. Thus, NWEA may submit its own evidence to show that EPA has failed to ensure Oregon's temperature water quality standards will not jeopardize endangered salmonids.

The Ninth Circuit has recognized and reaffirmed that a court's review of claims brought against federal agencies under the ESA's citizen-suit provision is not confined to an administrative record. In *Washington Toxics Coalition v. U.S. Environmental Protection Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005), the Ninth Circuit held that where a "substantive statute

independently authorizes a private right of action, the APA does not govern the plaintiffs' claims" and further stated: "Plaintiffs' suits to compel agencies to comply with the substantive provisions of the ESA arise under the ESA citizen-suit provision, and not the APA." In *Kraayenbrink*, the Ninth Circuit reaffirmed that because the court reviews "claims brought under the ESA under the citizen-suit provision of the ESA," it "may consider evidence outside the administrative record for the limited purposes of reviewing… ESA claim[s]." 632 F.3d at 481, 497. In *Kraayenbrink*, the court examined expert declarations submitted by the plaintiffs to determine whether the agency action was arbitrary and capricious. *Id.* at 497–98. In both *Washington Toxics Coalition* and *Kraayenbrink*, the Ninth Circuit recognized that while the *standard* of review of ESA citizen-suit claims was the APA's familiar "arbitrary and capricious" standard, the *scope* of review was not limited to the APA's "whole record" rule.

District courts within the Ninth Circuit have repeatedly followed *Washington Toxics* and *Kraayenbrink* to permit the consideration of evidence beyond the agency's purported "record" in ESA citizen suits against federal agencies. *See, e.g.*, Order Regarding Scope of Review, *Nw. Env't. Advocs. v. U.S. Dep't of Commerce, et al*, Case No. C16-1866-JCC (W.D. Wash. Nov. 8, 2017), Dkt. No. 58 at 2 (holding that adjudication of an ESA citizen-suit claim requires a broader, more searching analysis than the administrative record can provide and thus "the Court need not limit consideration of such matters to the administrative record"); *Wild Fish Conservancy v. Pritzker*, No. C16-0223-JCC, 2016 WL 9175633, at *3 (W.D. Wash. June 30, 2016) (granting plaintiff's motion to determine the scope of review of an ESA citizen-suit claim, and holding that the court could "consider evidence outside the administrative record on that particular claim"); *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, No. C11-2044-RSM, 2014 WL 5449859, at *8 (W.D. Wash. Oct. 24, 2014) (explaining that "the evidentiary

31  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

restrictions under the APA do not apply" to plaintiff's ESA claim, and thus "the Court may consider evidence outside the administrative record"); *Nw. Coal. for Alternatives to Pesticides v. U.S. Env't Protection Agency*, 920 F. Supp. 2d 1168, 1176 (W.D. Wash. 2013) (denying EPA's motion to limit review to the administrative record, and holding instead that because plaintiffs' claim was under the ESA citizen-suit provision and not the APA, reliance on "extra-record evidence is permissible and appropriate under the circumstances of this case").

Even beyond *procedural* errors by action agencies to initiate consultation to begin with, courts have recognized that *substantive* errors "may be supported by extra-record evidence and are not limited to the administrative record review restrictions of the [APA]." *Or. Nat. Desert Ass'n v. Tidwell*, 716 F.Supp.2d 982, 987–88 (D. Or. 2007) (holding that judicial review of plaintiffs' substantive claims under section 7 of the ESA was not limited to an administrative record, and therefore the court could consider expert reports and rebuttals and declarations); *see also Ctr. for Biological Diversity v. Ross*, 349 F.Supp.3d 38, 45–46 (D.C. Cir. 2018) (holding that evidence submitted by plaintiff was appropriate for its section 7(a)(2) ongoing substantive failure to prevent jeopardy claim).

Further, limiting review to any particular "administrative record" makes no logical sense in this case because Claim 2 does not challenge a discrete agency decision. Rather, Claim 2 alleges an ongoing failure by EPA to fulfill its duty to ensure that its actions are not likely to jeopardize endangered species or result in destruction or adverse modification to their critical habitat as required by ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2). In this regard, ESA Section 7(a)(2) claims are analogous to claims under APA Section 706(1) to "compel agency action unlawfully withheld or unreasonably delayed," and review of such claims not "limited to the record as it existed at any single point in time, because there is no final agency action to

32  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

demarcate the limits of the record." *Dombeck*, 222 F.3d at 560; *see also Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998) ("[W]here the issue is alleged agency inaction, we believe the scope of review . . . is broader[.] A broader scope of review is necessary because there will generally be little, if any, record to review.").

In a recent case in this Court involving a CWA citizen-suit claim, Judge Hernandez acknowledged that for CWA citizen-suit claims, like both APA section 706(1) claims and ESA citizen-suit claims, judicial review is not limited to a closed, final record. *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, No. 3:21-cv-01136-HZ, 2022 WL 15331465 at *3 (D. Or. Oct. 24, 2022). The Court went on to state "[i]n the context of citizen suits under the [ESA], the Ninth Circuit has held that because the APA does not provide relief, the court may consider evidence outside the record." *Id.* at *4. The court reiterated this understanding in a later opinion, citing *Kraayenbrink* for the proposition that "where the [ESA] provided a citizen suit remedy, the APA did not apply[,]" analogizing CWA citizen-suit claims to ESA citizen-suit claims. Opinion and Order, *Nw. Env't Advoc. V. U.S. Env't Prot. Agency*, No. 3:21-cv-01136-HZ, at 58–59 (Aug. 20, 2024), ECF No. 76.

### III. Because Claim 2 Is Not Limited to any "Administrative Record" NWEA is Entitled to Discovery

Because this Court's review for Claim 2 is not limited to an administrative record, NWEA is entitled to rely on any admissible evidence to prove its contention that EPA is failing to fulfill its obligation under the ESA to protect against jeopardy of Oregon's cold-water salmonids. For this same reason, NWEA would be entitled employ the full breadth of discovery tools available under the Federal Rules of Civil Procedure, including depositions, interrogatories, requests for admission, and requests for production of documents, all of which are designed to enable a plaintiff (or defendant) to gather evidence relevant to the case. Such discovery could be

33  MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

aimed not only at obtaining factual information in the possession of agency personnel, but also to obtain facts known and opinions held by experts that may be relied upon by EPA to defend Claim 2. *See* Fed. R. Civ. P. 26(a)(2)(B)(2) & (3). In this case, in the interest of efficiency and judicial economy, NWEA does not intend to employ the full panoply of discovery tools provided by the Federal Rules of Civil Procedure. NWEA does not intend to propound interrogatories, requests for admission, or requests for production of documents.

NWEA does, however, intend to rely on expert testimony—submitted as declarations in support of NWEA's forthcoming motion for summary judgment—and expects that EPA also may wish to rely on expert declarations filed in opposition to NWEA's motion. Submission of expert declarations to support NWEA's ESA citizen-suit claim is consistent with prior practice within the Ninth Circuit. *See, e.g., Tidwell*, 716 F.Supp.2d at 987 (relying on expert reports and rebuttals submitted in support of cross motions for summary judgment on the plaintiff's ESA citizen-suit claim); *Or. Nat. Desert Ass'n v. Kimbell*, 593 F.Supp.2d 1213, 1215 (D. Or. 2008) (granting plaintiff's motion to submit extra-record evidence, including expert reports, in support of ESA citizen-suit claim).

To streamline this process, NWEA requests, first, that this Court confirm by order that NWEA is entitled to rely on any admissible evidence to prove Claim 2, including expert declarations and reports. We anticipate that EPA will oppose this request. But it is consistent with the law discussed above concerning the scope of review in an ESA citizen suit.

Second, NWEA requests that this Court order NWEA and EPA to confer over a schedule to govern discovery of expert opinions, including depositions (if desired) and production of expert files, and to present this Court with a joint discovery plan in due course. If this Court confirms via order that Claim 2 is not limited to any purported "administrative record," contrary

to what EPA has contended to date, then we are hopeful that NWEA and EPA can work out a mutually agreeable discovery plan.

**CONCLUSION**

For the foregoing reasons, NWEA respectfully requests that this Court: allow supplementation of NMFS's record, should the Court choose to rule on that issue now; grant NWEA's request to clarify the scope of review; and order that the Parties may depose expert witnesses and cross-examine those witnesses in support of their motions for summary judgment.

Respectfully submitted this 6th day of September, 2024.

/s/ Allison LaPlante
ALLISON LAPLANTE, OSB No. 023614
Attorney at Law
333 NE Russell St. #200
Portland, OR 97212
(503) 351-1326, allison.laplante@gmail.com

LYDIA DEXTER, OSB No. 233151
Earthrise Law Center, Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6830, lydiadexter@lclark.edu

BRYAN TELEGIN, OSB No. 105253
Telegin Law
175 Parfitt Ave., SW Suite N270
Bainbridge Island, WA 98110
(206) 453-2884, Ext. 101, bryan@teleginlaw.com

*Attorneys for Plaintiff*
*Northwest Environmental Advocates*