ALLISON LAPLANTE, OSB No. 023614
Attorney at Law
333 NE Russell St. #200
Portland, OR 97212
(503) 351-1326, allison.laplante@gmail.com

LYDIA DEXTER, OSB No. 233151
Earthrise Law Center, Lewis & Clark Law School
10101 S Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6830, lydiadexter@lclark.edu

BRYAN TELEGIN, OSB No. 105253
Telegin Law
175 Parfitt Ave., SW Suite N270
Bainbridge Island, WA 98110
(206) 453-2884, Ext. 101, bryan@teleginlaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit organization, | Case No. 3:21-cv-01591-AB |
| Plaintiff, | |
| v. | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY** |
| UNITED STATES NATIONAL MARINE FISHERIES SERVICE, a United States Government Agency, JENNIFER QUAN, in her official capacity as NMFS Regional Administrator for the West Coast Region, THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency, and MICHAEL REGAN, in his official capacity as EPA Administrator, | |
| Defendants. | **(Oral Argument Requested)** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.    NWEA Has Not Waived Any Arguments Advanced in this Motion. ................................ 2

    A.   Procedural History and Conferral ................................................................. 3

    B.   NWEA Did Not Waive its Right to Any Issues Pertaining to the Adequacy of NMFS's Record or the Scope of Review for Claim 2. .................................................................. 5

II.    NWEA Should Be Allowed to Supplement NMFS's Administrative Record Because the Documents it Seeks to Supplement the Record with Fall Squarely Within the First *Lands Council* Exception, and Alternatively, Are Subject to Judicial Notice. ..................................... 7

    A.   NWEA Does Not Need to Make a Threshold Showing that NMFS's Administrative Record is "Insufficient" or "Inadequate." ................................................................. 8

    B.   The *Lands Council* Exceptions Govern the Standard for Supplementation. ................ 10

    C.   The Documents NWEA Seeks to Supplement NMFS's Administrative Record With are Necessary for This Court to Determine Whether the Agency Considered All Relevant Factors. ................................................................................................. 13

        1.   Exhibits H–K (Miles Creek, Umatilla River, Walla Walla, and Molalla Pudding TMDLs) ................................................................................. 15

        2.   Exhibits L and M (EPA Columbia River Temperature TMDL) ............................. 19

        3.   Exhibit N (Deschutes TMDLs Website) ................................................ 20

        4.   Exhibits R, T–U, W–AA (CZARA Documents) ...................................... 21

        5.   Exhibit A (DEQ 1992–1994 Water Quality Standards Review Document) ............. 22

        6.   Exhibit B (2004 Independent Technical Report) ........................................ 23

        7.   Exhibit V (2012 Oregon Agricultural Water Quality Report) ............................... 24

    D.   This Court May Take Judicial Notice of the Documents NWEA Seeks to Supplement NMFS's Administrative Record With. ............................................................... 25

III.    NWEA's Claim Against EPA is Governed by the Citizen-Suit Provision of the Endangered Species Act, and Therefore the Scope of Review from the APA Does Not Apply. 26

    A.   The Ninth Circuit Applies the APA's *Standard* of Review to Endangered Species Act Citizen-Suit Cases, but Not the APA's *Scope* of Review. ................................... 27

    B.   The Ninth Circuit Has Twice Definitively Addressed the Scope of Review for Endangered Species Act Citizen-Suit Cases. ........................................................ 28

    C.   The Ninth Circuit Did Not Expressly Overrule *Washington Toxics* and *Kraayenbrink* in *Karuk Tribe*, and Has Relied on *Kraayenbrink* post-*Karuk Tribe*. ................................. 30

D.  Cases Examining Statutes Other Than the Endangered Species Act to Determine Scope of Review Are Not Applicable for Review of Endangered Species Act Citizen-Suit Claims. 32

E.  The Legislative History of the Endangered Species Act Does Not Support a Conclusion That the Court's Review of Claim 2 is Limited to an Administrative Record. . 33

IV.  In Light of the Clear Law in the Ninth Circuit Regarding the Scope of Review, NWEA Is Entitled to Discovery in this Case. ...................................................................................... 34

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Animal Defense Council v. Hodel*,
   840 F.2d 1432 (9th Cir. 1988) ...................................................................................9, 10

*Audubon Society of Portland v. Zinke*,
   No. 1:17-cv-00069-CL (lead), 2017 WL 2172439 (D. Or. May 16, 2017) ........................6

*Bair v. California State Department of Transportation*,
   867 F.Supp.2d 1058 (N.D. Cal. 2012) ...................................................................................9

*Bark v. Northrop*,
   2 F.Supp.3d 1147 (D. Or. 2014) ...........................................................................................9

*Bennett v. Spear*,
   520 U.S. 154 (1997)..............................................................................................................28

*Center for Environmental Law & Policy v. U.S. Bureau of Reclamation*,
   655 F.3d 1000 (9th Cir. 2011) .............................................................................................26

*Delgadillo v. Kijakazi*,
   No. 20-56211, 2022 WL 301548 (9th Cir. Feb. 1, 2022) ...................................................26

*Ellis v. Housenger*,
   No. C-13-1266-MMC, 2015 WL 3660079 (N.D. Cal. June 12, 2015).............................31

*Fence Creek Cattle Company v. U.S. Forest Service*,
   602 F.3d 1125 (9th Cir. 2010) ...............................................................................................8

*Friends of the Clearwater v. Dombeck*,
   222 F.3d 552 (9th Cir. 2000) ...............................................................................................28

*Friends of the Clearwater v. Higgins*,
   523 F.Supp.3d 1213 (D. Idaho 2021) ..................................................................................32

*Hoopa Valley Tribe v. National Marine Fisheries Service*,
   230 F.Supp.3d 1106 (N.D. Cal. 2017) .................................................................................31

*In re Delta Smelt Consolidated Cases*,
   No. 1:09-CV-1053 OWW DLB, 2010 WL 2520946 (E.D. Cal. June 21, 2010)....... *passim*

*Karuk Tribe of California v. U.S. Forest Service*,
   379 F.Supp.2d 1071 (N.D. Cal. 2005) ...................................................................................9

iii   PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

*Karuk Tribe v. United States Forest Service*,
    681 F.3d 1006 (9th Cir. 2012) ...............................................................30, 31, 32

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ..................................................................... *passim*

*National Association of Homebuilders v. Defenders of Wildlife*,
    551 U.S. 664 (2007)......................................................................................29, 30

*National Family Farm Coalition v. U.S. Environmental Protection Agency*,
    966 F.3d 893 (9th Cir. 2020) ...............................................................................30

*Ninilchik Traditional Council v. United States*,
    227 F.3d 1186 (9th Cir. 2000) .......................................................................32, 33

*Northwest Coalition for Alternatives to Pesticides v. U.S. Environmental Protection Agency*,
    920 F.Supp.2d 1168 (W.D. Wash. 2013)..............................................................31

*Northwest Environmental Advocates v. U.S. Environmental Protection Agency*,
    855 F.Supp.2d 1199 (D. Or. 2012) ..................................................................1, 15

*Northwest Environmental Advocates v. U.S. Environmental Protection Agency*,
    No. 3:12-cv-01751-HZ, 2017 WL 1370713 (D. Or. Apr. 11, 2017) ...................16

*Northwest Environmental Advocates v. U.S. Fish & Wildlife Service*,
    No. 3:18-CV-01420-AC, 2019 WL 6977406 (D. Or. Dec. 20, 2019) ..............9, 31

*Oregon Natural Desert Association v. Bureau of Land Management*,
    625 F.3d 1092 (9th Cir. 2010) .............................................................................25

*Pinnacle Armor, Inc. v. United States*,
    923 F. Supp. 2d 1226, 1245 (E.D. Cal. 2013).......................................................8

*Rybachek v. Environmental Protection Agency*,
    904 F.2d 1276 (9th Cir. 1990) .............................................................................26

*Safe Chemicals, Healthy Families v. U.S. Environmental Protection Agency*,
    943 F.3d 397 (9th Cir. 2019) ...............................................................................26

*Southwest Center for Biological Diversity v. U.S. Forest Service*,
    100 F.3d 1443 (9th Cir. 1996) .............................................................................11

*San Luis & Delta-Mendota Water Authority v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...............................................................................10

iv    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
    ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
    LEAVE TO TAKE DISCOVERY

*San Luis & Delta-Mendota Water Authority v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ...................................................................................11

*The Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) .....................................................................................8

*United States v. Carlo Bianchi & Company*,
    373 U.S. 709 (1963)..................................................................................................32

*United States v. Wells*,
    519 U.S. 482, 496, (1997)........................................................................................34

*Washington Toxics Coalition v. U.S. Environmental Protection Agency*,
    413 F.3d 1024 (9th Cir. 2005) ....................................................................... *passim*

*Western Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ......................................................................... *passim*

*White v. U.S. Army Corps of Engineers*,
    Case No. 3:22-cv-06143-JSC, 2024 WL 24322 (N. D. Cal. Jan. 2, 2024)..................28, 32

*Willamette Riverkeeper v. National Marine Fisheries Service*,
    No. 6:21-cv-0034-AA, 2023 WL 4173893 (D. Or. June 26, 2023)..................................31

*Xerces Society for Invertebrate Conservation, et al. v. Shea, et al.*,
    No. 3:22-cv-00790-HZ (D. Or. Dec. 9, 2022), ECF No. 27 ................................................6

**Statutes**

The Administrative Procedure Act, §§ 551 *et seq.*; §§ 701 *et seq.*

    5 U.S.C. § 704................................................................................................26, 29

    5 U.S.C. § 706................................................................................................27, 28

    5 U.S.C. § 706(2)(A)...........................................................................................27

The Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*

    33 U.S.C. § 1313(c) ............................................................................................19

    33 U.S.C. § 1313(d) ............................................................................................19

The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*

    16 U.S.C. § 1540(g)(1)(A)...............................................................................26, 28

v     PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

Coastal Zone Act Reauthorization Amendments, 16 U.S.C. §§ 1455b *et seq.*

    16 U.S.C. §§ 1455b *et seq.*................................................................................21

**Miscellaneous**

House Conference Report 93-740, at 25, reprinted in 1973 U.S.C.C.A.N. 3001 (Dec. 19, 1973)
..............................................................................................................................33, 34

**INTRODUCTION**

This is the fourth case before this Court about protecting imperiled species of salmon and steelhead from Oregon's overheated rivers and streams. But this case is not just the latest in a long line. It also represents a significant turning point—from the facial adequacy of Oregon's water quality standards, to the practical adequacy of Oregon's implementation of those standards and whether the state will actually do so in a manner that will avoid jeopardy of cold-water salmonids under the Endangered Species Act.

For many years, regulators and scientists have acknowledged the harm from unhealthy water temperatures to cold-water salmonids, and those species' need for "cold-water refugia," which are areas of cooler water for temporary respite as they migrate. Oregon first incorporated a requirement for cold water refugia in its water quality standards two decades ago. In Northwest Environmental Advocates' ("NWEA") prior litigation, this Court reluctantly upheld Oregon's 20ºC migration criterion—an unsafe temperature that the National Marine Fisheries Service ("NMFS") now admits jeopardizes salmonids—specifically and only because that criterion was accompanied by a narrative requirement to ensure cold-water refugia. *Nw. Env't Advocs. v. U.S. Env't Prot. Agency* ("*NWEA II*"), 855 F. Supp.2d 1199, 1214 (D. Or. 2012).

That prior case was about whether, in concept, such a narrative requirement could mitigate the harm to salmonids caused by the 20ºC migration criterion. In other words, that case—arising under the Clean Water Act—was about the adequacy of the words of Oregon's water quality standards and whether, on paper, they stated an appropriate goal of providing cold water refugia.

In contrast, this Endangered Species Act case is about *how*, and *whether*, those words will be implemented and effectuated as experienced by imperiled fish. As evidenced by many of the extra-record documents described in this reply brief, Oregon has an abysmal record of controlling

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

the nonpoint sources of pollution that preclude actually protecting cold-water refugia. The federal Defendants in this case—NMFS and the Environmental Protection Agency ("EPA") (together "Defendants")—erred in failing to consider Oregon's track record, or even how it might change, when they made the decisions challenged in this case.

In order for this Court to meaningfully examine whether NMFS's analysis holds up, and whether EPA has complied with its independent duty to prevent jeopardy to these fish, the Court needs to look beyond what the agencies have deemed to be the "administrative records." Because the agencies did not consider, let alone evaluate, whether the State of Oregon is remotely likely to ensure the sufficiency of streamside trees that are essential to controlling temperature pollution in Oregon's rivers—*where restoration of these trees is key to creating and protecting cold water refugia*—the agencies' "records" cannot and do not reflect that analytical failure. Instead, the agencies relied on a wholly unsupported assumption that actions taken by the Oregon Department of Environmental Quality ("DEQ"), in its normal course of business, would be sufficient to achieve the words that appear on paper. What they ignored is highly relevant to the Court's consideration of this case—that Oregon has never taken action pursuant to its Clean Water Act and related authorities to ensure sufficient streamside trees that would, in turn, protect and create cold-water refugia, and that the agencies had no basis to conclude that pattern would change in the future.

## **ARGUMENT**

### I.      **NWEA Has Not Waived Any Arguments Advanced in this Motion.**

As an initial matter, this Court should reject the various "waiver" arguments sprinkled throughout Defendants' brief. *See* ECF No. 69 at 7, 8, 17 n.7. Defendants make these arguments detached from the history of the Parties' conferral in this case, and find no support in the law.

## A. Procedural History and Conferral

On November 2, 2021, NWEA filed this case against NMFS and the NMFS Regional Administrator, alleging that NMFS issued a biological opinion that failed to prevent jeopardy to imperiled salmonids in Oregon rivers and was otherwise arbitrary, capricious, and contrary to the Endangered Species Act. ECF No. 1. On January 31, 2022, NWEA filed its First Amended Complaint, adding as Defendants EPA and the EPA Administrator, alleging that EPA has failed to prevent jeopardy to imperiled species and has failed to re-initiate section 7 consultation, both in violation of the Endangered Species Act. ECF No. 6.

Relatively soon after NWEA amended its Complaint, the Parties sought to extend the deadlines in this case so that they could explore the possibility of resolving the matter through a negotiated settlement. The Court granted that initial stay request on March 1, 2022, and ordered the Parties to file monthly joint status reports beginning April 1, 2022. ECF No. 12. The Parties then filed several status reports (*see* ECF Nos. 13, 14, 15, 19, 23, 24), as well as joint motions to extend the stay of the case (*see* ECF Nos. 16, 18, 25) to allow settlement discussions to continue. Those settlement communications continued in earnest for roughly nine months.

In December 2022, lead counsel on the case (Allison LaPlante) needed to take an unplanned medical leave. *See* ECF Nos. 27, 28. Settlement communications resumed after Ms. LaPlante's return from medical leave until June 2023. While the Parties made earnest efforts to reach a negotiated resolution of this case, ultimately, they were unable to agree upon the terms of a settlement. Accordingly, the Parties notified the Court and filed a joint motion requesting that the Court lift the stay and reinitiate the litigation. ECF Nos. 37, 40. In that motion, the Parties also submitted a partial proposed schedule for the case. ECF No. 40 at 2–3. That proposed schedule was the result of the Parties' ongoing, good-faith conferral, and it reflected the Parties' collective

3    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

desire to attempt to resolve issues pertaining to the administrative record(s) and the scope of review in this case, without the Court's intervention.

Shortly thereafter, on August 8, 2023, Judge Hernandez held a status conference with the Parties and lifted the stay at the Parties' request. *See* ECF No. 42. During that status conference, the Court inquired about the potential for motions practice regarding the administrative record(s) in this case. Ms. LaPlante summarized NWEA's position that Claim 2 in this case against EPA is not limited to an administrative record because it is not an Administrative Procedure Act ("APA") claim. Counsel for both Parties also informed the Court that they hoped to resolve issues pertaining to the scope of review, and any other administrative record issues, through conferral, but that the Parties wanted to build in dates for motions practice, should those discussions not resolve the anticipated issues. The Court entered the Parties' agreed-upon partial case management schedule, establishing dates for NWEA to file a motion for leave to file a Second Amended Complaint, a date for Defendants to file a responsive pleading, a date for Defendants to lodge administrative records, and several dates relating to the Parties' conferral and potential motions practice pertaining to the sufficiency of the records and/or the scope of judicial review in this case. *Id.*

Through conferral, the Parties agreed that Defendants would lodge administrative records, NWEA would review those, notify Defendants of any concerns, and the Parties would continue their conferral. NWEA maintained its position, and has never wavered, that the Court's review of Claim 2 in this case is not limited to an administrative record. NWEA was willing, however, to hold off on bringing this issue to the Court until it had reviewed what EPA deemed an "administrative record" for Claim 2. NWEA agreed to this because, if what EPA lodged as a record was adequate for judicial review, NWEA would not need to file a motion, notwithstanding its legal position that the claim against EPA was not limited to such a record. The Parties anticipated

4    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
     ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
     LEAVE TO TAKE DISCOVERY

conferral on issues pertaining to both NMFS's and EPA's "records." This is why all of the Parties' joint motions reference deadlines for motions regarding "scope of review and/or sufficiency."

This is exactly what the Parties did. For months, the Parties exchanged letters and had numerous phone calls regarding both the adequacy of NMFS's record, and the scope of review for the claim against EPA.[1] Indeed, the detailed conferral regarding NMFS's record resulted in NMFS's agreeing to add numerous documents to its record, which NWEA understands NMFS intends to do once this motion is resolved. The specific documents that are the subject of this motion are the documents upon which the Parties could not reach agreement.

With respect to the claim against EPA, NWEA ultimately concluded that what EPA produced as a "record" was not adequate for judicial review. NWEA also informed Defendants that expert testimony may be necessary for Claim 2. The Parties again spent several months trying to come to a resolution of this issue, but were unable to do so. Accordingly, in June 2024, the Parties filed a joint motion informing the Court that the Parties would be engaging in motions practice on the scope of judicial review for Claim 2, but seeking additional time to attempt to resolve the remaining issues regarding NMFS's record. ECF No. 57. The Parties continued to work to resolve issues pertaining to NMFS's record, and as noted, the documents that are the subject of this motion reflect only those documents about which the Parties could not reach agreement.

**B. NWEA Did Not Waive its Right to Any Issues Pertaining to the Adequacy of NMFS's Record or the Scope of Review for Claim 2.**

Defendants' arguments regarding waiver ignore this incredibly extensive conferral between the Parties and misrepresent NWEA's positions in this case.

First, NWEA did not waive its right to ask the Court to defer ruling on the adequacy of

---

[1] Because the vast majority of these written communications are marked "confidential," NWEA is not providing them to the Court at this juncture.

5    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

NMFS's record. Defendants argue that NWEA cannot ask the Court to defer ruling on this issue because NWEA negotiated a schedule for briefing the instant motion. ECF No. 69 at 7. This makes no sense. Yes, NWEA negotiated a briefing schedule. And on September 6, 2024, NWEA filed a motion detailing its arguments about NMFS's record. Thus, NWEA filed the very motion it was required to file, asking the Court to supplement NMFS's record with specific documents. Defendants repeatedly state that NWEA, by now suggesting that the Court could defer ruling on the NMFS record documents, is seeking the opportunity to file another motion at a later date. *Id.* at 7–8. But NWEA has not sought leave to file a second motion. NWEA is simply suggesting that the issues about NMFS's administrative record—which, as evidenced by this very briefing— include much detail related to the underlying issues on the merits of the case; for this reason, the Court may be in a better position to resolve these issues in the context of summary judgment.

Indeed, many courts are moving in this direction, including in the District of Oregon. *See, e.g.*, *Audubon Soc'y of Portland v. Zinke*, No. 1:17-cv-00069-CL (lead), 2017 WL 2172439, at *1– 2 (D. Or. May 16, 2017); *Xerces Soc'y for Invertebrate Conservation, et al. v. Shea, et al.*, No. 3:22-cv-00790-HZ (D. Or. Dec. 9, 2022), ECF No. 27 (following *Audubon Society* and holding that "the parties may include requests to supplement the Administrative Records with extra-record materials as part of their summary judgment briefs"). Defendants dismiss these cases out of hand, arguing that "the parties and the Court have already declined to take that procedural route." ECF No. 69 at 7 n.3. True, here, NWEA has already laid out the arguments for supplementation. As explained in its opening brief, NWEA did this to honor the agreed-upon schedule. ECF No. 65 at 19. This does not mean, however, that the reasoning behind deferring supplementation issues until summary judgment does not still apply with equal force here. The Court clearly has discretion on this issue, and NWEA has not waived any right to bring this matter to the Court's attention now.

6    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
     ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
     LEAVE TO TAKE DISCOVERY

Second, NWEA has also not waived any right to seek expert testimony for the claim against EPA. Defendants argue that NWEA waived this right because it did not make timely initial disclosures. ECF No. 69 at 17 n.7. This argument ignores the many months of negotiations between the Parties on this issue and is borderline disingenuous. NWEA has *always* maintained its view that Claim 2 is not limited to an administrative record. It nevertheless engaged in negotiations with Defendants on the issue in the hopes of reaching an agreement regarding the scope of review that would obviate the need for filing a motion. Expert testimony was, in fact, the primary focus of the Parties' conferral on the scope of review for Claim 2. During those negotiations, it made little sense for NWEA to spend time with initial disclosures or seek a specific discovery order from the Court, given the Parties' mutual hope that they could resolve this issue. Judge Hernandez was well aware of the nature of the Parties' negotiations, but never imposed any deadlines on the Parties pertaining to discovery—presumably because he assumed the scope of review would be put before the Court for a decision, prior to any discovery taking place. That is exactly what this motion is about, and to suggest that NWEA somehow waived its right to discovery is baseless.

II.    **NWEA Should Be Allowed to Supplement NMFS's Administrative Record Because the Documents it Seeks to Supplement the Record with Fall Squarely Within the First *Lands Council* Exception, and Alternatively, Are Subject to Judicial Notice.**

This Court should allow supplementation of NMFS's administrative record because NWEA has made the requisite showing that the specific documents at issue satisfy the relevant Ninth Circuit test, as set out in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Rather than squarely addressing the *Lands Council* test, Defendants rely on district court cases about supplementation that seemingly create a higher burden than the Ninth Circuit has imposed— both by suggesting a rigid two-part test for supplementation, and by arguing that NWEA must show each document pertains to an "entirely new" subject matter. The Ninth Circuit has never

adopted either of these approaches.

Further, Defendants repeatedly point to the size of NMFS's administrative record, suggesting that because of the number of pages included in the record, there is "ample documentation" for judicial review of Claim 1. ECF No. 69 at 1, 4, 13. But the size of the record is irrelevant to this question, because "[t]o determine whether deference is warranted, [courts] look to the sufficiency of the evidence, not the size of the record." *The Lands Council v. McNair*, 537 F.3d 981, 995 (9th Cir. 2008).

For the reasons set forth below, this Court should grant NWEA's request to supplement the record with specific documents or, alternatively, take judicial notice of these documents. The Court needs to look beyond NMFS's administrative record to understand the many ways in which NMFS's 2015 Biological Opinion and Reasonable and Prudent Alternative fail to meet the requirements of the Endangered Species Act or satisfy NMFS's duty to protect imperiled salmonid species from Oregon's overheated rivers.

### A. NWEA Does Not Need to Make a Threshold Showing that NMFS's Administrative Record is "Insufficient" or "Inadequate."

As an initial matter, supplementing the record under the *Lands Council* exceptions does not require the rigid, step-wise test Defendants imply. ECF No. 69 at 1, 8–10 (suggesting that NWEA must first make a threshold showing that the administrative record is inadequate before invoking a *Lands Council* exception). Instead, a showing of "inadequacy" is part and parcel of the supplementation analysis: a party seeking supplementation must offer sufficient explanation as to why the existing record is inadequate to allow judicial review and how supplementation would cure that insufficiency. *Pinnacle Armor, Inc. v. United States*, 923 F.Supp.2d 1226, 1245 (E.D. Cal. 2013); *see also Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (citing *Lands Council* and noting that the purpose of supplementation is to identify and plug

holes in the administrative record while also holding that supplementing the record with 25 unrelated cancelled grazing permits does not satisfy that purpose). In other words, a party seeking supplementation must offer "adequate[] justif[ication]" for its request. *Bark v. Northrop*, 2 F.Supp.3d 1147, 1153 (D. Or. 2014).

NWEA has offered precisely those explanations and justifications. NWEA has argued, ECF No. 65 at 20–29, and demonstrates further below, *infra* at II.C., that the supplementary documents requested are not currently in the record and that those documents are needed in order for the Court to determine whether NMFS considered all relevant factors and adequately explained its decision. Moreover, NWEA has explained the necessity of the supplemental documents to making that determination. In short, NWEA has demonstrated why supplementation is necessary to "identify and plug holes in the administrative record." *Lands Council*, 395 F.3d at 1030. There is no requirement for a prior, separate, and independent showing of inadequacy.

The origin of Defendants' assertion that a threshold showing of inadequacy must be found *prior* to considering supplementation appears to be *Animal Defense Council v. Hodel*, 840 F.2d 1432 (9th Cir. 1988).[2] There, the Ninth Circuit held that there was no need "to go outside the administrative record" because the administrative record, as it existed, "contain[ed] adequate

---

[2] Defendants cite to a slew of opinions to support the assertion that a threshold showing of inadequacy must be found prior to considering supplementation under a *Lands Council* exception. *See* ECF No. 69 at 9, n.4. Many of those opinions ultimately rest their assertions on the *Hodel* court's conclusion that the plaintiffs there "ma[d]e no showing that the district court needed to go outside the administrative record." *See, e.g., Nw. Env't Advocs. v. U.S. Fish & Wildlife Serv.*, No. 3:18-CV-01420-AC, 2019 WL 6977406, at *8 (D. Or. Dec. 20, 2019); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F.Supp.2d 1071, 1087–88 (N.D. Cal. 2005); *In re Delta Smelt Consol. Cases*, No. 1:09-CV-1053 OWW DLB, 2010 WL 2520946, at *5 (E.D. Cal. June 21, 2010). Others, though not citing *Hodel* directly, cite opinions that are themselves based on *Hodel*. *See, e.g., Zinke*, 2017 WL 6376464, at *7 (citing to *Pinnacle Armor*, 923 F.Supp.2d at 1245; *Bair v. Cal. State Dep't of Transp.*, 867 F.Supp.2d 1058, 1067 (N.D. Cal. 2012); *Hodel*, 840 F.2d at 1437 ("The [plaintiff] makes no showing that the district court needed to go outside the administrative record to determine whether the [agency] ignored information")).

9    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
     ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
     LEAVE TO TAKE DISCOVERY

information to respond to [Plaintiff's] allegations." *Id.* at 1437; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) (citing *Hodel* and denying the parties' efforts to supplement the record, under the technical expertise exception, with their own expert declarations when the district court had already appointed its own experts). However, denying extra-record review where a record contains adequate information to respond to a party's allegations does not require its inverse: that an initial showing of inadequacy is required prior to evaluating the need for supplementation. Requiring such a preliminary finding of inadequacy unduly raises the bar for parties seeking supplementation under *Lands Council*.

### B. The *Lands Council* Exceptions Govern the Standard for Supplementation.

*Lands Council* enumerates four exceptions where courts may permit extra-record evidence:

(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

395 F.3d at 1030 (internal quotations omitted). These four exceptions govern the standard for supplementing administrative records in the Ninth Circuit. Defendants' attempt to create a heightened standard under the "relevant factors" exception by asserting that NWEA must identify an "entirely new" subject matter that NMFS failed to consider is contrary to both *Lands Council* and other Ninth Circuit precedent.

The standard "entirely new" has hever been used or adopted by the Ninth Circuit. Defendants rely on a case from the Eastern District of California for the premise that each of the extra-record documents submitted by NWEA must not only identify "relevant factors" NMFS should have considered, but that each of these extra-record documents must present an "entirely new" subject matter in the record. ECF No. 69 at 12–13; *Delta Smelt*, 2010 WL 2520946, at *5. If

the Ninth Circuit had meant to qualify the "relevant factors" exception by requiring a party to both show why an extra-record document is relevant to explain an agency decision *and* demonstrate that such document identifies an "entirely new" subject matter, the Circuit would have done so. Tellingly, Defendants cite no Ninth Circuit precedent applying this heightened standard. *See* ECF No. 69 at 10–13. Instead, Defendants rely on *Delta Smelt* and a handful of other district court opinions that simply recite the *Delta Smelt* language, with no further analysis. *Id.* at 12–13.

Defendants' assertion that NWEA must identify an "entirely new" subject matter to satisfy the "relevant factors" exception is contrary to the Ninth Circuit precedent because the Ninth Circuit analyzes the *purpose* of the extra-record document, not the *substantive subject matter* of the extra-record document. The "relevant factors" exception permits courts to consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014). The Ninth Circuit makes clear that evaluating the subject matter of extra-record evidence introduced is not determinative; rather evaluating the purpose of the extra-record evidence is the proper standard. *Id.* at 993. No extra-record evidence may be submitted if its purpose is to "judge the wisdom of [an] agency's action," regardless of whether it presents an entirely new subject matter or a subject matter already in the record. *Id.* So long as the purpose of the extra-record evidence is to allow the district court to "evaluate the integrity of the agency's analysis," whether the evidence presents an entirely new subject matter or a subject matter already in the record is not the proper standard. *Id.* Supplementation of extra-record evidence is proper where the information contained in the proposed documents is necessary to this Court's review of the agency's action and the information cannot be extracted from the existing record. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir. 1996). Here, the documents NWEA seeks to

11    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

supplement NMFS's administrative record with meet the "relevant factors" standard, as explained below. *See infra*, II.C.

To suggest that the "relevant factors" exception creates an additional hurdle to supplementation by requiring an "entirely new" subject matter distorts the exception because it will allow Defendants to create wide abstractions about the subject matters already covered by record, such that supplementation could almost never be warranted. Although the relevant factors exception is a narrow exception and the exception must not swallow the rule, Defendants' requirement of an "entirely new" subject matter threatens to destroy the exception because some extra-record evidence may not discuss an "entirely new" subject matter but may nonetheless be relevant in evaluating the integrity of the agency's analysis.

Further, Defendants omit the context in which the court used the "entirely new" language in *Delta Smelt*. In that case, the plaintiffs asked the court to supplement the record under the "relevant factors" exception with documents it claimed showed that the agency did not give "appropriate consideration" to the predation of the endangered species at issue in its biological opinion. 2010 WL 2520946, at *5. The court held that the disputed documents did not meet that exception because the documents "merely offer[ed] a nuanced point" rather than "an entirely new consideration." *Id.* at *6. The court further elaborated that "the 'relevant factors' exception only applies when Federal Defendants fail to consider a general subject matter that is demonstrably relevant to the outcome of the agency's decision, not when specific hypotheses and/or conclusions are omitted from consideration." *Id.* at *5. The court simply reiterated the point that the "relevant factors" exception is a narrow exception. NWEA does not dispute this point. Instead, NWEA disputes Defendants' proposition that the Ninth Circuit meant to create a heightened standard for the *Lands Council* "relevant factors" exception by requiring every piece of extra-record evidence

12    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

to introduce an "entirely new" subject matter, despite the Circuit never using this language. NWEA understands that it must avoid presenting documents that only offer a nuanced point or specific hypothesis about a subject matter in the record, and it has done so here.

### C. The Documents NWEA Seeks to Supplement NMFS's Administrative Record With are Necessary for This Court to Determine Whether the Agency Considered All Relevant Factors.

NWEA seeks to supplement NMFS's record with a list of specific documents, all of which meet the standard set by the Ninth Circuit in *Lands Council*, discussed above. This Court needs the documents to assess whether NMFS "has considered all relevant factors and has explained its decision." *Lands Council*, 395 F.3d at 1030. Defendants criticize NWEA's attempt to succinctly explain the "relevance" of each document and category of documents, ignoring that the word "relevant" is the very word the Ninth Circuit used in the exception NWEA invokes. *See* ECF No. 69 at 10–12 (confusingly arguing that showing something is "relevant" does not meet the "relevant factors" exception). As noted above, "relevant" rather than "entirely new" is the applicable standard, and NWEA has made this showing. Defendants then take aim at most, but not all, of the specific documents NWEA proffers, seemingly resting on their view that "[s]everal examples" of NWEA's alleged failures suffice. ECF No. 69 at 11. Below, NWEA responds to each of Defendants' specific attacks.[3]

Before turning to the documents, however, NWEA addresses Defendants' fundamental misunderstanding of NWEA's arguments. Defendants claim that "Plaintiff does not allege that documents in NMFS's Administrative Record are devoid of considerations of Oregon's

---

[3] To the extent Defendants take issue with the relevance of the remaining documents not specifically addressed in their opposition brief, NWEA points the Court to pages 20–29 of NWEA's opening brief, ECF 65, for NWEA's explanation of each of those documents' importance.

13    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

implementation of the CWA or protection of refugia." ECF No. 69 at 13. This is incorrect. Indeed, NWEA emphatically asserts the documents it has provided the Court show that the existing record has enormous gaps regarding implementation. To be sure, the Biological Opinion makes numerous references to "implementation" of the Clean Water Act. *See, e.g.*, ECF No. 66-28 at 259, 261, 267–69, 273, 276, 282. But at summary judgment, NWEA will show that "implementation" in the form of various Clean Water Act actions *on paper* (e.g., state-issued and EPA-approved clean-up plans, or Total Maximum Daily Loads ("TMDLs") for temperature) is wholly separate from what implementation means *on the ground* in terms of protecting imperiled species. It is the latter category of documentation that is strikingly absent from the record; and that information is critical to the Court's understanding of why the assumptions and promises in the Biological Opinion are untethered to the reality of Oregon's decades-long failure to improve water quality through its purported "implementation" of the Clean Water Act and other authorities. And it is this latter category that is relevant to the Endangered Species Act, which is only concerned with actually protecting the listed species.

As discussed in detail below, NMFS relies heavily on the notion that Oregon's temperature TMDLs are the primary vehicle for carrying out the refugia requirement. But the Biological Opinion says nothing about whether this would benefit the fish, even if refugia were directly addressed through TMDLs. Oregon's temperature TMDLs contain entirely unenforceable pollution reduction expectations for nonpoint sources (i.e., the vast majority of temperature impacts). Pointedly, NMFS does not say that it asked EPA whether TMDLs would help fish via refugia, even if the TMDL paperwork were to address them. *See id.* at 9 (setting forth the specific list of questions NMFS sent EPA). Likewise, the Biological Opinion makes no mention of the track record—or rather, lack thereof—of Oregon's programs that purport to control nonpoint

14    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
       ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
       LEAVE TO TAKE DISCOVERY

source pollution. Thus, despite Defendants' characterization, the gap NWEA seeks to close through this motion is very much about "implementation" and "protection of refugia." ECF No. 69 at 13.

### 1. Exhibits H–K (Miles Creek, Umatilla River, Walla Walla, and Molalla Pudding TMDLs)

As discussed in NWEA's opening brief, ECF No. 65 at 14, EPA identified TMDLs as the sole or primary method by which refugia would be "identified and restored." *NWEA II*, 855 F.Supp.2d at 1214; *see also* ECF No. 66-28 at 168–69. In the 2015 Biological Opinion, however, NMFS evaluated this assertion and disagreed that had occurred to date. NMFS concluded, *inter alia*, that "the narrative criterion pertaining to [cold water refugia] does not, to date, appear to be an effective means for minimizing the adverse effects likely to be experienced by migrating salmon and steelhead under the 20°C migration corridor criterion." ECF No. 66-28 at 177–79. NMFS also relied upon an assertion that two specific temperature TMDLs pertaining to the Columbia and Snake Rivers (Snake River and Upper Grande Ronde TMDLs) would be revised in the future, *id*. at 178, while ignoring numerous other EPA-approved TMDLs for Columbia and Snake tributaries. NMFS, therefore, relied on a collection of past and future TMDLs for tributaries discharging to the Columbia River, ostensibly to provide the cold water refugia required to mitigate jeopardy to salmonids from the 20°C migration criterion.

The four TMDLs in Exhibits H–K show that NMFS did not consider all relevant factors because, in relying only on a subset of temperature TMDLs when developing its Biological Opinion, NMFS did not consider the Columbia River Basin TMDLs that—through EPA's approval action—established superseding temperature criteria higher than 20°C without any

15    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

mitigating refugia requirement.[4] These TMDLs also demonstrate that NMFS did not evaluate whether Oregon DEQ would use the TMDLs to actually cool tributary temperatures to create refugia, including in a timeframe that would benefit salmonid species migrating through the Columbia. Instead, NMFS's Reasonable and Prudent Alternative just states that "[o]ver time, [cold water refugia] are more likely to be available and functional, increasing the likelihood that adult and juvenile listed species of salmon and steelhead can reduce their disease risk during migration and avoid water temperatures high enough to impair migration." ECF No. 66-28 at 276. Finally, in its sole reference to on-the-ground implementation in the Biological Opinion, NMFS asserted that by "developing and implementing temperature TMDLs. . . . DEQ will is likely [sic] to be able to reduce the impacts of the 20°C criterion by appropriately controlling . . . nonpoint sources of heat." *Id.* NMFS did not explain how it concluded that the mere development of EPA-approved TMDLs would result in on-the-ground implementation of TMDLs that would actually reduce stream temperatures and create refugia.

These four TMDLs are relevant specifically because, *had NMFS looked at them*, it would have learned that the TMDLs explicitly did not contemplate any additional pollution controls beyond the status quo for the two primary nonpoint sources: logging and farming. For example, Exhibit J states that "[i]f a nonpoint source that is covered by the TMDL complies with its finalized

---

[4] As explained in NWEA's opening brief, Oregon relied on its natural conditions criterion ("NCC") to develop numerous temperature TMDLs. *See* ECF No. 65 at 12–16. The NCC, and how Oregon used it in TMDLs, is an essential part of the story in the instant case. *Id*. By using the NCC in the TMDLs, Oregon supplanted the biologically-based numeric criteria—including the 20°C migration criterion with its accompanying cold water refugia narrative requirement—with new superseding criteria as high as 32.5°C (90.5°F), a temperature instantaneously lethal to salmon. *Id*. at 15. While NWEA prevailed in getting the NCC overturned (*NWEA II*), as well as 14 temperature TMDLs that relied on it (*Nw. Env't Advocs. v. U.S. Env't Prot. Agency* ("*NWEA III*"), No.3:12-cv-0175-HZ, 2017 WL 1370713 (D. Or. Apr. 11, 2017)), some Columbia Basin temperature TMDLs remain in place, having already changed the temperature criteria to well over 20°C.

16    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

Implementation Plan or applicable forest practice rules, it will be considered in compliance with the TMDL." ECF No. 66-10 at 6. The Biological Opinion cited the Willamette River TMDL implementation plan as stating that other agencies "need to address CWR in their TMDL implementation plans," citing a variety of agencies, none of which regulates or even purports to regulate logging and farming. ECF No. 66-28 at 177.

Further, although NMFS discussed some specific TMDLs and TMDLs in general, it did not explain its decision to rely upon TMDLs for Columbia River tributaries that could be refugia. It did not even mention many of the TMDLs already in place at the time of the Biological Opinion's issuance, including the four discussed here. Nor did it mention whether older TMDLs that established superseding temperature criteria higher than 20°C were likely to achieve temperatures at the confluence of the Columbia that were less than the 20°C numeric criterion or meet the definition for a cold water refuge. NMFS did not even examine the existing TMDLs to see what superseding temperature targets they established at their confluences with the Columbia to see if they could function as refugia if they were implemented with pollution controls.

Moreover, and underscoring the overarching point about the Biological Opinion's failure to meaningfully address implementation, NMFS did not contemplate whether the TMDLs were merely Clean Water Act paperwork exercises or whether they were implemented on the ground to the benefit of salmonids. Instead, NMFS based the Reasonable and Prudent Alternative on a future plan that would "adequately interpret the narrative criterion to allow for implementation of the criterion through DEQ's Clean Water Act authorities," *id.* at 273, without exploring: (1) whether these authorities could and likely would control the nonpoint sources causing most of the stream heating; and (2) whether DEQ was using or would use its federal or state authorities, by itself or in conjunction with any other agencies, to implement pollution controls pursuant to the TMDLs.

17    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

NMFS simply did not explain a decision to rely on TMDL paperwork developed pursuant to the Clean Water Act as a means to *actually protect* salmon from high and often lethal temperatures during migration. Instead, it assumed that there is such a thing as "implementing temperature TMDLs" after they are developed. *Id*. at 276.

Among other things, each of these four TMDLs reflects superseding temperature criteria above the biologically-based criteria that would otherwise apply:

The 2008 Miles Creek TMDL (Exhibit H) illustrates the points made above by demonstrating that: (1) the EPA-approved superseding temperature criterion of 19°C at the confluence of Fifteenmile Creek with the Columbia River does not meet the definition of a cold water refuge[5] (ECF No. 66-10 at 60, fig. 3-18); (2) current temperatures at this confluence are 26°C (*id*.); and (3) nonpoint sources in compliance with existing practices are deemed to be in compliance with the TMDL (*id*. at 73–74).

The 2001 Umatilla River TMDL (Exhibit I) demonstrates that current temperatures at its confluence with the Columbia are "greater than 78° F [25.6°C]" with superseding EPA-approved temperature criteria of 19.4–22° C (67–71.5°F). ECF No. 66-9 at 60, fig. 13; 109–10, figs. 41, 42. Similar to the Miles Creek TMDL, and despite DEQ's finding that 98 percent of the Umatilla basin's streams had less shade than required, *id*. at 62, neither agriculture nor logging was required to change practices to meet the Umatilla TMDL, *id*. at 196 (noting that a 1999 *voluntary* plan from the Oregon Department of Agriculture is the basis for meeting the TMDL); *id*. at 200–03, 210 (relying on existing Oregon Forest Practices Act practices). NMFS did not look at the Umatilla TMDL despite numerous findings in the Biological Opinion that Umatilla salmonids were among

---

[5] Refugia are defined as "those portions of water body where, or times during the diel temperature cycle when, the water temperature is at least 2°C colder than the daily maximum temperature of the adjacent well mixed flow of the water body." OAR 340-041-0002(10).

18    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

the populations most likely to be severely affected by temperature. *See* ECF No. 66-28 at 234, 83, 267–68.

The 2009 Molalla Pudding TMDL (Exhibit K), while a subbasin of the Willamette River, clearly shows (in an unusual chart form) the superseding temperature criteria over 20°C and as high as 21.6°C. *See* ECF No. 66-11 at 42, tables 2-5 and 2-6.

Finally, the 2005 Walla Walla TMDL (Exhibit J) shows that for this potential Columbia River refuge (with its confluence in Washington State), eight percent of basin streams have EPA-approved superseding temperature criteria of 24–26°C, 22 percent have superseding criteria of 22–24°C, and 20 percent have superseding criteria of 20–22°C.

NMFS did not identify any of these four TMDLs as being among those subject to revision,[6] ECF No. 66-28 at 178, which would preclude their future use as refugia. In addition, NMFS appeared to rely on its review of a single TMDL—for the Umpqua River Basin—for the proposition that "modeled natural thermal potential would be only slightly cooler." *Id.* at 161 (footnote omitted).  NMFS did not review these four TMDLs to see if they called for changes to the very logging and farming practices that are driving high river temperatures, *see, e.g.,* ECF No. 66-28 at 64, 82, 100, such that NMFS could correctly rely on TMDLs as a mechanism to be implemented with nonpoint source controls that would benefit actual fish.

### 2.  Exhibits L and M (EPA Columbia River Temperature TMDL)

NMFS's administrative record does not contain EPA's then-pending temperature TMDL for the Columbia River, notwithstanding that this TMDL would theoretically have the single

---

[6] Note that the Clean Water Act does not provide a process or mandate for TMDLs to be revised once they have been developed. Section 303(c), 33 U.S.C. § 1313(c), requires states to review their water quality standards every three years and submit changes to EPA for review and approval. In contrast, section 303(d), 33 U.S.C. § 1313(d), requires no such process for TMDLs.

greatest impact on whether refugia were provided to migrating salmonids in the Columbia and Snake Rivers. Exhibit L is a draft TMDL developed by EPA that was in public circulation and available on EPA's website at the time of the 2015 Biological Opinion's issuance. Exhibit M is a 2002 PowerPoint presentation showing that EPA was disregarding the importance of refugia in its development of that TMDL. Given NMFS's reliance on TMDLs to carry out the refugia criterion, that the Columbia and Snake Rivers are the primary waterbodies affected by the refugia requirement, and that EPA had issued a draft TMDL in which it asserted that the future TMDL "won't necessarily restore . . . the cold water refugia which provided cooling times and areas for salmon in the natural rivers," NMFS's failure to consider this information and to explain why it still relied on DEQ's Clean Water Act authorities to provide refugia to otherwise jeopardized salmonids is without basis. ECF No. 66-12 at 45.

### 3.   Exhibit N (Deschutes TMDLs Website)

As noted many times, NMFS relied on the development of TMDLs to address refugia. *See, e.g.*, ECF No. 66-28 at 177. NMFS evaluated the extent of violations of Oregon's temperature criteria in the Deschutes River Basin, including the confluence of the Deschutes with the Columbia River, a potential cold water refuge. *Id*. at 94, fig. 9. More than any other tributary, NMFS described the temporary use of the Deschutes River by migrating salmonids as a refuge from high summer temperatures in the Columbia. *Id.* at 222–23 (Chinook), 237–38 (sockeye). NMFS knew, prior to EPA's response to the Reasonable and Prudent Alternative, that steelhead relied on the Deschutes for temporary refuge, to the greatest extent of all the large Oregon tributaries. *Id*. at 233–35. Despite having focused on the importance of the Deschutes River as a refuge for migrating salmonids, and despite NMFS's reliance on TMDLs to provide cold water refugia, NMFS did not consider the relevance of whether Oregon DEQ was likely to either develop or implement a TMDL

for the Deschutes River Basin. Had it done so, by simply looking at DEQ's public website, it would have seen that for some portions of the basin, no TMDLs had been started, and for other portions, TMDL development had been initiated as early as 2000 with no resulting TMDLs. *See* Ex. N, ECF No. 66-14. NMFS's failure to consider whether a Deschutes River Basin TMDL would ever be completed—let alone implemented—demonstrates its failure to consider all relevant factors, including its failure to explain how the Reasonable and Prudent Alternative would meaningfully protect salmonids and mitigate its finding that the 20°C criterion alone jeopardizes the species.

### 4.  Exhibits R, T–U, W–AA (CZARA Documents)

Exhibits R, T–U, and W–AA all pertain to Oregon's nonpoint source program, specifically for coastal watersheds, including the Lower Columbia River. Again, water temperatures in Oregon's watersheds—forming refugia at their confluences with the Columbia River—are influenced predominantly by nonpoint sources. *See, e.g.,* ECF No. 66-28 at 64. As a result, TMDLs to address temperature impairments focus exclusively or almost entirely on restoring streamside vegetation to streams and rivers. *See, e.g.,* NMFS_0037623, NMFS_0037624 (Umpqua River Basin TMDL with allocations for shade), NMFS_0037644 (allocation for channel width for only one creek); NMFS_0014191 (Rogue River Basin TMDL with allocations for shade and some flows). This is consistent with NMFS's own observations. *See* ECF No. 66-28 at 100 (citing study for the proposition that "agriculture and cutting of streamside trees were major agents of change for riparian vegetation"). As the result of a now 26-year-old process pursuant to the Coastal Zone Act Reauthorization Amendments ("CZARA"), 16 U.S.C. §§ 1455b *et seq.*, National Oceanic and Atmospheric Administration ("NOAA") and EPA have been evaluating whether Oregon has a program in place to control nonpoint sources, focused primarily on temperature pollution from loss of streamside vegetation. NOAA is the parent agency to NMFS, which itself was highly

21    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
LEAVE TO TAKE DISCOVERY

involved in this process. NMFS's failure to even consider whether the results of this parallel process—in which three federal agencies were concluding that Oregon's nonpoint source control program was inadequate to meet water quality standards and protect salmonids—was a failure to consider all relevant factors. Remarkably, the Biological Opinion never once even mentions CZARA; nor does it disclose the fact that the federal agencies ultimately cut funding to Oregon under this process—a necessarily harsh yet *unprecedented* penalty for a state's failures. NMFS's Reasonable and Prudent Alternative nevertheless relies upon this very same failed program to "allow for implementation of the [refugia] criterion through DEQ's Clean Water Act authorities," ECF No. 66-28 at 273, and nothing in the Biological Opinion or the record explains how NMFS could have relied upon Oregon's nonpoint source control program to prevent jeopardy to migrating salmonids via refugia without also assessing the known failure of the very same program.[7]

### 5. Exhibit A (DEQ 1992–1994 Water Quality Standards Review Document)

Exhibit A is a 1995 Oregon rulemaking document that reflects the first time that cold water refugia were considered for water quality standards "as an important element in the survival of cold-water species in warmer waters." ECF No. 66-1 at 69. At the time of NMFS's 2015 Biological Opinion, Oregon DEQ had failed to protect and restore refugia that had been identified as essential

---

[7] NMFS does not specifically object to two of the CZARA documents NWEA has proffered: (1) Exhibit O, the joint findings of NOAA and EPA in 1998 pertaining to Oregon's nonpoint source pollution control program; and (2) Exhibit S, a settlement pertaining to how Oregon could rectify its longstanding program failures. These documents are highly relevant to the likelihood that NMFS's Reasonable and Prudent Alternative will translate into meaningful improvements in fish habitat in the Columbia River and its tributary refugia. NMFS's failure to both consider its own parent agency's findings in 1998 and to explain why those findings were not relevant to its determination that a Reasonable and Prudent Alternative based on that very same failed program meets the test set out in *Lands Council*. Further, while NWEA maintains that "entirely new" is not the relevant test, given that the Biological Opinion does not even mention CZARA, this category of documents easily meets the "entirely new" standard.

22    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

*for 20 years*. This extended period of agency inaction is a relevant factor in whether NMFS Reasonable and Prudent Alternative directing EPA and DEQ to prepare a plan that would "adequately interpret the narrative criterion to allow for implementation of the [refugia] criterion through DEQ's Clean Water Act authorities" was likely to mitigate the jeopardy to salmonids caused by EPA's approval of the 20°C migration criterion. *See* ECF No. 66-28 at 273. Nowhere in the Biological Opinion did NMFS explain why, in light of the state agency's failure to carry out its own EPA-approved water quality standards for two decades, the Reasonable and Prudent Alternative's exhortation was likely to meet with greater success, either on paper or in actual water quality results.

### 6. Exhibit B (2004 Independent Technical Report)

Exhibit B is a report by Oregon's Independent Multidisciplinary Science Team ("IMST") to the Oregon Legislature and Governor pertaining to Oregon' water quality standards for temperature, including "causes, consequences, and controversies." ECF No. 66-2 at 1. The author of the 2015 Biological Opinion, NMFS's Jeff Lockwood, was a technical reviewer of the report, demonstrating that its findings are a relevant factor in his development of the agency's Biological Opinion. The IMST report determined both that refugia were an essential part of the Oregon temperature standards and that the standards were inadequate to identify, protect, and restore refugia. *Id.* at 9–10, 39, 58–61, 63, 116. For example, the report identified the problem of having inadequate refugia in which "[e]xcessive temperature can temporarily crowd fish into habitats that are incapable of supporting fish over the long-term, potentially increasing competition among fish and enhancing disease transmission" and noted that "coldwater refugia do not replace the need to lower temperatures in streams that have been warmed excessively by human activity." *Id.* at 61. The IMST also found that the Oregon refugia standard was "difficult to implement." *Id.* at 63.

23    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

NMFS's failure to address the findings and concerns of the IMST and its numerous technical reviewers, including the author of the 2015 Biological Opinion, is relevant to whether NMFS considered the barriers to achieving the sufficient cold water refugia that agencies and scientists acknowledge are critical to salmonid survival. Moreover, NMFS's Biological Opinion failed to address the harm that inadequate cold water refugia could have on the species, as set out in this report.

**7.  Exhibit V (2012 Oregon Agricultural Water Quality Report)**

NMFS concludes that in the Interior Columbia Recovery Domain—which includes the major Oregon tributaries of the Deschutes, John Day, Umatilla, Walla Walla, Grande Ronde, and Imnaha rivers—critical habitat "has been degraded by intense agriculture" and that "[r]emoval of riparian vegetation, alteration of natural stream morphology, and withdrawal of water all contribute to elevated stream temperatures." ECF No. 66-28 at 72–73. The Biological Opinion described the "indirect new obligations" established by water quality standards on the Oregon Department of Agriculture ("ODA") "since their programs reference compliance with WQSs." *Id*. at 112. Exhibit V is a report by the ODA that discusses whether TMDLs are likely to be implemented on the ground in such a way as to measurably reduce water temperatures in tributaries that will protect and restore thermal refuges in the Columbia River, as is contemplated in the Reasonable and Prudent Alternative. Published three years prior to the Biological Opinion, it refers to "implementation-ready TMDLs," a now abandoned commitment made by the Oregon DEQ in the CZARA settlement (Ex. S). ECF No. 66-22 at 5, 24. The report states definitively that "[i]f a landowner is in compliance with the ODA riparian regulations, they are considered to be meeting the water quality standard for temperature on their operation." *Id*. at 24. Similarly, the report states neither water quality standards nor TMDLs "require landowners to plant trees to attain compliance,

reducing regulatory burden." *Id*. at 25. It further explains that landowners can "be in compliance with streamside vegetation regulations" while not providing the shade called for by TMDLs. *Id*. Thus, it concludes, the program "[r]elies on voluntary efforts to attain temperature load allocations in some cases." *Id*. NMFS's failure to look past its assertion that ODA programs "reference compliance with [water quality standards]" to evaluate whether ODA programs were likely to control agricultural contributions to high stream temperatures such that DEQ's TMDLs would, in fact, result in cooled stream temperatures, ignored a highly relevant factor regarding whether the Reasonable and Prudent Alternative would meaningfully protect salmonids. The Reasonable and Prudent Alternative's focus on DEQ's implementation of the refugia criterion "through DEQ's Clean Water Act authorities" ignored whether those authorities could or would control the nonpoint sources causing most of the stream heating. NMFS also failed to explain its reliance on the Reasonable and Prudent Alternative in light of the fact that despite hundreds or thousands of completed temperature TMDLs in Oregon, there is no evidence of stream temperature restoration, let alone at the geographic scale necessary to reduce temperatures at the confluence of a major tributary of the Columbia River serving as a thermal refuge.

### D. This Court May Take Judicial Notice of the Documents NWEA Seeks to Supplement NMFS's Administrative Record With.

While each of the previously-described documents fall within the first *Lands Council* exception, and can thus be added to NMFS's administrative record via supplementation, this Court has broad discretion to take judicial notice of many of these documents if it prefers. Judicial notice is appropriate for documents that are available on public government websites, even when those documents are also eligible for supplementation, as recognized by the Ninth Circuit in APA cases on several occasions. *See, e.g.*, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1109, 1112 n.14 (9th Cir. 2010) (taking judicial notice of an agency's guidance handbook, a public

agency document); *Ctr. for Env't L. & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1010–11 n.5 (9th Cir. 2011) (taking judicial notice of a draft Environmental Impact Statement, another public agency document, which was published after the district court ruled); *Safe Chemicals, Healthy Families v. U.S. Env't Prot. Agency*, 943 F.3d 397, 420 n.13 (9th Cir. 2019) (taking judicial notice of an agency evaluation that was publicly available online). Interestingly, the case that Defendants rely on for the proposition that NWEA must prove the documents it seeks to supplement must involve an "entirely new" subject matter, *Delta Smelt*, allowed the plaintiff to supplement the administrative record with declarations from related litigation "because the declarations would be subject to judicial notice in any event[.]" 2010 WL 2520946, at *4–5.

While there are certainly instances where courts have declined to take judicial notice of publicly available agency documents in APA record review cases,[8] *see, e.g.*, *Rybachek v. Env't Prot. Agency*, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990) (denying request for judicial notice because the proposed documents did not meet the standard for supplementation), this does not mean that this Court does not have the authority or discretion to do so.

### III. NWEA's Claim Against EPA is Governed by the Citizen-Suit Provision of the Endangered Species Act, and Therefore the Scope of Review from the APA Does Not Apply.

Claim 2 arises under the Endangered Species Act citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A). Because the Endangered Species Act provides a private right of action, the APA does not govern this Claim, as the APA only applies where "there is no other adequate remedy" in court. 5 U.S.C. § 704. Since the Endangered Species Act citizen-suit provision governs Claim 2,

---

[8] Defendants argue judicial notice is not available here because NWEA "cannot circumvent the rules governing administrative record supplementation by asking for judicial notice[,]" citing to *Delgadillo v. Kijakazi*, No. 20-56211, 2022 WL 301548, at *1 (9th Cir. Feb. 1, 2022). However, *Delgadillo* involves claims arising under the Social Security Act, which involves an entirely different record collection and review process than claims arising under the APA. *See id*. at *1.

26    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

the scope of review is not limited to an administrative record the way it would be under the APA, 5 U.S.C. § 706, which has been twice affirmed by the Ninth Circuit and followed by many district courts. The legislative history of the Endangered Species Act does not dispute this interpretation, and in fact, does not support Defendants' proposition that the scope of review for Claim 2 is limited to an administrative record.

**A. The Ninth Circuit Applies the APA's *Standard* of Review to Endangered Species Act Citizen-Suit Cases, but Not the APA's *Scope* of Review.**

Defendants frequently conflate the APA's standard of review with the APA's scope of review, arguing that both apply to Endangered Species Act citizen-suit claims, despite well-established Ninth Circuit precedent holding the contrary. While the Ninth Circuit does apply the APA's *standard* of review, it does not apply the APA's *scope* of review to Endangered Species Act citizen-suit claims.

Under the APA, reviewing courts must hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). This constitutes the *standard* of review a court must use when determining whether to set aside agency action for claims brought under the Endangered Species Act citizen-suit provision. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) ("Because ESA contains no internal standard of review, section 706 of the [APA], 5 U.S.C. § 706, governs review of [agency] actions and the normal 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' standard applies." (internal quotations omitted)).

Conversely, the *scope* of review describes universe of documents that reviewing courts may consider when determining if agency actions are arbitrary and capricious. For claims arising under the APA, the scope is different from claims arising under statutes authorizing a private right

27    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
LEAVE TO TAKE DISCOVERY

of action, including the Endangered Species Act. Under the APA, courts are generally[9] limited to reviewing "the whole record" compiled by the agency. 5 U.S.C. § 706. However, "the APA by its terms independently authorizes review only when there is no other adequate remedy in a court." *Bennett v. Spear*, 520 U.S. 154, 161–62 (1997). The Endangered Species Act citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A), "is a means by which private parties may enforce the substantive provisions of the ESA[,]" and thus provides its own remedy. *White v. U.S. Army Corps of Eng'rs*, Case No. 3:22-cv-06143-JSC, 2024 WL 24322, at *1–2 (N.D. Cal. Jan. 2, 2024) (quoting *Bennett*, 520 U.S. at 173). Thus, the *scope* of review for Endangered Species Act citizen-suit claims is "divisible" from the APA *standard* of review, and this Court should not confine its review to EPA's administrative record. *White*, 2024 WL 24322, at *2–3.

**B. The Ninth Circuit Has Twice Definitively Addressed the Scope of Review for Endangered Species Act Citizen-Suit Cases.**

Because Claim 2 arises under the Endangered Species Act citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A), the scope of review is not governed by the APA, 5 U.S.C. § 706, as held in both *Washington Toxics Coalition v. U.S. Environmental Protection Agency*, 413 F.3d 1024 (9th Cir. 2005), and *Kraayenbrink*, 632 F.3d at 472, the controlling precedent in the Ninth Circuit.

The Ninth Circuit in *Washington Toxics* clearly held that "the ESA citizen suit provision creates an express, adequate remedy[,]" and as such, "the APA does not govern the plaintiffs' claims." 413 F.3d at 1034. Defendants argue that *Washington Toxics* did not hold that the scope

---

[9] While the scope of review for APA section 706(2) claims is limited to an administrative record, it is not for APA section 706(1) claims, which allow courts to "compel agency action unlawfully withheld or unreasonable delayed[.]" This is because section 706(1) claims do not challenge a discrete agency decision, but rather an ongoing failure. In these instances, the scope of review is not "limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). In this way, APA section 706(1) claims are analogous to ESA citizen-suit claims.

28    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

of review for Endangered Species Act citizen-suit claims extends beyond an administrative record, and that instead the court "held only that it was not necessary to challenge 'final' agency action in accordance with 5 U.S.C. § 704 in order to plead an ESA citizen-suit claim." ECF No. 69 at 21–22. This assertion is untrue. In *Washington Toxics*, the Ninth Circuit recounted the district court proceedings, where the intervenors had contended that the Endangered Species Act citizen-suit claim was "governed by the principles of judicial review… of the [APA]," and as such, "the district court lacked jurisdiction… apart from reviewing the administrative record pursuant to a cause of action established by the APA." 413 F.3d at 1029. The Ninth Circuit then explained: "The district court held that because the ESA independently authorized a private right of action, the APA was inapplicable[,]" and thus, the scope of review was not limited to the record. *Id.* at 1030. The Ninth Circuit then "affirm[ed] the district court's orders in their entirety[,]" which includes the district court's holding about the scope of review for Endangered Species Act citizen suit claims. *Id.* at 1029. Even if *Washington Toxics* left any doubt, *Kraayenbrink* subsequently reiterated its understanding of the court's discussion in *Washington Toxics* and ultimately concluded "under *Washington Toxics Coalition* we may consider evidence outside the administrative record for the limited purposes of reviewing [an] ESA claim." 632 F.3d at 497.

Further, Defendants' assertion that *National Association of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644 (2007), "unambiguously imported the APA, including the finality requirement. 5 U.S.C. § 704, into its ESA evaluation" does not hold water. ECF No. 69 at 22. The Supreme Court's review considered the merits of the petitioners' claims, not any issues either party may have had with the scope of review. *Homebuilders,* 551 U.S. at 649–50. Thus, *Homebuilders* by no means "unambiguously" resolves the scope of review for Endangered Species Act citizen-suit claims. Additionally, NWEA agrees that *Homebuilders* properly applied the APA's standard

29     PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
       ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
       LEAVE TO TAKE DISCOVERY

of review by assessing the agency's decision under the arbitrary and capricious standard. *Id.* at

657. As explained above, the APA's *standard* of review applies to Endangered Species Act citizen-

suit cases, and as such, the Supreme Court's opinion in *Homebuilders* does not affect the holding

of *Washington Toxics*.

*Washington Toxics* in *Kraayenbrink* mark the most recent times that the Ninth Circuit has

expressly addressed what the scope of review encompasses for Endangered Species Act citizen-

suit cases.[10]

### C. The Ninth Circuit Did Not Expressly Overrule *Washington Toxics* and *Kraayenbrink* in *Karuk Tribe*, and Has Relied on *Kraayenbrink* post-*Karuk Tribe*.

The Ninth Circuit had the opportunity to expressly overrule *Washington Toxics* and

*Kraayenbrink* in *Karuk Tribe v. United States Forest Service*, 681 F.3d 1006 (9th Cir. 2012), but

it did not do so. While the Ninth Circuit labelled the plaintiffs' Endangered Species Act section 7

claim a "record review" case, the scope of the administrative record was not at issue. 681 F.3d at

1011, 1017. Additionally, this single sentence referencing the record falls under the heading,

"Standard of Review," where the court noted that it follows the APA's *standard* of "arbitrary [or]

capricious" to determine an agency's compliance with the Endangered Species Act. *Id.* at 1017.

This brief discussion—which neither expressly addressed the *scope* of review for Endangered

Species Act citizen-suit cases, nor mentioned *Washington Toxics* and *Kraayenbrink*—cannot

overrule well-established Ninth Circuit precedent without distinctly saying so.

Further, the Ninth Circuit has cited to and relied on *Kraayenbrink* since its *en banc* decision

in *Karuk Tribe*. In *National Family Farm Coalition v. U.S. Environmental Protection Agency*, 966

F.3d 893, 926 n.11 (9th Cir. 2020), the Ninth Circuit cited to *Kraayenbrink*, acknowledging the

---

[10] NWEA provided other examples of district courts following *Washington Toxics* in *Kraayenbrink* in its Opening Brief. *See* ECF No. 65 at 31–32.

30    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
      ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
      LEAVE TO TAKE DISCOVERY

court could consider materials outside the administrative record "for the limited purpose[] of reviewing [Petitioners'] ESA claim" (alternations in original). Thus, this Court is not limited to an administrative record for its scope of review under Claim 2.

Additionally, since the Ninth Circuit's *en banc* opinion in *Karuk Tribe*, many district court decisions, including in the District of Oregon, have held that *Karuk Tribe* did not silently overrule *Washington Toxics* and *Kraayenbrink*, and thus the scope of review for Endangered Species Act citizen-suit cases is not limited to an administrative record. As Judge Aiken explained in *Willamette Riverkeeper v. National Marine Fisheries Service*, No. 6:21-cv-0034-AA, 2023 WL 4173893, at *2 (D. Or. June 26, 2023), "*Karuk Tribe* did not silently overrule the holdings of *Washington Toxics* and *Kraayenbrink* concerning the scope of review for citizen suit claims under the ESA." Other district court judges have agreed. *See, e.g.*, *Nw. Env't Advocs*, 2019 WL 6977406, at *14 ("Thus, the Ninth Circuit did not 'hold' that ESA citizen-suits must adhere to the scope of review set forth in the APA, and *Karuk Tribe* did not quietly overrule *Washington Toxics* or *Kraayenbrink*."); *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F.Supp.3d 1106, 1124 (N.D. Cal. 2017) ("There is no indication that the Ninth Circuit intended this ['record review' case] statement to overrule the reasoning in *Washington Toxics* and *Kraayenbrink*; those cases are neither cited nor discussed in *Karuk Tribe*."); *Nw. Coal. for Alts. to Pesticides v. U.S. Env't Prot. Agency*, 920 F.Supp.2d 1168, 1174 (W.D. Wash. 2013) ("*Karuk Tribe* cannot reasonably be read to implicitly or silently overrule the Ninth Circuit's reasoned holdings that, in circumstances where a plaintiff challenges a federal agency's failure to act under the citizen suit provision of the ESA, review is not confined to an administrative record."); *Ellis v. Housenger*, No. C-13-1266 MMC, 2015 WL 3660079, at *3 (N.D. Cal. June 12, 2015) (rejecting the argument that *Karuk Tribe* silently overruled *Washington Toxics* and *Kraayenbrink* given that it cites to neither case and "does

31    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
LEAVE TO TAKE DISCOVERY

not address in any manner the issue of whether evidence outside the administrative record can be considered").

Additionally, several courts have rejected the proposition that *Karuk Tribe* overruled *Washington Toxics* and *Kraayenbrink* because the parties in *Karuk Tribe* recognized the case as a record review case, not a citizen-suit case, like here in Claim 2. *White*, 2024 WL 24322, at *3 ("So, *Karuk Tribe* was a 'record review case' because all parties conceded as much."); *Friends of the Clearwater v. Higgins*, 523 F. Supp. 3d 1213, 1219–20, 1220 n.1 (D. Idaho 2021) (explaining "[t]he scope of review was not an issue by the time the court heard" *Karuk Tribe en banc* as "[t]he Ninth Circuit panel that originally heard *Karuk Tribe* upheld" the district court's decision to exclude extra-record evidence, "finding that the merits of the factual dispute supported by the extra-record documents were not relevant to the legal question at issue in the case"). In other words, there is no reason to believe the Ninth Circuit was opining on an issue that was not before the court in the first place.

**D. Cases Examining Statutes Other Than the Endangered Species Act to Determine Scope of Review Are Not Applicable for Review of Endangered Species Act Citizen-Suit Claims.**

Because the Ninth Circuit has held and affirmed that review of Endangered Species Act citizen-suit claims is not limited to an administrative record, this Court should not consider cases applying a different scope of review to statutes other than the Endangered Species Act.

Defendants point to two cases to support their proposition that the scope of review for Endangered Species Act citizen-suit claims is limited to an administrative record, yet neither case involved the Act. In *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 709–10, 714 (1963), a case from over sixty years ago, the Supreme Court determined its scope of review was limited to an administrative record for claims arising under the Wunderlich Act. In *Ninilchik Traditional*

32   PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

*Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000), the Ninth Circuit applied the APA's standard of review to an Alaska National Interest Lands Conservation Act claim. Additionally, although the court relied on a record, it did not expressly adopt the APA's scope of review. *See id.* 1194 ("We adopt the arbitrary and capricious standard…"). Moreover, *Ninilchik* was decided five years before *Washington Toxics*; if the Ninth Circuit wanted to apply the same reasoning and standard or scope of review to an Endangered Species Act citizen-suit claim, it could have chosen to do so.

**E. The Legislative History of the Endangered Species Act Does Not Support a Conclusion That the Court's Review of Claim 2 is Limited to an Administrative Record.**

Contrary to Defendants' assertion, ECF No. 69 at 19–20, the Endangered Species Act's legislative history does not demonstrate that Congress equated silence on the scope of review for citizen-suit claims as incorporating the APA's scope of review. In making this assertion, Defendants rely on a House Conference Report that states: "[t]he Senate bill followed in part and differed in part from the otherwise controlling [APA]; the House bill did not discuss the issue and thereby adopted the APA." ECF No. 69 at 20; H. Conf. Rep. 93-740, at 25, reprinted in 1973 U.S.C.C.A.N. 3001, 3003 (Dec. 19, 1973). Defendants cherry-pick this quote and provide no context. Defendants fail to clarify that this language is in "Section 4. Determination of endangered species and threatened species" of the Report—the section that becomes Section 4 of the final Endangered Species Act, known as the "listing provision." H. Conf. Rep. 93-740, at 24–25. In this section of the Report, the Committee explained that the proposed Senate bill deviated from the APA rulemaking process by requiring "consultation with a special Advisory Committee," but that the House did not discuss requiring a similar body. *Id.* at 24–25. The conferees rewrote this portion of the Senate bill as subsection 4(f), explaining that "[t]he new subsection extends the period of

33    PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR LEAVE TO TAKE DISCOVERY

public notice, provides for discretionary hearings, and establishes procedures whereby emergency action may be taken for a short period, which period may be extended only if the Secretary later goes through the prescribed regulatory procedures." *Id.* at 24–25. Nowhere in this section does the Committee discuss the applicable scope of review. Nowhere in this section does the Committee discuss citizen suits. Defendants rely on an out-of-context quote from a House Conference Report that discusses the Section 4 listing process, a section of the Endangered Species Act not at issue in this case, for the broad proposition that Congress implicitly adopted the APA scope of review for citizen suits bringing a section 7 claim. Such a tortured reading of legislative history fails to support Defendants' erroneous claim that silence equals adoption of the APA. The Supreme Court has cautioned that it is "at best treacherous to find in congressional silence alone the adoption of a controlling rule of law" when there is "at most legislative silence on the crucial statutory language." *United States v. Wells*, 519 U.S. 482, 496, (1997).

IV.    **In Light of the Clear Law in the Ninth Circuit Regarding the Scope of Review, NWEA Is Entitled to Discovery in this Case.**

While NWEA is entitled to employ the full breadth of discovery tools available under the Federal Rules of Civil Procedure, including depositions, interrogatories, requests for admission, and requests for production of documents, NWEA is only seeking a modest amount of discovery here. In the interest of efficiency and judicial economy, NWEA does not intend to use each of these available tools. NWEA intends only to rely on expert testimony, with the potential for expert depositions, to support NWEA's forthcoming motion for summary judgment. NWEA understands and expects EPA to rely on its own expert testimony filed in opposition to NWEA's motion at summary judgment, as well.

Additionally, NWEA suggested a process by which this Court can streamline discovery in its opening brief. ECF No. 65 at 34–35. By limiting the types of discovery it intends to use, and

by providing a streamlined process the Parties may use to develop discovery, NWEA offers a simple and fair process for both Parties to provide evidence for Claim 2.

## **CONCLUSION**

For the foregoing reasons, NWEA respectfully requests that this Court: allow supplementation of NMFS's record, should the Court choose to rule on that issue now; grant NWEA's request to clarify the scope of review; and order that the Parties may use expert testimony, depose expert witnesses, and cross-examine those witnesses in support of their motions for summary judgment.

Respectfully submitted this 22nd day of November, 2024.

/s/ Allison LaPlante

ALLISON LAPLANTE, OSB No. 023614
Attorney at Law
333 NE Russell St. #200
Portland, OR 97212
(503) 351-1326, allison.laplante@gmail.com

LYDIA DEXTER, OSB No. 233151
Earthrise Law Center, Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
(503) 768-6830, lydiadexter@lclark.edu

BRYAN TELEGIN, OSB No. 105253
Telegin Law
175 Parfitt Ave., SW Suite N270
Bainbridge Island, WA 98110
(206) 453-2884, Ext. 101, bryan@teleginlaw.com

*Attorneys for Plaintiff*
*Northwest Environmental Advocates*

35   PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE
     ADMINISTRATIVE RECORD, CLARIFY THE SCOPE OF REVIEW, AND FOR
     LEAVE TO TAKE DISCOVERY